LIONEL Z. GLANCY (#134180)
ROBERT V. PRONGAY (#270796)
LESLEY F. PORTNOY (#304851)
CHARLES H. LINEHAN (#307439)
**GLANCY PRONGAY & MURRAY LLP**
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone:      (310) 201-9150
Facsimile:      (310) 201-9160
Email:          lportnoy@glancylaw.com

*Attorneys for Plaintiff*
[Additional Counsel On Signature Page]

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ROEI AZAR, on Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> vs. <br><br> YELP, INC., JEREMY STOPPELMAN and LANNY BAKER, <br><br> Defendants. | Case No. <br><br> **COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** <br><br> CLASS ACTION <br><br> **DEMAND FOR JURY TRIAL** |

Plaintiff Roei Azar, individually and on behalf of all others similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and upon information and belief as to all other matters based on the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of Securities and Exchange Commission ("SEC") filings by Yelp, Inc. ("Yelp" or the "Company"), as well as media and analyst reports about the Company and conference all transcripts. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a securities class action on behalf of all purchasers of common stock of Yelp between February 10, 2017 and May 9, 2017, inclusive (the "Class Period"), alleging violations of §§10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act").

## JURISDICTION AND VENUE

2.      The claims asserted herein arise under §§10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5, 17 C.F.R. §240.10b-5. Jurisdiction is confirmed by §27 of the Exchange Act, 15 U.S.C. §78aa.

3.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and Section 27 of the Exchange Act (15 U.S.C. §78aa).

4.      Venue is proper in this district pursuant to 28 U.S.C. §1391(b) and Section 27 of the Exchange Act (15 U.S.C. §78aa(c)). The acts and transactions giving rise to the violations of law complained of occurred and Yelp's headquarters are located in this District.

5.      In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the

1  United States mail, interstate telephone communications, and the facilities of a national securities

2  exchange.

3  <center>**PARTIES**</center>

4        6.     Plaintiff Roei Azar purchased Yelp common stock during the Class Period as

5  described in the Certification attached hereto and incorporated herein by reference and suffered

6  damages.

7        7.     Defendant Yelp is a California corporation with its principal executive offices

8  located in San Francisco, California.  Yelp's stock trades on the New York Stock Exchange under

9  the ticker YELP.  The Company's Annual Report filed with the SEC on March 1, 2017 states that

10 79,602,606 shares of Yelp common stock were issued and outstanding as of February 23, 2017.

11       8.     Defendant Jeremy Stoppelman ("Stoppelman") is, and was at all relevant times, the

12 Chief Executive Officer ("CEO") of Yelp and a member of its Board of Directors.

13       9.     Defendant Lanny Baker ("Baker") is, and was at all relevant times, the Chief

14 Financial Officer ("CFO") of Yelp.

15       10.    During the Class Period, Defendants Stoppleman and Baker oversaw the

16 Company's operations and finances. Defendants Stoppleman and Baker were intimately

17 knowledgeable about all aspects of Yelp's financial and business operations and were also

18 intimately involved in deciding which disclosures would be made by Yelp. Defendants

19 Stoppleman and Baker made various public statements for Yelp during the Class Period, and

20 participated in Class Period investor conferences.

21 <center>**DEFENDANTS' FALSE AND MISLEADING CLASS PERIOD STATEMENTS**</center>

22       11.    Yelp is an online review company to seek to provide a platform for businesses and

23 consumers to interact regarding goods and services.  Yelp provides business with both free and

24 paid services and derives most of its revenue though the sale of advertising products.    As with

many online businesses, adoption by mobile users was critical to Yelp's growth and success. Investors closely tracked Yelp's ability to generate revenue from repeat customers, particularly with local businesses, which were a primary source of revenue for the Company.

12.     The Class Period starts on February 10, 2017, the first day of trading after Yelp announced its financial results for the fourth quarter 2016 ("4Q 2016") and 2016 annual ("FY2016") results after the close of trading on February 9, 2017.

13.     The February 9 press release revealed that Yelp 4Q 2016 revenue grew 27% over fourth quarter of 2015 and generated net income of $8.3 million, compared to a net loss of $22.2 million in the fourth quarter of 2016.  Defendant Stoppleman is quoted in the press release, in relevant part, as follows:

> We had an outstanding year, growing local revenue by 39%[.] I am extremely proud of how Yelp **has become deeply integrated into consumers' daily habits and increasingly essential to local business owners**. In 2017, we look forward to increasing engagement on the app, expanding transactions and broadening our sales strategy.

14.     Yelp also provided financial guidance for the first quarter of 2017 ("1Q 2017") in the press release, stating:

> For the first quarter of 2017, net revenue is expected to be in the range of $195 million to $199 million, representing growth of approximately 25% compared to the first quarter of 2016 at the midpoint of the range. Adjusted EBITDA is expected to be in the range of $25 million to $28 million. Stock-based compensation is expected to be in the range of $26 million to $27 million, and depreciation and amortization is expected to be approximately 4.5% to 5% of revenue.

15.     Yelp also provided financial guidance for fiscal 2017 ("FY2017") in the press release, stating:

> For the full year of 2017, net revenue is expected to be in the range of $880 million to $900 million, representing growth of approximately 25% compared to full year 2016 at the midpoint of the range. Adjusted EBITDA is expected to be in the range of $150

million to $165 million. Stock-based compensation is expected to be in the range of $110 million to $112 million, and depreciation and amortization is expected to be approximately 4.5% to 5% of revenue.

16.     Defendants also conducted a conference call with analysts on February 9, 2017 to discuss Yelp's 4Q2016 and FY2016 financial results.

17.     On the conference call, Defendant Stoppleman described the FY2016 performance as follows:

> Our strong 2016 results reflect the successful execution of our priorities for the year. **We grew local revenue 39%, compared to 2015 by driving strong productivity in our local SMB business**. . .
>
> ****
>
> Executing well on these priorities sets Yelp up for continued growth in 2017, and we're excited about the potential we see in the year ahead. **Local advertising dollars continue to shift online at a fast pace.**

18.     Defendant Baker discussed Yelp's expectations for FY2017, saying:

> Looking to 2017, our current outlook is that total revenue for the year will be in the range of $880 million to $900 million, representing a 25% increase at the midpoint of the range.
>
> ****
>
> As indicated in our press release, our current outlook for first-quarter 2017 revenue is a range of $195 million to $199 million, an increase of 25% year-to-year at the midpoint. Adjusted EBITDA is expected to be $25 million to $28 million for the first quarter, up from $13 million in the first quarter of 2016.

19.     Defendant Baker elaborated on Yelp's opportunity to grow local advertizing dollars by stressing the size of the market in the following statement:

> So we were, in a year in which we were increasing our brand spend in 2016, a year in which we're walking away from brand advertising revenue dollars, and showed that kind of leverage. And I think that's inherent, and unchanged in the model. But when we turned, and we looked at the opportunity ahead of Yelp, $700 million of revenue is sizable, but we're still pretty small in terms of the long-term

opportunity we believe. **We've got 138,000 advertisers in a market that is 20 million local businesses,** and I'd point out, 3.4 million claimed businesses on Yelp.

20.    Defendant Stoppleman described strength in Yelp's ability to generate advertising sales from repeat customers in the following exchange:

On the repeat rate, obviously, repeat rate is a mix of folks who have advertised with us in the past, and that's at an all-time high right now. **And while, we're really encouraged by our kind of strong, embedded client base, and that's a really kind of healthy number to understand that those folks are coming back**, it's double-edged sword, because we also think that making sure that we get enough new clients into the pipeline is really an important initiative for the Company.

And so, **we're not alarmed in any way, about where we are in the repeat rate side**, but you'd love to see -- again, adding the number of local advertising accounts. Even if we were up in the 7,000, 8,000, 10,000 range, based on the opportunity that we actually have in this marketplace, with millions of businesses that have claimed their presence on Yelp, **we think we're still the very early stages**. And we've got to look at both sides of the coin here, making sure that we're driving new business, **and taking advantage of kind of the existing client base that has very nice trends behind it.**

21.    Defendant Stoppleman further assured investors that its growth in local advertising was strong in the following exchange:

**YOUSSEF SQUALI, ANALYST, CANTOR FITZGERALD:** I guess, given that the local ad account metric may start losing some of its meaning over time, can you just help us maybe quantify the contribution of the national accounts and the self-serve initiatives for the quarter, either terms of contribution to growth, or contribution in dollars? . . .

**JEREMY STOPPELMAN:** . . .And from a source of growth in terms of the dollars, **the majority of the dollar growth is still very much coming from our sort of wheelhouse engine, that is our local sales team**. And we think there is a lot of track ahead of that team, to continue to penetrate the marketplace.

22.    The price of Yelp common stock traded at a Class Period high of more than $38 per share on February 10, 2017 on extremely high volume relative to Yelp's average.

23.     The statements referenced above in ¶¶ 12-21 were each materially false and misleading because they failed to disclose and misrepresented the following adverse facts known by Defendants Stoppleman and Baker during the Class Period:

a.   Yelp's transition from a Cost-Per-Thousand-Impressions (CPM) to a Cost-Per-Click (CPC) model in FY2016 created a distinct cohort of local advertisers that would reach the end of their contracts during the first part of FY2017;

b.   New customers that signed on with Yelp under the CPC pricing model had lower retention rates because the customers did not effectively compete with Yelp's more established customers;

c.   As a result of the lower retention rates, Yelp was not on track to achieve its financial guidance or results during the Class Period.

## THE TRUTH IS REVEALED

24.     On May 9, 2017, after the close of trading, Defendants announced Yelp's 1Q 2017 financial results.  While Yelp's 1Q 2017 revenue and adjusted EBITDA met the Company's prior expectations, the Company was revising its FY2017 guidance downward to reflect poor retention rates with existing customers.

25.     Yelp reported 1Q 2017 revenue of $197.3 million and adjusted EBITDA of $29.3 million.  Yelp, however, disclosed that the Company's local advertising accounts had only risen to 143,000, below analyst expectations.

26.     As a result, Yelp significantly lowered its financial guidance for the second quarter of 2017 ("2Q 2017") and the remainder of FY2017. Yelp adjusted its FY2017 annual revenue guidance to between $850 million to $865 million, down from $880 million to $890 million claimed on February 9, 2017, and lowered its adjusted EBITDA guidance for FY2017 to between $130 million and $145 million.

27.     Defendants held a conference call with analysts on May 9, 2017 to discuss Yelp's 1Q 2017 financial results.

28.     Defendant Stoppleman revealed in his prepared remarks that, during most of the first quarter retention rates – *i.e.* repeat customers – were not high enough to support Yelp's financial guidance for the year. Specifically, Defendants Stoppleman revealed the following:

> While we're encouraged by the normalization of production in the first quarter, **we did see a decline in retention that has impacted our outlook**. However, **revenue retention improved towards the end of the first quarter and through April**. Given the disproportionate impact first quarter performance has on our annual results, we've reduced our outlook for the balance of the year.

29.     Defendant Baker went on to confirm that Yelp's was not performing up to historical expectations with regard to repeat customers from the start of 1Q2017 when he made the following comment:

> Advertising revenue grew 24% year-to-year in the first quarter to $177 million. During the first quarter, we saw a recovery in local sales rep productivity and continued strong growth in the self-serve channel. However, **revenue growth across all 3 primary channels** -- local, national and self-serve, **decelerated from the prior quarter as well as from the prior year. The biggest factors slowing revenue growth were** the carryover effect of soft local sales production in the fourth quarter, and **lower account retention in early 2017.**
>
> ****
>
> Turning to account and revenue retention. We experienced weaker-than-expected revenue retention in our local ad business in the first quarter. And those losses early in the year have an outsized impact on our full year revenue outlook. **At the start of the year, overall local revenue churn was at the upper end of the range we normally see and we've identified several factors contributing to those trends**. The account growth and revenue growth acceleration we saw at the start of 2016 created an echo of contract terminations in the recent quarter, **and an uptick in less well-established local businesses within our customer base brought greater account turnover as these business owners typically have a harder time competing with our more well-established advertisers**. We've adjusted our business outlook for 2017 to reflect what we saw in the

first quarter and to reflect a cautious approach to the remainder of the year.

30.    Defendant Baker further described the impact of the lower retention rates on Yelp's FY2017 financial outlook, stating in relevant part:

> Based on the results of the first quarter, **our experience with account retention at the start of the year** and the acquisition of Turnstyle at the start of the second quarter, we're updating our business outlook for 2017. We now anticipate full year 2017 revenue will be in a range of $850 million to $865 million, with the midpoint of that range representing 20% growth over full year 2016. Based on that revenue outlook, we're also updating our full year adjusted EBITDA to a range of $130 million to $145 million, which equates to growth of 15% over 2016 adjusted EBITDA at the midpoint.
>
> **The primary factor within the change in business outlook is the local revenue challenge we experienced in the first quarter.** We believe local sales rep productivity will continue to trend favorably compared to the fourth quarter of last year and we expect to continue to grow the self-serve channel strongly in 2017 and beyond. The revised outlook contemplates some improvement in account retention as we move beyond the first quarter into the rest of the year. However, we are taking a cautious approach with the outlook for 2017. Retention improvements from here forward will be expected to have a bigger impact on 2018 than they will within the current year.

31.    Yelp's Chief Operating Officer, Joseph R. Nachman (Nachman"), provided further details about the decline in retention rates in 1Q 2017 that impacted Yelp's expected full year performance in the following exchange:

> **So we recognize the churn issue about halfway through the quarter and we're able to tie it back actually to a distinct cohort of advertisers that came on Yelp about a year ago as we were making the transition from CPM to CPC.** We saw that there were different retention characteristics amongst that cohort, more emerging businesses on Yelp that had trouble competing in the ad system with some of the more established businesses.

32.    Defendant Baker explained how the decline in retention rates impacted expectations for Yelp's FY2017 financial performance, stating in relevant part:

1

[T]he way the business works is that retention has a big impact over the course of the forward 12-month period. And when retention is weaker than anticipated of the start of the year, those are missing revenues sort of in the plan for the rest of the year. We exited the quarter with a smaller core book of business than we anticipated because the retention had been worse during the first quarter. As Jed said, it got better towards the end of the quarter

33.     Nachman further described the underlying reason for the decline in retention rates occurred in January and February of 2017 and was the result of Yelp's business practices, stating in relevant part:

So specifically, as it relates to the retention issue, it was concentrated, obviously, *in a cohort that surfaced around the beginning of last year.* When we made the transition from CPM to CPC, there was certainly a learning curve in terms of how people sold the product and there are, in fact, some other pockets of folks that we couldn't approach before, just based on the product that folks went out and kind of got right there initially when the CPC product was released. We recognize that and upstream have put things in place in order to make sure that our sales reps' upstream work were calling on the right clients. *And we addressed this kind of acute problem in January and February.* We put this recovery team on higher response rates, put a lot of focus on that particular cohort and the numbers have kind of spoken for themselves *as we've gotten into March and April.* So we're feeling comfortable about where we are there. I guess taking a step back on the retention issue, we've been really focused on retention and revenue -- account retention and revenue retention for the better part of last year.

34.     Defendant Stoppleman further explained how the decline in retention rates was driven by changes to Yelp's pricing model in the following exchange:

[A]s we moved from [Cost-Per-Thousand-Impressions] to [Cost-Per-Click], it opened up a variety of leads that weren't available prior to that. And so of course, the sales force went after it and that slightly changed our mix of advertisers as far as how many are engaged in this at a different level. *And so that then shows up as all of those folks come off of their term a year later, and so that's what we're seeing.* The sales force did normalize over time as they got used to the CPC product and the opportunities were more consistent month over month, and so we believe that effect goes away. But there was a transitional thing that happened there.

35.     The price of Yelp common stock declined significantly on May 10, 2017, the first trading day after the Company reported its 2Q 2017 results. Yelp's stock price closed at $34.70

1  on May 9, 2017 and fell to as low as $26.93 on May 10, 2017 before closing at $28.33.  Volume

2  exceeded 47 million shares traded on May 10, 2017 compared to just 1.3 million shares traded on

3  May 5, 2017 and 3.2 million traded on May 9, 2017.

4
5  ### DEFENDANT STOPPLEMAN'S SUSPICIOUS STOCK SALES SUPPORT SCIENTER

6  36.    Despite telling investors on February 9, 2017 that no reason existed to be

7  concerned about Yelp's retention rates, Defendants later admitted that during January and

8  February 2017 the Company was experiencing lower retention rates with a distinct cohort of

9
10  advertising customers as a result of Yelp's prior change in pricing.

11  37.    Defendant Stopplement took advantage of the artificially inflated price of Yelp

12  stock resulting from the false statements by selling a significant amount of his personally held

13  shares in the days and weeks following the February 9, 2017 disclosure of Yelp's financial results.

14  38.    Defendant Stoppleman made the follows stock sales during the Class Period:

15
16

| Date | Shares Sold | Price | Total Proceeds |
|---|---|---|---|
| 2/16/2017 | 250,000 | $35.0981 | $8,774,525 |
| 3/3/2017 | 250,000 | $33.6794 | $8,419,850 |
| 3/15/2017 | 250,000 | $33.7441 | $8,436,025 |

21  39.    These sales were suspicious in both timing and amount.  The three sales generated

22  proceeds of $25,630,400 and constituted approximately 20% of his holdings.  Such dramatic

23  selling was inconsistent with Defendant Stoppleman's prior trading practices.

24
25  ### NO SAFE HARBOR

26  40.    Most of the false and misleading statements related to existing facts or conditions,

27  and the Safe Harbor provisions have no applicability to such statements.  To the extent that known

28  trends should have been included in the Company's financial reports prepared in accordance with

GAAP, they too are excluded from the protection of the statutory Safe Harbor.  15 U.S.C. §78u-5(b)(2)(A).

41.    Yelp's "Safe Harbor" warnings accompanying its reportedly forward-looking statements issued during the Class Period were also ineffective to shield those statements from liability.    Defendants Stoppleman and Baker are liable for any false or misleading forward-looking statements because, at the time each forward-looking statements was made, the speaker knew the forward-looking statements was false or misleading and the forward-looking statements was authorized and/or approved by an executive officer and/or director of Yelp who knew that the forward-looking statements was false.    In addition, the forward-looking statements were contradicted by existing, undisclosed material facts that were required to be disclosed so that the forward-looking statements would not be misleading.    Finally, most of the purported "Safe Harbor" warnings were themselves misleading because they warned of "risks" that had already materialized or failed to provide meaningful disclosures of the relevant risks.

**ADDITIONAL SCIENTER ALLEGATIONS**

42.    As alleged herein, Defendants Stoppleman and Baker acted with scienter in that each knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  As set forth elsewhere herein in detail, Defendants Stoppleman and Baker, by virtue of their receipt of information reflecting the true facts regarding Yelp, their control over, and/or receipt of modification of Yelp's allegedly materially misleading misstatements and/or his associations with the Company which made them privy to confidential proprietary information concerning Yelp, participated in the fraudulent scheme alleged herein.

**APPLICABILITY OF PRESUMPTION OF RELIANCE:**

**FRAUD-ON-THE-MARKET DOCTRINE**

43.     At all relevant times, the market for Yelp's common stock was an efficient market for the following reasons, among others:

(a)     Yelp's stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b)     The Company had more than 79.6 million shares outstanding as of February 9, 2017.  During the Class Period, on average, 2,742,605 shares of Yelp stock were traded on a daily basis, demonstrating a very active and broad market for Yelp stock and permitting a very strong presumption of an efficient market;

(c)     as a regulated issuer, Yelp filed periodic public reports with the SEC;

(d)     Yelp regularly communicated with public investors via established market communication mechanisms, including regular disseminations of press releases on the national circuits of major newswire services, the Internet and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

(e)     Yelp was followed by many securities analysts who wrote reports that were distributed during the Class Period.  Each of these reports was publicly available and entered the public marketplace; and

(f)     unexpected material news about Yelp was rapidly reflected in and incorporated into the Company's stock price during the Class Period.

44.     As a result of the foregoing, the market for Yelp common stock promptly digested current information regarding Yelp from publicly available sources and reflected such information in Yelp's stock price.  Under these circumstances, all purchasers of Yelp common stock during the

Class Period suffered similar injury through their purchase of Yelp common stock at artificially inflated prices, and a presumption of reliance applies.

## LOSS CAUSATION

45.     During the Class Period, as detailed herein, Defendants Stoppleman and Baker made false and misleading statements, and omitted material information, concerning Yelp's business fundamentals and financial prospects and engaged in a scheme to deceive the market.

46.     By artificially inflating and manipulating Yelp's stock price, Defendants Stoppleman and Baker deceived Plaintiff and the Class and caused them losses when the truth was revealed.  Defendants Stoppleman's and Baker's prior misrepresentations and fraudulent conduct became apparent to the market on May 9, 2017, causing Yelp's stock price to fall precipitously as the prior artificial inflation came out of the stock price.  As a result of their purchases of Yelp securities during the Class Period, Plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

## CLASS ACTION ALLEGATIONS

47.     This is a class action on behalf of those who purchased or otherwise acquired Yelp common stock between February 9, 2017 and May 9, 2017, inclusive, excluding Defendants Stoppleman and Baker (the "Class").  Also excluded from the Class are officers and directors of the Company as well as their families and the family of Defendants Stoppleman and Baker.  Class members are so numerous that joinder of them is impracticable.

48.     Common questions of law and fact predominate and include whether Defendants Stoppleman and Baker: (a) violated the Exchange Act; (b) omitted and/or misrepresented material facts; (c) knew or recklessly disregarded that their statements were false; (d) artificially inflated the price of Yelp common stock; and (e) the extent of and appropriate measure of damages.

49.     Plaintiff's claims are typical of those of the Class.   Prosecution of individual actions would create a risk of inconsistent adjudications.   Plaintiff will adequately protect the interests of the Class.   A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## COUNT I

### For Violation of Section 10(b) of the Exchange Act
### and Rule 10b-5 Against All Defendants

50.     Plaintiff repeats and realleges the above paragraphs as though fully set forth herein.

51.     Throughout the Class Period, Defendants Yelp, Stoppleman and Baker, in pursuit of their scheme and continuous course of conduct to inflate the market price of Yelp common stock, had the ultimate authority for making, and knowingly or recklessly made, materially false or misleading statements or failed to disclose material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading.

52.     During the Class Period, Defendants Yelp, Stoppleman and Baker, and each of them, carried out a plan, scheme, and course of conduct using the instrumentalities of interstate commerce and the mails, which was intended to and, throughout the Class Period did: (a) artificially inflate and maintain the market price of Yelp common stock; (b) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (c) cause Plaintiff and other members of the Class to purchase Yelp common stock at inflated prices; and (d) cause them losses when the truth was revealed.   In furtherance of this unlawful scheme, plan and course of conduct, Defendants Yelp, Stoppleman and Baker took the actions set forth herein, in violation of §10(b) of the Exchange Act and Rule 10b-5, 17 C.F.R. §240.10b-5.

53.     In addition to the duties of full disclosure imposed on Defendants Yelp, Stoppleman and Baker as a result of their affirmative false and misleading statements to the investing public, these Defendants had a duty to promptly disseminate truthful information with

respect to Yelp's operations and performance that would be material to investors in compliance with the integrated disclosure provisions of the SEC, including with respect to the Company's revenue and earnings trends, so that the market price of the Company's securities would be based on truthful, complete and accurate information.  SEC Regulations S-X (17 C.F.R. §210.01, *et seq.*) and S-K (17 C.F.R. §229.10, *et seq.*).

54.     Defendants Yelp, Stoppleman and Baker had actual knowledge of the misrepresentations and omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and disclose such facts, even though such facts were either known or readily available to them.

55.     As a result of the dissemination of the materially false and misleading information and failure to disclose material facts as set forth above, the market price of Yelp common stock was artificially inflated during the Class Period.  In ignorance of the fact that the market price of Yelp common stock was artificially inflated, and relying directly or indirectly on the false and misleading statements made knowingly or with deliberate recklessness by Defendants Yelp, Stoppleman and Baker, or upon the integrity of the market in which the shares traded, Plaintiff and other members of the Class purchased Yelp stock during the Class Period at artificially high prices and, when the truth was revealed, were damaged thereby.

56.     Had Plaintiff and the other members of the Class and the marketplace known of the true facts, which were knowingly or recklessly concealed by Defendants Yelp, Stoppleman and Baker, Plaintiff and the other members of the Class would not have purchased or otherwise acquired their Yelp shares during the Class Period, or if they had acquired such shares during the Class Period, they would not have done so at the artificially inflated prices which they paid.

57.     By virtue of the foregoing, Defendants Yelp, Stoppleman and Baker have violated §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.  17 C.F.R. §240.10-5.

**COUNT II**

**For Violation of Section 20(a) of the Exchange Act**
**Against the Individual Defendants**

58.     Plaintiff repeats and realleges the above paragraphs as though fully set forth herein.

59.     Defendants Stoppleman and Baker had control over Yelp and made the material false and misleading statements and omissions on behalf of Yelp within the meaning of §20(a) of the Exchange Act as alleged herein.  By virtue of their executive positions and stock ownership, as alleged above, Defendants Stoppleman and Baker had the power to influence and control and did, directly or indirectly, influence and control the decision making of the Company, including the content and dissemination of the various statements which Plaintiff contends were false and misleading.  Defendants Stoppleman and Baker were provided with or had unlimited access to the Company's internal reports, press releases, public filings, and other statements alleged by Plaintiff to be misleading prior to or shortly after these statements were issued, and had the ability to prevent the issuance of the statements or cause them to be corrected.

60.     In particular, Defendants Stoppleman and Baker had direct involvement in and responsibility over the day-to-day operations of the Company and, therefore, are presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein.

61.     By reason of such wrongful conduct, Defendants Stoppleman and Baker are liable pursuant to §20(a) of the Exchange Act.   As a direct and proximate result of Defendants Stoppleman's and Baker's wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment as follows:

A.      Determining that this action is a proper class action, designating plaintiff as Lead Plaintiff and certifying plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and plaintiff's counsel as Lead Counsel;

B.      Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.      Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.      Awarding such other and further relief as the Court may deem just and proper.

**JURY DEMAND**

Plaintiff demands a trial by jury.


DATED: January 18, 2018                    **GLANCY PRONGAY & MURRAY LLP**


                                           By:  *s/ Lesley F. Portnoy*
                                           Lionel Z. Glancy
                                           Robert V. Prongay
                                           Lesley F. Portnoy
                                           Charles H. Linehan
                                           1925 Century Park East, Suite 2100
                                           Los Angeles, CA 90067
                                           Telephone:  (310) 201-9150
                                           Facsimile:  (310) 201-9160
                                           Email: lportnoy@glancylaw.com

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**HOLZER & HOLZER, LLC**
Corey D. Holzer
Marshall P. Dees
Alexandria P. Rankin
1200 Ashwood Parkway, Suite 410
Atlanta, Georgia 30338
Telephone: (770) 392-0090
Facsimile: (770) 392-0029

*Attorneys for Plaintiff*

**Plaintiff Certifies That:**

1. Plaintiff has reviewed the complaint and authorized its filing.
2. Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.
3. Plaintiff is willing to serve as a representative party on behalf of a class, including providing testimony at deposition and trial, if necessary.
4. Plaintiff represents and warrants that he/she/it is fully authorized to enter into and execute this certification.
5. Plaintiff will not accept any payment for serving as a representative party on behalf of a class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.
6. Plaintiff has made no transaction(s) during the Class Period in the debt or equity securities that are the subject of this action except those set forth below:

**Plaintiff's Class Period Transactions:**

| Class Period Purchases: | | |
| --- | --- | --- |
| Date Purchased | Number of Shares Acquired | Acquisition Price Per Share |
| 5.5.17 | 3520 | 35.6495 |

**7. During the three years prior to the date of this Certification, Plaintiff has not sought to serve or served as a representative party for a class in an action filed under the federal securities laws except if detailed below (enter none if not applicable):**

**I declare under penalty of perjury, under the laws of the United States, that the information entered is accurate.**

- I agree.

**I intend to sign and execute this Agreement and retain Holzer & Holzer, LLC to proceed on my behalf.**

- I agree.

**Signature** *



Date: May 11, 2017        Name:  Roei Azar

\* Signed pursuant to the Uniform Electronic Transactions act as adopted by the various states and territories of the United States.