LIONEL Z. GLANCY (#134180)
ROBERT V. PRONGAY (#270796)
STAN KARAS (#222402)
CHRISTOPHER R. FALLON (#235684)
**GLANCY PRONGAY & MURRAY LLP**
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160
Email: info@glancylaw.com

*Attorneys for Plaintiffs and the Class*
[Additional Counsel On Signature Page]

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| JONATHAN DAVIS and ROEI AZAR, on Behalf of All Others Similarly Situated,<br><br>Plaintiffs,<br><br>v.<br><br>YELP, INC., JEREMY STOPPELMAN, LANNY BAKER, and JED NACHMAN<br><br>Defendants. | Case No. 3:18-cv-00400-EMC<br><br>**AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br><u>**DEMAND FOR JURY TRIAL**</u> |

# <u>TABLE OF CONTENTS</u>

I.     NATURE OF THE ACTION ....................................................................................... 1

II.    JURISDICTION AND VENUE ................................................................................... 3

III.   PARTIES ..................................................................................................................... 3

IV.    BACKGROUND .......................................................................................................... 5

    A.   Overview Of Yelp's Business ........................................................................... 5

    B.   Yelp's Transition From Cost Per Impression to Cost Per Click Advertising
       In 2015.............................................................................................................. 6

    C.   Yelp's Business Model Provided Defendants Substantial Insight Into Future
       Revenues .......................................................................................................... 6

    D.   Performance Metrics Gave Defendants Direct Insight Into Future Revenues .......... 8

V.     OVERVIEW OF DEFENDANTS' FRAUD ............................................................... 9

    A.   In 2016, Yelp Trumpets Its Impressive Growth And Retention ............................... 9

       1.   Yelp Adds A Record Number Of New Accounts in 1Q'16 ......................... 9

       2.   Yelp's Growth Continued Throughout 2016 ............................................. 10

    B.   Defendants Were Acutely Focused On Retention Throughout 2016 And
       Were Admittedly Monitoring The Retention Rate Of Advertisers Added In
       Q1'16.............................................................................................................. 11

    C.   Defendants Issue Overstated 2017 Guidance While Concealing That Elevated Churn
       Among Local Advertising Customers Added In Q1'16 Is Negatively Impacting Yelp's
       Financial Performance And Undermining The Company's 2017 Guidance ......... 14

    D.   The Truth Emerges Causing Yelp's Stock To Plummet ....................................... 16

    E.   Defendants Belatedly Admit That The Churn Issue Was A Known Problem Since
       Late 2016 Yet Was Not Factored Into The Company's 2017 Guidance ................ 16

VI.    DEFENDANTS' FALSE AND MISLEADING  STATEMENTS DURING THE CLASS
      PERIOD .................................................................................................................... 20

    A.   Yelp's February 9, 2017 Press Release .................................................................. 20

    B.   Yelp's February 9, 2017 Earnings Conference Call .............................................. 21

C.   Yelp's Annual Report On Form 10-K Filed On March 1, 2017 ............................ 26

D.   The March 1, 2017 Morgan Stanley Technology, Media & Telecom Conference. 27

VII.   LOSS CAUSATION ........................................................................................ 29

VIII.   POST-CLASS PERIOD DISCLOSURES ........................................................... 30

IX.   ADDITIONAL SCIENTER ALLEGATIONS .................................................... 31

A.   Defendant Stoppelman's Suspicious Stock Sales Support Scienter........................ 31

B.   Engagement And Revenue Retention Were Core Operations ................................ 35

C.   Defendants Repeatedly Touted The Visibility And Predictability Of Revenues.... 37

X.   CLASS ACTION ALLEGATIONS.................................................................... 39

XI.   APPLICABILITY OF PRESUMPTION OF RELIANCE ................................. 40

XII.   NO SAFE HARBOR........................................................................................ 42

XIII.   PRAYER FOR RELIEF ................................................................................... 45

XIV.   JURY TRIAL DEMANDED ........................................................................... 45

1         Lead Plaintiff Jonathan Davis and Plaintiff Roei Azar (collectively, "Plaintiffs"), individually

2   and on behalf of all others similarly situated, by Plaintiffs' undersigned attorneys, for Plaintiffs'

3   complaint against Defendants, allege the following based upon personal knowledge as to Plaintiffs

4   and Plaintiffs' own acts, and upon information and belief as to all other matters based on the

5   investigation conducted by and through Plaintiffs' attorneys, which included, among other things: (a)

6   review and analysis of regulatory filings made by Yelp, Inc. ("Yelp" or the "Company"), with the

7   United States Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases

8   and media reports issued by and disseminated by Yelp; and (c) review of other publicly available

9   information concerning Yelp.

10   **I.**      **<u>NATURE OF THE ACTION</u>**

11         1.      This is a securities fraud class action on behalf of a class of persons and entities that

12   purchased or acquired Yelp securities between February 10, 2017 and May 9, 2017, inclusive (the

13   "Class Period"), seeking to pursue remedies under Sections 10(b) and 20(a) of the Securities

14   Exchange Act of 1934 (the "Exchange Act").

15         2.      Yelp is an online platform devoted largely to reviews of businesses.  Yelp's revenues

16   depend heavily on advertising.

17         3.      In or about the beginning of 2016, Yelp focused on increasing advertising from local

18   businesses, as opposed to national or other large chains.  To effect this policy, Yelp implemented

19   various promotional offers to local businesses, encouraging them to sign up for year-long advertising

20   contracts. This included a significant concentration of advertisers added in Q1'16. Yelp discouraged

21   early termination of these contracts by imposing hefty early termination fees.  Defendants expected

22   that a substantial number of customers would start cancelling their contracts in late 2016 and Q1'17,

23   when the advertisers would no longer have to pay a termination fee.  Indeed, Defendant Jeremy

24   Stoppelman belatedly admitted (on a February 7, 2018 earnings conference call with the public) that

25   "[Defendants] anticipated that [advertisers brought on in the early part of 2016] would churn off. . .," 

26   especially those advertisers with lower levels of engagement (*i.e.,* few reviews and photos on the

27   platform).

28

4.      Nevertheless, throughout 2016, Defendants emphasized their high retention levels for advertisers.  They also highlighted their access to real-time performance metrics, which would allow them to predict retention with great precision.  The strategy culminated in Defendants' issuance of 2017 guidance on the February 9, 2017.  Specifically, Defendants informed the market that "[f]or the full year of 2017, net revenue is expected to be in the range of $880 million to $900 million, representing growth of approximately 25% compared to full year 2016. . ."  On an analyst conference call regarding the guidance, Defendant Jed Nachman touted the Company's "strong, embedded client base," while Defendant Stoppelman highlighted "80% of [advertisers] who are saying I'm repeating." During the Class Period, Defendants made numerous additional statements emphasizing high levels of advertiser retention, while being fully aware that numerous advertising contracts would expire in Q1'17, which would lead to substantial churn.

5.      Defendants concealed from investors that in late 2016 through February 2017, Yelp was experiencing weak revenue retention in its local advertising business.  In fact, at the start of the year, overall local revenue churn was at the upper end of the range that Yelp had normally seen and was especially pronounced amongst the group of advertisers added in Q1'16.  Nevertheless, when Yelp provided guidance to investors on February 9, 2017, Defendants did not take into account the substantial weakness in retention it was experiencing in late 2016 and January 2017. Defendants' failure to do so rendered the guidance materially false and misleading because, as Defendants would belatedly admit after the Class Period, retention has a big impact over the course of a forward twelve month period and when retention is weaker than anticipated at the start of the year, revenues from those advertisers will be missing even though included in Yelp's plan for the full year. Effectively, Defendants revenue guidance for 2017 included revenue from a substantial number of advertisers even though those advertisers were churning at a higher than expected/planned rate, including, contracts already churned in January 2017. While this information was being concealed from investors, Defendant Stoppelman took advantage and dumped $25 million of Yelp stock after the Company's issuance of the 2017 guidance in February 2017.

6.      Defendants were finally forced to acknowledge the truth.  On May 9, 2017, Yelp issued a press release announcing 1Q'17 financial results and slashed its 2017 guidance from a range of $880

million - $900 million to $850 million - $865 million in revenue, and from $150 million - $165 million to $130 million - $145 million in adjusted EBITDA. Defendants attributed the poor financial results and guidance to the churn of advertisers in Q1'17, which Defendants had anticipated and which Defendants sought to conceal by repeatedly touting their high retention numbers.

7.      As a result of the Company's decreased 2017 guidance, Yelp's stock price plummeted from $34.70 on May 9, 2017 to as low as $26.93 on May 10, 2017 before closing at $28.33 on unusually high volume, a decline in excess of 18%, on unusually heavy trading volume. By this action, Plaintiffs seeks to recover the losses caused by Defendants' false and misleading statements and omissions.

## II.      JURISDICTION AND VENUE

8.      The claims asserted herein arise under §§10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5, 17 C.F.R. §240.10b-5. Jurisdiction is confirmed by §27 of the Exchange Act, 15 U.S.C. §78aa.

9.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and Section 27 of the Exchange Act (15 U.S.C. §78aa).

10.      Venue is proper in this district pursuant to 28 U.S.C. §1391(b) and Section 27 of the Exchange Act (15 U.S.C. §78aa(c)). The acts and transactions giving rise to the violations of law complained of occurred and Yelp's headquarters are located in this District.

11.      In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## III.      PARTIES

12.      Lead Plaintiff Jonathan Davis purchased Yelp common stock during the Class Period, as described in the Certification previously filed with the Court (ECF. 14-2) and incorporated herein by reference, and suffered damages.

13.     Plaintiff Roei Azar purchased Yelp common stock during the Class Period, as described in the Certification previously filed with the Court (ECF. 1 at 20) and incorporated herein by reference, and suffered damages.

14.     Defendant Yelp is a California corporation with its principal executive offices located in San Francisco, California. Yelp's stock trades on the New York Stock Exchange under the ticker YELP. The Company's Annual Report filed with the SEC on March 1, 2017 states that 79,602,606 shares of Yelp common stock were issued and outstanding as of February 23, 2017.

15.     Defendant Stoppelman is the co-founder, and was at all relevant times, the Chief Executive Officer ("CEO") of Yelp and a member of its Board of Directors.

16.     Defendant Charles "Lanny" Baker ("Baker") is, and was at all relevant times, the Chief Financial Officer ("CFO") of Yelp.

17.     Defendant Jed Nachman ("Nachman") is, and was at all relevant times, the Chief Operating Officer ("COO") of Yelp, and previously served as the Company's Chief Revenue Officer from January 2016 to August 2016, Senior Vice President of Revenue from September 2011 to January 2016 and Vice President of Sales from January 2007 to September 2011.

18.     During the Class Period, Defendants Stoppelman, Baker, and Nachman oversaw the Company's operations and finances. Defendants Stoppelman, Baker, and Nachman were intimately knowledgeable about all aspects of Yelp's financial and business operations and were also intimately involved in deciding which disclosures would be made by Yelp. Defendants Stoppelman, Baker, and Nachman made various public statements for Yelp during the Class Period, and participated in Class Period investor conferences.  The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Yelp's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market.  Each Individual Defendant, during their tenure, was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and access to material non-public information available to them, each of these defendants knew that the adverse facts specified herein had not been disclosed to, and

were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading.  The Individual Defendants are liable for the false statements pleaded herein, as those statements were each "group-published" information, the result of the collective actions of the Individual Defendants.

## IV.     BACKGROUND

### A.     Overview Of Yelp's Business

19.     Yelp is a leading online review platform for consumers to share their everyday local business experiences with other consumers by posting reviews, tips, photos and videos, and to engage directly with businesses. Yelp also provides businesses with a variety of free and paid services that help them engage with consumers. The Company allows businesses to register a business account for free and "claim" the Yelp business listing page for each of their locations, allowing them to provide additional information about their business and respond to reviews, among other features. Businesses can pay for premium services to promote themselves through targeted search advertising, discounted offers and further enhancements to their business listing pages.

20.     Yelp's advertising revenues were generated through three sales channels, its core local advertisers, national advertisers, and self-serve advertisers. Yelp's core local channel is focused on small and medium sized businesses who are directly engaged by its sales force, who are focused on adding new customers and are compensated by advertising sold in a given period.  This segment accounted for approximately 70% of the Company's advertising revenues in 2016.

21.     The Company had 121 million cumulative reviews through 2016.  The reviews, ratings, tips, photos and videos drive traffic to the platform, which in turn indicates the Company's ability to deliver clicks and ad impressions to advertisers.  Defendant Baker noted at the November 9, 2016 RBC Technology Internet Media and Telecommunications Conference that review content had grown 30% and the growth of photographs was double that, and "that's a core part of our business."

22.     The Company earns revenue from its advertising products, transactions and other services.  As of December 31, 2016, the Company recognized approximately 90% of its revenue from

approximately 135,000 paying advertising accounts, yet there were approximately 3.4 million claimed businesses on the platform, which the Company saw as a massive opportunity for growth.[1]

**B.    Yelp's Transition From Cost Per Impression to Cost Per Click Advertising In 2015**

23.    The Company began a transition from charging advertisers on cost per impression ("CPM") basis to a cost per click ("CPC") basis in 2015.

24.    CPM advertisers pay a predetermined amount for every 1,000 ad impressions, meaning that the publisher is paid for every ad shown regardless of whether it generates a click. Every visitor to the site earns the publisher money; therefore, if a publisher can predict traffic, they can predict revenues.

25.    CPC advertising means the advertiser pays each time one of their ads is clicked, and is therefore paying for visitors sent to their site from the publisher's site. Publishers who can provide a targeted audience for an advertiser's message are thought to have greater earning potential using CPC advertising. Publishers have full visibility into revenue generated, since they are able to track and record clicks. CPC appeals to more advertisers because they only pay for clicks, allowing them to control costs and track the return on their investment ("ROI").  The risk with CPC is if the ads do not succeed at driving clicks, they very quickly get sidelined and stop receiving impressions. Thus, ads that get really high customer engagement perform better in the CPC model because they are more likely to drive clicks, whereas, ads with less engagement do not perform well.

26.    Despite touting the positive effect of the switch to CPC on retention, Defendants were aware that many of their advertisers had low levels of engagement on the platform. These advertisers were not likely to renew their contracts and, thus, would impact retention rates negatively.

**C.    Yelp's Business Model Provided Defendants Substantial Insight Into Future Revenues**

27.    Yelp's advertising contracts were multi-month or annual contracts, which

---

[1] In addition to its advertising products, Yelp earned approximately 9% of its 2016 revenue from transactions between consumers and the local businesses they find on Yelp, including Yelp Eat24, Yelp Platform, Yelp Deals, and Gift Certificates.  Yelp also earned slightly less than 1% of its revenue from other services, including Yelp Reservations, Yelp Knowledge, and its subscription services.

automatically renewed on a month-to-month basis at the end of the contract period, unless customers provided a thirty-day written notice to the Company stating that they wished to cancel the contract. Advertisers who wished to cancel their contract early were assessed hefty termination fees, ranging from approximately $300 to $750 depending on the length of their contract.  Accordingly, *it was economically reasonable for customers who wished to stop advertising with Yelp to wait until the termination of their contract term to cancel, thus avoiding the termination fee*.

28.     These contracts provided the Company with significant visibility into future revenue growth.  Defendants repeatedly emphasized their ability to accurately predict future revenue. Defendant Baker noted on the Company's 2Q'16 earnings call that this "gives us quite a bit of visibility, [] – we go into the quarter with a pretty good amount of visibility" and "that allows us to be thinking about a little bit much further out frankly than just the current quarter, or even next quarter."

29.     For example, at a September 14, 2016 Deutsche Bank Technology Conference, Defendant Baker noted:

> When we walk into the sort of a quarter, in our advertising business, we probably have 75% of the revenue that we expect to realize in that quarter already sold in prior periods. And so, our product team, our sales team, and our marketing team aren't looking on day one of the quarter on like a 90-day race. They're looking quite a bit further out. And I think that gives us a lot of luxury to be planning the business, scaling the business for sort of the longer term and little bit less anxious about what's right in front of us.

30.     Recurring revenue was extremely important to Yelp's business. It was significant because the Company only paid its sales force commission to secure new accounts, not to retain accounts whose contract had expired, which drastically increased the Company's margins from 48% in year one to 95% in year two.  Yelp's former Chief Operating Officer Geoff Donaker stated on an earnings call to discuss the Company's financial results for the first quarter of 2016, "Important to note that *sales team performance in any quarter is actually a relatively small percentage of the overall quarter performance given how important overall recurring revenue is to the business*."

31.     The Company, analysts and investors understood that the size of its sales force drove the growth of core local advertising accounts, due to the fact that they were only paid commission on new accounts.  At the May 25, 2016 J.P. Morgan Global Technology, Media and Telecom

Conference,  Defendant Baker stated, "You can really predict the revenue that's going to come back from sales-driven growth if you're managing it well. You're going to hire salespeople and they should have this productivity at that many months, and they're not going to deviate from that while – and if they do, you cut your losses."

**D.       Performance Metrics Gave Defendants Direct Insight Into Future Revenues**

32.    Yelp reviews a number of performance metrics to evaluate its business, measure performance, identify trends in the business, prepare financial projections and make strategic decisions. *These real-time metrics provided Defendants with immediate insights into customer retention trends, including the likelihood of contract terminations in 1Q'17.*

33.    To measure its traffic, Yelp measures Desktop unique visitors, Mobile Web Unique Visitors, and App Unique Devices.  Desktop unique visitors is calculated as the number of "users," as measured by Google Analytics, who have visited the desktop website at least once in a given month, averaged over a given three-month period. Similarly, mobile website unique visitors is calculated as the number of "users" who have visited the mobile website at least once in a given month, averaged over a given three-month period. App unique devices is calculated as the number of unique mobile devices using its mobile app in a given month, averaged over a given three-month period.

34.    Yelp also measures engagement on its platform through cumulative reviews, percentage of searches on mobile, and percentage of Ad Clicks on mobile.   The number of reviews represents the cumulative number of reviews submitted to Yelp since inception, as of the period end, including reviews that were not recommended or had been removed from our platform.

35.    Yelp also measures its local advertising business through Claimed Business Locations, Local Advertising Accounts, Paying Advertising Accounts, and Repeat Rate. Claimed businesses were a key target for Yelp's sales force to convert to paying advertisers.

36.    Paying advertising accounts comprise all business accounts (local, national, and self-serve) from which the Company recognized advertising revenue in a given three month period.  Local advertising accounts (also referred to as advertising and subscription accounts) consist of business accounts from which the Company recognizes advertising revenue and revenue from Yelp reservations subscriptions in a given three month period.  The Repeat Rate is the percentage of local

advertising accounts from which Yelp recognized revenue in the immediately preceding 12-month period.

37.     All of these metrics were closely tracked by the Company, investors and analysts and used by the Company to evaluate its performance and forecast its future performance.  These metrics were available to Defendants to enable them to foresee a decline in advertiser retention in Q1'17.

## V.     OVERVIEW OF DEFENDANTS' FRAUD

### A.     In 2016, Yelp Trumpets Its Impressive Growth And Retention

#### 1.     Yelp Adds A Record Number Of New Accounts in 1Q'16

38.     Following a somewhat disappointing year in 2015,  the Company entered 2016 with a substantially larger, yet less experienced, sales force.  By the fourth quarter of 2015, Yelp had increased its salesforce by 45% over the prior year.  Robert J. Krolik, Yelp's then-CFO, noted at the December 3, 2015 Credit Suisse Tech, Media, and Telecom Conference that the Company had "the highest percentage of rookies than we've ever had as a total of our sales population." The Company also changed its commission sales curve so a new sales associate would start earning commission in less time to improve sales force retention.

39.     At the February 9, 2016 Goldman Sachs Technology and Internet Conference, Defendant Stoppelman noted that starting the year off with a strong performance in the core local ads business was a top priority for 2016, stating, "First off, I would say the execution around the core local ads business. So, we got to get that right. Obviously, first quarter last year was a little bumpy out of the gate. And so, we're going to make sure that everything's good this year."

40.      On May 5, 2016, the Company held an earnings call to discuss its first quarter of 2016 financial results, using the opportunity to assure investors that both its revenue and retention were growing. Defendant Stoppelman stated, "We had a great start to the year with ***local revenue growth accelerating to 40% year-over-year, driven by the continued strength of our recurring revenue base***, as well as better than expected ad budget fulfillment and strong sales team results." Krolik noted, "Local advertising accounts grew 34% year-over-year to approximately 121,000. A portion of the new advertising accounts came through our self-serve channel where we experimented with promotions that we don't necessarily plan to repeat in subsequent quarters."

41.     A large portion of the local revenue growth was due to businesses attracted to Yelp by various promotional offers.   A significant percentage of these businesses, however, were low-engagement.  Such businesses were substantially less likely to realize benefits from advertising with Yelp and were thus far less likely to remain with Yelp after the expiration of their initial contracts.

### 2.     Yelp's Growth Continued Throughout 2016

42.     Defendants continued to cite local revenue growth and improved retention despite the coming advertiser churn in Q1'17.  For example, on an August 9, 2016 earnings call, Defendant Stoppelman reported, "Second quarter results were strong, highlighted by local revenue growth accelerating to 41% year-over-year. Revenue exceeded our expectations, driven by upside across all sales channels, as well as *slightly better than expected revenue retention*. That revenue outperformance helped grow adjusted EBITDA by 24% year-over-year, even as we invested for the long-term. And based on these results, we're increasing our outlook for the year."

43.     On November 2, 2016, the Company held an earnings call  to discuss its 3Q'16 financial results. Defendant Stoppelman stated:

> Third quarter results were strong. We maintained our first half momentum generating record levels of both revenue and adjusted EBITDA, even while investing to fuel long term growth. Results exceeded our expectations as local revenue grew 41% year-over-year for the second consecutive quarter, while margins expanded significantly compared to the same quarter last year. The strong performance of our local sales force, coupled with product innovation within the multi-location in self-serve channels drove the growth in local revenue and let us to raise our outlook for 2016.

44.     Analysts were excited about the Company's improved retention. For example, a November 2, 2016, Barclays' report noted, "Due to improving ARPA and customer retention, we are starting to see operating leverage in the business."

45.     Similarly, a November 3, 2016, Cantor Fitzgerald report stated, "We remain constructive on YELP and are raising our ests and PT to $46 from $42 on the back of a third quarter in a row of robust ad growth. Strong execution across local, national and self-serve sales channels and better revenue retention prompted mgt, once again, to raise its FY16 outlook, implying sustained momentum, and no visible adverse impact from Google's latest algo[rithm] change (as some feared)."

**B.    Defendants Were Acutely Focused On Retention Throughout 2016 And Were Admittedly Monitoring The Retention Rate Of Advertisers Added In Q1'16**

46.    Because of the importance of recurring revenue to the Company's bottom line, the Company reported and frequently discussed retention and the importance of demonstrating a return on investment (or "ROI") to retaining customers. The Individual Defendants repeatedly indicated that they monitored and were aware of retention rates, which were of substantial importance to Yelp's financial performance and revenue growth.

47.    For example, at the May 25, 2016 J.P. Morgan Global Technology, Media and Telecom Conference, Defendant Baker stated, "we've got to make sure that our advertising products are delivering verifiable value to the customers, and they're aware of it going in and they see it once they bu[y] it." Defendant Baker also noted that the Company carefully measured the impact of advertising and noted the importance of advertisers curating their presence of Yelp:

> <Q>: One thing that was always hard maybe with the CPM model or in general is just kind of helping the advertisers understand their ROI and like when Google was growing it was always so super clear, you could tell where – what kind of metrics do you have or can you share about your advertisers ROI on this form of advertising and advertiser churn and stuff like that?
>
> <A - Charles C. Baker>: Well, I mean **the first thing when we talk about efficacy of advertising is it has to have an impact first**. You could have an advertising product that drives 350% ROI and if that means that the establishment sells one more ice cream cone, they don't really care. So, you have to – it has to have a scale impact on driving the business. **So that's something we measure really carefully, which is like do you feel customers coming to your business because of your advertising on Yelp.**
>
> **And once you get them over that hump and they believe in that and they start to do their marketing spend and activities with Yelp and their curation of their store presence on Yelp as a really important part of their marketing**, then naturally, the conversation starts to shift toward, well, what's the return and should I invest more on this than I have invested in the past. . . .
>
> **[F]or those who are advertising for a few hundred dollars of advertising a month, the lead volume we're driving to those businesses is off the charts.** . . .
>
> The home and local services category is 29% of revenue, and that's an area where those businesses like movers, et cetera, are really well **set up to kind of track where the customers are coming from, and they're paying some of the highest – they have the largest budgets. They've got the longest-standing commitments, the churn and retention of those people is the greatest, but it all starts to have an impact on the business before you get to the ROI**.

48.      At the June 7, 2016 Stifel Technology, Internet, Media and Telecom Conference, Defendant Baker expressly noted the Company was keenly focused on monitoring and retaining the record number of advertisers added in 1Q'16. He stated:

> [W]e've done a bunch of promotions, started this year, and we're doing this all time, but we did a little bit bigger ones, where we've said, hey, [ph] you will spot-check $200 of advertising or $300 of advertising and that – as you could see, we had a ***record number of new customer additions in the company's history in the first quarter this year***.
>
> So, clearly we're learning some stuff there. On the other hand, if you're given away advertising, you should have a pretty good number. So, but what we're really trying to do is, get people to sample and trial and get experience with the Yelp platform, and ***we'll be watching how those people renew and what – how we follow-up with them to make sure they become a long-time customers of ours going forward***.

49.      On the 2Q'16 earnings call, Defendant Baker addressed an analyst's question regarding increasing repeat rate and the Company's visibility into future revenues.  Defendant Baker touted that the Company has a "good amount of visibility" going into a quarter and that the Company's efforts to communicate with businesses were all contributing to improved retention:

> <A - Charles C. Baker>: . . .And really, one of the things, I'm trying to do is, I have come into the company and have a sort of a rare opportunity to seek with fresh eyes about what I see inside of this business. One of the things that really is notable to me is that, I think, there is a – ***I think, sometimes there is a perception that there's a lot of in-and-out, over-and-over through our revenue base, and when you actually look at it, there is quite a bit of predictability and visibility. We have a lot of one year annual contracts, we have a lot of less than one year, but multi-month contracts. We have a really big volume of people who are coming through the self-serve channel and committing to business. And that gives us quite a bit of visibility, so we don't – we go into the quarter with a pretty good amount of visibility as I said. I don't think that's wildly different than where – I'm not trying to note that that's higher or lower or moving up or down relative to the history, I'm just saying, that's a fact of this business, that I think is an important one that allows us to be thinking about a little bit much further out frankly than just the current quarter, or even next quarter***. . . .

50.      On the Q2'16 earnings call, Defendant Nachman also noted that, "As you would imagine, as folks get towards that month 12, there is a natural customer attrition, although ***we continue to kind of make improvements in that area***."

51.      At the September 14, 2016 Deutsche Bank Technology Conference, Defendant Baker stressed that the Company was focused on retention, stating, "So, we're very focused on account retention and revenue retention and revenue per account growing over time."  With regard to the

1  advertisers added through the Q1'16 promotions, he stated, "The retention of those people that we

2  acquired in the promotional sort of cycle was about as we expected."

3        52.    On the 3Q'16 earnings call, Yelp again stated that it had expanded its local client

4  partner team to retain and upsell advertisers, and on the product side, Request-A-Quote and the

5  business owner's app were helping businesses see their ROI. Defendant Baker noted that the

6  Company could see the engagement of advertisers on the business owner's app and it was continuing

7  to get stronger.

> <A - Jed Nachman>: Yeah, Hi, Matt. In terms of our retention efforts, **we've always been focused on retention**, and certainly there are initiatives in place right now, on the product side, on the marketing side, and on the human being side to generally have a great experience for our customers. Specifically, we have a small team right now, what we call local client partners, their job is to up-sell within that category. It's a small team now that we're going to be expanding over the coming quarters, and we're starting to see some initial signs that that has a nice impact on what we're doing.
>
> And then on the product side, we continue to focus on improvements that will help businesses see the value in Yelp and stay with Yelp over the long term. And so things like RAQ, make a difference, and servicing of metrics in the business owner's app, and **you can see that engagement that's happening on the business owner's app, that continues to kind of get stronger**. So that's pretty much the color on retention.

16       53.    On the 3Q'16 earnings call, Defendant Nachman also addressed an analyst's question

17 regarding what the Company was doing to drive up its repeat rate:

> <Q - Kerry Rice>: Thanks a lot. A two-part question and then a follow-up. So, **repeat rate keeps ticking up** and I know you have a lot of different initiatives there, whether it's account management or maybe business app adoption or the dashboard. Anything that you would call out in particular that is seeing a strong tick up usage-wise that would help drive that repeat rate up? And as it relates to the business app adoption, any color on the penetration there from the business users, either the paying users or otherwise.
>
> <A - Jed Nachman>: Yeah. Hi. On the repeat rate question, I think it's largely due to the fact that **we have a really strong recurring revenue base** and as a percentage of revenue kind of that base continues to grow versus new customers. And so, there is no magic bullet in terms of what is driving that outside of kind of the core business model. And we'll certainly going to try everything in our power to kind of move that rate up over time as well. **It bodes well for the business if we can get a lot more repeat business**.

26       54.    At the November 9, 2016 RBC Technology Internet Media and Telecommunications

27 Conference, Defendant Baker noted that the Company's customer churn had been fairly consistent

(even though Defendants knew that it would likely increase), and again stressed the importance of demonstrating ROI to retaining advertisers:

> I think there has been this concern that Yelp has really high advertiser turnover and advertiser churn, and thus, we have to go reinvent everything we have today next year. Well, if they're that slow of mind that only 4% of the local businesses have decided to advertise on Yelp over the last 10 years, I feel some degree of comfort that they're not all going to decide tomorrow that they're done with Yelp. ***They're not a fast-moving group of advertisers. They are fairly tried and true.*** When they become comfortable with a medium, I mean, heck, they're still in the yellow pages, they're still in direct marketing, they're still on bus benches, and they're still in the newspaper. ***We have a set of customers who are slow to change***.
>
> …
>
> <A - Charles C. Baker>: Yeah. I mean, I think it's really pretty simple, it's do we have a compelling advertising product for local businesses, are we demonstrating to those advertisers who do decide to take the leap and buy from Yelp that it's valuable and it's driving business to them, is it easy for them to acquire those services from Yelp. And so, I think I would answer your question this way. ***I'd say if we can continue to broaden the ways that we are getting Yelp in front of businesses and we can continue to do a good job of documenting for those businesses who do make the buy decision the efficacy of Yelp advertising, then we'll be able to get to the market, we'll be able to keep the ones we got***.
>
> …
>
> <Q - Mark Mahaney>: …What you can do to – you're an endemically high churn customer base, small local businesses, I mean you can be able to do things to really materially impact that churn, to improve the churn, to reduce it?
>
> <A - Charles C. Baker>: The churn that we've seen hasn't changed a whole lot. It hasn't changed in my timeframe, but even if I go back and look at the last couple of years, it hasn't changed a whole lot.

**C.      Defendants Issue Overstated 2017 Guidance While Concealing That Elevated Churn Among Local Advertising Customers Added In Q1'16 Is Negatively Impacting Yelp's Financial Performance And Undermining The Company's 2017 Guidance**

55.      On February 9, 2017, the Company issued a press release announcing its 4Q'16 and full year 2016 financial results and its 2017 guidance.  Therein, the Company, in relevant part, stated:

> "We had an outstanding year, growing local revenue by 39%," said Jeremy Stoppelman, Yelp's co-founder and chief executive officer. "I am extremely proud of how Yelp has become deeply integrated into consumers' daily habits and increasingly essential to local business owners. In 2017, we look forward to increasing engagement on the app, expanding transactions and broadening our sales strategy."
>
> …

**Business Outlook**

As of today, Yelp is providing its outlook for the first quarter and full year of 2017.

- For the first quarter of 2017, net revenue is expected to be in the range of $195 million to $199 million, representing growth of approximately 25% compared to the first quarter of 2016 at the midpoint of the range. Adjusted EBITDA is expected to be in the range of $25 million to $28 million. Stock-based compensation is expected to be in the range of $26 million to $27 million, and depreciation and amortization is expected to be approximately 4.5% to 5% of revenue.

- For the full year of 2017, net revenue is expected to be in the range of $880 million to $900 million, representing growth of approximately 25% compared to full year 2016 at the midpoint of the range. Adjusted EBITDA is expected to be in the range of $150 million to $165 million. Stock-based compensation is expected to be in the range of $110 million to $112 million, and depreciation and amortization is expected to be approximately 4.5% to 5% of revenue.

56.     On the same day, the Company held a conference call with investors, analysts and the public to discuss the Company's financial results for Q4'16 and financial guidance for 2017.

57.     In the February 9, 2017 press release and conference call, Defendants concealed from investors that in late 2016 through February 2017, Yelp was experiencing weak revenue retention in its local advertising business.  In fact, at the start of the year, overall local revenue churn was at the upper end of the range that Yelp had normally seen and was especially pronounced amongst the group of advertisers added in Q1'16.

58.     The guidance Yelp provided to investors on February 9, 2017, did not take into account the substantial weakness in retention it was experiencing in late 2016 and January 2017. Defendants' failure to do so rendered the guidance materially false and misleading because, as Defendants would belatedly admit after the Class Period, retention of advertisers after the expiration of the term of the initial contract has a big impact over the course of a forward twelve month period and when retention is weaker than anticipated at the start of the year, revenues from those advertisers will be missing even though included in Yelp's plan for the full year. Effectively, Defendants revenue guidance for 2017 included revenue from a substantial number of advertisers that were churning at a higher than expected/planned rate, including, contracts already churned in January 2017. While this information was being concealed from investors, Defendant Stoppelman took advantage and dumped $25 million of Yelp stock after the Company's issuance of the 2017 guidance in February 2017.

59.     On the February 7, 2017 conference call, Defendants mislead investors by touting that Yelp's "repeat rate" was at an "all-time high right now":

> <A - Jed Nachman>: I can take that one on the repeat rate. **Obviously, repeat rate is a mix of folks who have advertised with us in the past and that's at an all-time high right now, and while we're really encouraged by our kind of strong, embedded client base and that's a really kind of healthy number to understand that those folks are coming back**. You know it's a double-edged sword because we also think that making sure that we get enough new clients into the pipeline is a really important initiative for the company. . . .

> <A - Jeremy Stoppelman>: And I think from stuff that we've seen in terms of advertiser sentiment about Yelp products, it's funny. The reason that people stay with us for three and four and five years is the same reason that another advertiser might decide to stay with us for three or four or five weeks. **And that is, they all ask the question of, am I seeing a return on the advertising? And we've got 80% of them who are saying I'm repeating because I see the value and we've got another chunk who we haven't yet documented well enough for them the value of Yelp advertising. And we're working on that from a product perspective all the time.**

**D.      The Truth Emerges Causing Yelp's Stock To Plummet**

60.     On May 9, 2017, Yelp issued a press release announcing 1Q'17 financial results and **slashed** its 2017 revenue guidance from a range of $880 million - $900 million to $850 million - $865 million in revenue, and from $150 million - $165 million to $130 million - $145 million in adjusted EBITDA.

61.     On this news, Yelp's stock price plummeted by $6.37 per share, more than 18%, to close on May 10, 2017, at $28.30 per share, on usually heavy volume.

**E.      Defendants Belatedly Admit That The Churn Issue Was A Known Problem Since Late 2016 Yet Was Not Factored Into The Company's 2017 Guidance**

62.     On May 9, 2017, Yelp held a conference call with investors, analysts, and the public to discuss the Company's Q1'16 financial results and lowered 2017 guidance.  During the conference call, Defendant Stoppelman admitted, "While we're encouraged by the normalization of production in the first quarter, **we did see a decline in retention that has impacted our outlook**."  Defendant Stoppelman linked the downgrade directly to poor retention: "Given the disproportionate impact first quarter performance has on our annual results, we've reduced our outlook for the balance of the year."

63.     During the May 9, 2017 conference call Defendant Baker elaborated on the retention problems, acknowledging that the issue (and reason for slashing Yelp's 2017 guidance) related to

AMENDED CLASS ACTION COMPLAINT
Case No. 3:18-cv-00400-EMC

retention issues the Company had experienced at the outset of 2017 (*i.e.*, well before February 10, 2017):

> Turning to account and revenue retention, ***we experienced weaker than expected revenue retention in our local ad business in the first quarter. And those losses early in the year have an outsized impact on our full year revenue outlook***. *At the start of the year, overall local revenue churn was at the upper end of the range we normally see* and we've identified several factors contributing to those trends.
>
> ***The account growth and revenue growth acceleration we saw at the start of 2016 created an echo of contract terminations in the recent quarter***. And an uptick in less well-established local businesses within our customer base brought greater account turnover as these business owners typically have a harder time competing with our more well-established advertisers. . . .
>
> ***The primary factor within the change in business outlook is the local revenue challenge we experienced in the first quarter.*** …

64.     In fact, on the May 9, 2017 conference call Defendant Nachman effectively conceded that the brunt of the problem had occurred before February 2017 and admitted that the Company recognized the churn issue by no later than "halfway through" Q1'16 (*i.e.*, mid-February), which was of such a substantial magnitude that it required a "all hands on deck" response:

> ***So we recognized the churn issue about halfway through the quarter and we're able to tie it back actually to a distinct cohort of advertisers that came on Yelp about a year ago as we're making the transition from CPM to CPC***. We saw that there were different retention characteristics amongst that cohort, more emerging businesses on Yelp that had trouble competing in the ad system with some of the more established businesses.
>
> It was all hands on deck, obviously, at that point, and ***we put a team in place to focus on that particular cohort and that particular profile***. And we're able to really course-correct in a pretty short period of time and saw progressively better results as we got into March and particularly in April.

65.     Defendant Nachman even acknowledged on the May 9, 2017 conference call that the churn bump happened in January and February, stating, "In terms of our go-to-market strategy and, ultimately, we're not happy with either what happened in the fourth quarter on the sales productivity side nor what happened on the ***churn bump during January and February of the first quarter***."

66.     During the May 9, 2017 conference call Defendant Baker explained the impact to the reduction to the 2017 guidance was to account for the impact of higher churn in Q1'16 and the lack of

AMENDED CLASS ACTION COMPLAINT
Case No. 3:18-cv-00400-EMC

recurring revenues which had been previously included in the 2017 guidance (even though substantial customers had already churned in January 2017 before the guidance was issued in February 2017):

> And the way the business works is that **retention has a big impact over the course of the forward 12-month period. And when retention is weaker than anticipated at the start of the year, those are missing revenues sort of in the plan for the rest of the year**.
>
> **We exited the quarter with a smaller core book of business than we anticipated because the retention had been worse during the first quarter**. As Jed said, it got better toward the end of the quarter, and coming out of the quarter looks very encouraging. But we're going to be cautious about that and stay focused on it as we wait the rest of this year.

67.     The fact that the elevated churn issue had not been factored into Yelp's 2017 guidance was notable given that churn in January 2017 had prompted the Company to put a "recovery team in place." For example, on the May 9, 2017 conference call Defendant Nachman explained to an analyst that the issue was limited to advertisers added at the beginning of 2016, and the Company put measures in place in January and February 2017 to make sure its sales force was contacting the right clients.

> Q - Lloyd Walmsley>: Thanks. Two, if I can. First, just like digging into some of the attrition issues and the fixes you guys have put in place. Is that mostly a function of just the specific cohort in 1Q is different from how you acquired your customers for the rest of the year or is it more a function of fixes you've made to people coming in from those sort of channels you feel like are sustainable? Any color you can give there would be helpful…
>
> <A - Jed Nachman>: Sure. This is Jed. I'll take that, Lloyd. **So, specifically as it relates to the retention issue, it was concentrated obviously in a cohort that surfaced around the beginning of last year. When we made the transition from CPM to CPC, there was certainly a learning curve in terms of how people sold the product**. And there were, in fact, some other pockets of folks that we couldn't approach before just based on the product that folks went out and kind of got right, initially, when the CPC product was released.
>
> **We recognize that and upstream have put things in place in order to make sure that our sales reps upstream were calling on the right clients. And we addressed this kind of acute problem in January and February. We put this recovery team on higher response rates, put a lot of focus on that particular cohort and the numbers have kind of spoken for themselves as we've gotten into March and April.**

68.     Contrary to prior statements de-emphasizing the importance of ROI, on the May 9, 2017 conference call, Defendant Stoppelman explained that the problem was less engaged advertisers were not seeing a high enough ROI:

> <Q - Samuel James Kemp>: … Maybe a follow-on to the retention questions. You said that there are larger advertisers that are impairing the ability of smaller advertisers to gain traction within Yelp. I guess when you say larger advertisers, do you mean advertisers who have been on the platform longer or are you specifically calling out the national accounts impacting that? And then second on the home and local segment, can you just break out within that how large home services is? Thanks.

> <A - Jeremy Stoppelman>: This is Jeremy. I'll take the questions here. So when we said – when we're talking about advertisers, I think what you meant is ***we were talking about more engaged, less engaged, with more engaged advertisers having some advantage in essentially getting a higher ROI***. So if you think about having more photo content, having more descriptive information about your business, having more review content, then in general that's going to appeal to consumers in a stronger way than maybe some business that just set up shop and has very little content on their page.

> And so, the higher ROI fundamentally that that engaged advertiser is getting is going to lead to, over the long-term, better retention. And so that's something that we've seen in our local advertising world, is that certainly businesses that do well generally tend to do even better when they become advertisers. And I think that's something that makes intuitive sense, and it's just a reality I think of being in the local business landscape.

69.     Defendant Stoppelman admitted on the May 9, 2017 conference call that as the sales force got used to the CPC product after 1Q'16, and the issue with less engaged advertisers went away:

> <Q - Jason Helfstein>: Thanks. Just want to dig a little bit deeper into the CPM versus CPC and that kind of what happened? So is basically the point that you had advertisers who were encouraged to move to CPC and didn't have, let's say, the level of sophistication to use it properly. And then as a result, they didn't get good results. …

> <A - Jeremy Stoppelman>: Yeah. The other thing to touch on is as we moved from CPM to CPC, it opened up a variety of leads that weren't available prior to that. And so, of course the sales force went after it. And that slightly changed our mix of advertisers as far as how many are engaged at each different level. And so, that then shows up as  all of those folks come off their term a year later. And so, that's what we're seeing. ***The sales force did normalize over time as they got used to the CPC product and the opportunities were more consistent month over month. And so, we believe that effect goes away, but there was a transitional thing that happened there***.

70.     The day after the May 9, 2017 conference call, analyst report issued by Guggenheim described the situation as follows:

YELP pinned the revenue guidance cut on a pick-up in churn for a specific advertiser cohort from early 2016, a time when it was transitioning from CPM to CPC. Management specifically talked about the cohort including a high percentage of less well established small businesses that were unable to compete well in the CPC environment. While YELP claims the issue has been addressed with retention normalizing in March-April, it ended the quarter with a smaller base than previously expected and that flows through the remainder of the year. That said, the issue feeds into long-held bear concerns around churn in the model and it will likely take time for investors to build comfort that this is more of a one-timer than a trend.

71.     A May 10, 2017, MKM Partners analyst report, blasted Defendants for their admissions about the previously undisclosed problems with Yelp's churn in early 2017, noting that " *Investors are critical of management's suggestion that churn escalation was noticed early in the quarter, but then offered unachievable guidance after six-weeks of observing retention issues.* "

72.     Many months later, on a February 7, 2018 earnings call, Defendant Stoppelman admitted that Defendants were aware in 2016 that Q1'17 would see substantial churn and even admitted that the churn had occurred late in 2016, well before Defendants finally revealed the truth. Specifically, he admitted, "[T]he retention issues that we had in the first quarter of 2017 . . . related to cohort of advertisers we brought on in 2016. . . . [A]dvertisers brought on in the early part of 2016 who never really established the normal level of engagement with their Yelp advertising program.  *We anticipated that they would churn off and they churned off at the end of the year [(i.e., the end of 2016)] at a higher rate than we'd anticipated.  And that set us back at the start of 2017.* "

## VI.     DEFENDANTS' FALSE AND MISLEADING STATEMENTS DURING THE CLASS PERIOD

### A.     Yelp's February 9, 2017 Press Release

73.     On February 9, 2017, after the market closed, Yelp issued its 2017 guidance, stating, "For the full year of 2017, net revenue is expected to be in the range of $880 million to $900 million, representing growth of approximately 25% compared to full year 2016 at the midpoint of the range. Adjusted EBITDA is expected to be in the range of $150 million to $165 million. Stock-based compensation is expected to be in the range of $110 million to $112 million, and depreciation and amortization is expected to be approximately 4.5% to 5% of revenue."

74.     This statement was materially false and/or misleading because it failed to disclose that the 2017 guidance had not accounted for a material number contract terminations in January 2017 among a cohort of less engaged advertisers added in 1Q'16 whose annual contracts were expiring, and as a result the Company was entering 2017 with a smaller book of business and less than forecasted recurring revenues.

**B.      Yelp's February 9, 2017 Earnings Conference Call**

75.     On February 9, 2017, Yelp held a conference call with investors, analysts, and the public to discuss the Company's Q4'16 financial results and the Company's financial guidance for 2017. Therein, Defendant Stoppelman stated:

> Increasing awareness and engagement was another important goal for 2016 and we saw great results. Our ad campaigns drove awareness and familiarity to their highest levels and reached over 200 million consumers on television and online. On the product side, servicing the best content and providing actionable suggestions and reminders contributed to a more engaging user experience. Our ad campaign and focus on product helped propel Yelp into the top 30 in Apples app store by the end of the year, with app unique devices up 25% and page use per user growing approximately 20% compared to 2015.
>
> Executing well on these priorities sets Yelp up for continued growth in 2017 and we're excited about the potential we see in the year ahead.

76.     This statement was materially false and/or misleading because it failed to disclose that the Company was experiencing material number contract terminations in January 2017 among a cohort of less engaged advertisers added in 1Q'16 who saw less ROI, and as a result the Company was entering 2017 with a smaller book of business and less than forecasted recurring revenues, which would negatively impact its growth projections for 2017.

77.     Defendant Baker stated, "For the full year of 2016, 31% of revenue growth flowed through to an increase in adjusted EBITDA. And our incremental profitability was even stronger in the second half of the year. This operating leverage is an important attribute of the Yelp business model, providing an indication of the company's underlying earnings power, as well as a source of investment resources to help drive long-term revenue growth."

78.     This statement was materially false and/or misleading because it failed to disclose that the recurring revenues which drove profitability in the second half of 2016 had been materially impacted by a  material number contract terminations in January 2017 among a cohort of less engaged

1  advertisers added in 1Q'16 who saw less ROI, and as a result the Company was entering 2017 with a

2  smaller book of business and less than forecasted recurring revenues, which would negatively impact

3  revenue growth in 2017.

4      79.    Defendant Baker represented that nothing had structurally changed about the business:

5          <Q - Mark Mahaney>: Okay. Just one question then on the – in terms of the margin
           guidance for 2017, would you say there's anything structurally changed in the
6          business or are these mostly elective investments, particularly in product
           development? And I guess what I'm trying to tease out is, as some of the other areas
7          really build out transactions, for example, does that have a sustainably dilutive
           impact on the profitability margins of the business? Thank you.
8

9          <A - Charles C. Baker>: Sure, Mark. *I don't think there's anything structurally
           changing in the business.* We had kind of a 30% plus incremental profitability in
10         2016, which I think is the best in four, five years for the company. And you saw in
           the second half the incremental profitability north of 50%, even while the revenue
11         has grown pretty well. So, we were in a year in which we were increasing our brand
           spend in 2016, a year in which we were walking away from brand advertising
12         revenue dollars and showed that kind of leverage. And I think that's inherent and
           unchanged in the model. But when we turn and we look at the opportunity ahead of
13         Yelp, $700 million of revenue is sizeable, but we're still pretty small in terms of
           long-term opportunity, we believe. We've got 138,000 advertisers in a market that
14         is 20 million local businesses. And I'd point out 3.4 million claims businesses on
           Yelp.
15

16         So we've got a strong brand, we've got a great product experience for consumers
           and businesses, and we think it makes sense to continue to invest in that. So, we're
17         making elective decisions to invest in our product, in our marketing, particularly
           around performance marketing, and in our sales channels with the goals of driving
18         users, businesses, and new ways to make money. So, I think the trade-off of maybe
           another few margin points we might otherwise deliver this year is for more revenue
19         growth in the long term rather than any kind of structural thing.
20

21     80.    This statement was materially false and/or misleading because it failed to disclose that

22 the Company was experiencing material number contract terminations in January 2017 among a

23 cohort of less engaged advertisers added in 1Q'16 who saw less ROI and did not have a "great product

24 experience" and, as a result, the Company was entering 2017 with a smaller book of business and less

25 than forecasted recurring revenues, which would negatively impact its 2017 margin and revenue

26 projections, and as a result the Company would have an increased focus retention in 2017.

27     81.    Defendant Nachman stated, "So on the local account side, certainly, we are happy with

28 the revenue side of the equation in Q4. You look at things like an accelerating national business, self-

serve being up 100% year-over-year. If I were to point to a weakness and a slowness, it's potentially around kind of the local sales force in the fourth quarter and particularly – it was a modest slowdown that, quite frankly, we think the election and a period around the election both from an output and productivity perspective from the sales force and that kind of bled into vacation time. ***It's not something we're super concerned about kind of coming into 2017 and feel like the fundamentals are in place and really strong***."

82.     This statement was materially false and/or misleading because it failed to disclose that the Company was experiencing material number contract terminations in January 2017 among a cohort of less engaged advertisers added in 1Q'16 who saw less ROI, which was having a material impact on recurring revenues that would reverberate throughout 2017.

83.     Defendants Nachman and Stoppelman addressed an analyst's question about the Company's increasing repeat rate:

<Q - Stan Velikov>: Hi. Good afternoon. This is Stan Velikov for Brian. Thank you for taking my question. We're seeing that the repeat rate keeps increasing. Actually it looks like it hit an all-time high, but still from those local advertisers that do not finish their relationship with Yelp, what do you hear as the most common reason for that?

<A - Jed Nachman>: I can take that one on the repeat rate. Obviously, repeat rate is a mix of folks who have advertised with us in the past and that's at an all-time high right now, and while we're really encouraged by our kind of strong, embedded client base and that's a really kind of healthy number to understand that those folks are coming back. You know it's a double-edged sword because we also think that making sure that we get enough new clients into the pipeline is a really important initiative for the company.

***And so we're not alarmed in any way about kind of where we are in the repeat rate side***, but you'd love to see, again, adding the number of local advertising accounts. Even if we were up in the 7,000, 8,000, 10,000 range, based on the opportunity that we actually have in this marketplace with millions of businesses that have claimed their presence on Yelp, we think we're still in the very early stages and we've got to look at both sides of the coin here, making sure that we're driving new business and taking advantage of kind of the existing client base that has very nice trends behind it.

<A - Jeremy Stoppelman>: And I think from stuff that we've seen in terms of advertiser sentiment about Yelp products, it's funny. The reason that people stay with us for three and four and five years is the same reason that another advertiser might decide to stay with us for three or four or five weeks. And that is, they all ask the question of, am I seeing a return on the advertising? And we've got 80% of them who are saying I'm repeating because I see the value and we've got another chunk who we haven't yet documented well enough for them the value of Yelp advertising. And we're working on that from a product perspective all the time.

84.     These statements were materially false and/or misleading because they failed to disclose that the Company was experiencing material number contract terminations in January 2017 among a cohort of less engaged advertisers added in 1Q'16 who saw less ROI, which was having a material impact on recurring revenues that would reverberate throughout 2017.

85.     Defendant Baker addressed an analyst's questions about margin improvement:

<Q - Justin Post>: Great. I apologize if you've already talked about this, but last year was a nice driver of margin improvement across a lot of areas and I was just thinking out maybe two or three years, where do you see the opportunities there? Can you still grow like you have been? And is that really driving the new sales areas that maybe have lower sales intensity? And then, on the Request-A-Quote side, we've seen some ads around those pages, but have you discussed at all how you're thinking about monetizing all that activity? Thank you.

<A - Charles C. Baker>: We talked about just a little bit a few minutes ago, so I'll be kind of brief. I think that the margin leverage that we saw last year I think gives you a really good representation of sort of the inherent earnings power of the business. And it also gives us, in thinking about the long-term, a great pool of resources to continue to invest. So I think we had a year in which 30% of the revenue went down to the bottom line. We had a second half of the year in which 50% of the revenue went down to the bottom line. So, our long-term prospects for profitability at Yelp are outstanding and we turn and we look at the opportunity ahead of us and think it just makes all the sense in the world to continue to invest in our product, our marketing and our sales to get after that.

86.     This statement was materially false and/or misleading because it failed to disclose that the Company was experiencing material number contract terminations in January 2017 among a cohort of less engaged advertisers added in 1Q'16 who saw less ROI, which was having a material impact on recurring revenues and would negatively impact its 2017 margin and revenue projections.

87.     On February 14, 2017 at the Goldman Sachs Technology and Internet Conference, Defendant Stoppelman answered the analyst's question about the strong growth in local advertising revenue in 2016, stating, "I think really it was just about focusing on the core. And that was the message that was delivered to the teams at the start of the year is, hey, there's nothing fundamentally wrong with our business. We just need to execute even better. And so we really did that and I think it paid off."

88.     This statement was materially false and/or misleading because it failed to disclose that the Company's growth in local advertising revenue in 2016 was due in part to a its sales force signing up a cohort of less engaged advertisers to annual contracts as the Company transitioned from CPM to

1    CPC in 1Q'16, who saw less ROI and were terminating their contracts at higher than normal rates,

2    which resulted in a smaller book of business and loss of recurring revenues in 2017.

3        89.     Defendant Baker also addressed the importance of the transition to CPC to the growth

4    in local advertising revenue, stating, "[] the movement from CPM to CPC is all about making the sort

5    of monetization mindset and product mindset at Yelp to be about, hey, it doesn't matter that we sold it;

6    it has to work for the business. We have to drive the leads for local businesses and CPC is the format

7    to do that."

8        90.     This statement was materially false and/or misleading because it failed to disclose that

9    the Company's growth in local advertising revenue in 2016 was due in part to a its sales force signing

10    up a cohort of less engaged advertisers to annual contracts as the Company transitioned from CPM to

11    CPC in 1Q'16, who saw less ROI and were terminating their contracts at higher than anticipated rates

12    in January and February of 2017, at which time the Company implemented a team to improve

13    engagement and retention amongst this cohort and  put measures into place to make sure its sales force

14    were no longer calling on these less engaged businesses to sell ads.

15        91.     Defendant Stoppelman also addressed the analyst's question about 2017 guidance:

16         <Q>: Yeah. So just wanted to talk to – the EBITDA flow-through was really high,
especially in the second half. But when you guided for EBITDA in 2017, the

17         leverage there was below what many of us were kind of expecting. Just wondering
– you touched on this a little bit, [ph] where we're investing, why it's so important

18         for the revenue growth and then why sales and marketing has to grow above or at

19         or above the revenue growth?

20         <A - Jeremy Stoppelman>:  . . . On the sales side, I think we continue to want to
grow our local sales team and expand that at a double-digit clip this year. ***That's a***

21         ***fairly proven model that we feel we're pretty good at operating.*** We like the
returns in that business. ***They tend to be predictable over time***. . . .

22

23        92.     This statement was materially false and/or misleading because it failed to disclose that

24    the Company's 2017 guidance had not accounted for a material number contract terminations in

25    January and February of 2017 among a cohort of less engaged advertisers added in 1Q'16 whose

26    annual contracts were expiring, and, as a result, the Company was entering 2017 with a smaller book

27    of business and less than forecasted recurring revenues, which would have a material impact on

28    margins and revenue growth in 2017.

1    **C.    Yelp's Annual Report On Form 10-K Filed On March 1, 2017**

2       93.    On March 1, 2017, the Company filed its Annual Report on Form 10-K for the 2016

3   fiscal year. The Company's Form 10-K was signed by Defendants Baker and Stoppelman. Therein,

4   Yelp, in relevant part, stated:

5       *Ability to Attract and Retain Advertisers.* Our revenue growth is driven by our ability to
        attract and retain local business that purchase our advertising products. Our largest sales
6       and marketing expenses consist of the costs associated with acquiring advertisers. We
        spent a majority of our sales and marketing expense for 2016 on initiatives related to
7       advertiser acquisition and expect to continue to expend significant amounts to attract
        additional advertisers. At the same time, our advertising agreements increasingly provide
8       for performance-based cost-per-click payment terms, which may make it more difficult to
        forecast advertising revenue accurately. In addition, our advertisers typically do not have
9       long-term obligations to purchase our products, and their decisions to renew depend on the
        degree of satisfaction with our products as well as a number of factors that are outside of
10      our control, including their ability to continue their operations and spending levels. The
        small and medium-sized businesses on which we heavily rely often have limited
11      advertising budgets and may be disproportionately affected by economic downturns. As a
        result, a worsening economic outlook would likely cause businesses to decrease
12      investments in advertising, which could adversely affect our revenue.

13

14      94.    This statement was materially false and/or misleading because it failed to disclose that

15   a cohort of less engaged advertisers added in 1Q'16 as the Company transitioned to CPC did not see a

16   material benefit and were  unsatisfied with the return on the advertising, and as a result: (i) the

17   Company experienced a material number contract terminations in January and February of 2017 when

18   this cohort's annual contracts expired; (ii) the Company had implemented a team to improve

19   engagement and retention amongst this cohort,  (iii) the Company put measures into place to make

20   sure its sales force were no longer calling on these less engaged businesses to sell ads, and (iv)  the

21   Company had not factored in this smaller book of business and loss of recurring revenues into its 2017

22   guidance.

23      95.    The 2016 10-K in relevant part, also stated: "Advertising revenue increased $173.8

24   million, or 37%, in 2016 compared to 2015, and $136.0 million, or 41% in 2015 compared to 2014.

25   The increase in both periods was primarily due to a significant increase in the number of customers

26   purchasing advertising plans as we expanded our sales force to reach more businesses. The growth in

27   both periods was driven primarily by purchases of cost-per-click advertising."

28

96.     This statement was materially false and/or misleading because it failed to disclose that a cohort of less engaged advertisers added in 1Q'16 as the Company transitioned to CPC did not see a material benefit and were  unsatisfied with the return on the advertising, and as a result: (i) the Company experienced a material number contract terminations in January and February of 2017 when this cohort's annual contracts expired; (ii) the Company had implemented a team to improve engagement and retention amongst this cohort,  (iii) the Company put measures into place to make sure its sales force were no longer calling on these less engaged businesses to sell ads, and (iv)  the Company had a smaller book of business and less than forecasted recurring revenues in 2017.

**D.     The March 1, 2017 Morgan Stanley Technology, Media & Telecom Conference**

97.     On March 1, 2017, at the Morgan Stanley Technology, Media & Telecom Conference Defendant Nachman discussed the Company's retention, stating, "And then you also look at our existing client base as well. And so from a – really focusing on retention and up-sell and the [ph] LCP group that's kind of shown that that's a really – we've been purely focused on acquisition for kind of a very long time. And we've got a really strong client base that's recurring and they love our product. And you look at things like [Request-a-Quote] and I know we'll get into it a little bit, but really promising looking forward."

98.     This statement was materially false and/or misleading because it failed to disclose that a cohort of less engaged advertisers added in 1Q'16 as the Company transitioned to CPC did not see a material benefit and were  unsatisfied with the return on the advertising, and as a result: (i) the Company experienced a material number contract terminations in January and February of 2017 when this cohort's annual contracts expired; (ii) the Company had implemented a team to improve engagement and retention amongst this cohort,  (iii) the Company put measures into place to make sure its sales force were no longer calling on these less engaged businesses to sell ads, and (iv)  the Company had a smaller book of business and less than forecasted recurring revenues in 2017.

99.     Defendant Baker also addressed an analyst question about margin guidance for 2017:

> I think that from a margin perspective, we're trying to do a couple of really important things this year. We are really dedicated to advancing the transactional capabilities, functionalities, flows and experiences within our product for both consumers and for businesses. I'll come back and talk about that in a second. And we're building a brand new capability that Yelp hasn't had around performance marketing. Let me stop on that one for a second.

…
And as the business moves in that transactional direction, you could have all the salespeople you want, but you have to stimulate where you have opportunity to stimulate consumer activity. And our salespeople aren't calling up consumers saying, hey, use Yelp. They're calling businesses. And so our marketing dynamic is starting to get more involved around bringing customers back and bringing customers into and bringing them throughout the Yelp experience for all of these transactional elements. There's another whole element of what we're doing. And so there's an investment there around building performance marketing activity to stimulate usage as the business becomes one where there are more transactional turnstiles, bringing customers through those turnstiles.
…
So it's really about making product and marketing investments at a heartier clip than we made them in the second half of last year. Second half of last year, in which 50% of the revenue growth dropped down to the bottom line, gives an indication of the margin and leverage that's inherent in the business. But the revenue opportunity that sits out there with 3 million claimed businesses and only 140,000 paid advertisers really merits the investment activity that would – we think merits the investment activity on the product and marketing side that we're making this year. Little things kind of seesaw back and forth. Last year, there was an acceleration in revenue growth in 2016, an acceleration in investment activity in 2017. And I think that's all part of the long-term plan.

100.    This statement was materially false and/or misleading because it failed to disclose that a cohort of less engaged advertisers added in 1Q'16 as the Company transitioned to CPC did not see a material benefit and were unsatisfied with the return on the advertising, and as a result: (i) the Company experienced a material number contract terminations in January and February of 2017 when this cohort's annual contracts expired; (ii) the Company had implemented a team to improve engagement and retention amongst this cohort,  (iii) the Company put measures into place to make sure its sales force were no longer calling on these less engaged businesses to sell ads, and (iv)  the Company had not factored in this smaller book of business and loss of recurring revenues into its 2017 guidance, which would have a material impact on revenues and margins.

101.    Defendants Baker and Nachman also addressed a question about the impact of the transition to CPC:

<Q>: Now that you've transitioned the monetization to CPC ads, how sensitive is your revenue growth going forward to the usage of the platform?

<A - Charles C. Baker>: Well, it's a lot more sensitive to it than it was in the past. And so in particularly some high-value categories where the advertisers are super jazzed to get Yelp leads, there is an ability to drive traffic there and really have an impact on revenue. So the model is much more responsive to traffic than it has been in the past. We're at a place today where with 24 million monthly active users of the app and 138,000 advertisers at the end of

last quarter, we got a lot more users and a lot more usage than we do advertiser demand and interest and budget right now. So the reality is although the model is more responsive, we're not at a place where if we had a lot more usage kind of sprinkled all across Yelp, it probably wouldn't drive a big change in the short term in the financial performance. Does that make sense? Basically what I'm saying is we got a lot of inventory relative to the level of usage that we have.

<A - Jed Nachman>: But from a budget perspective, I think the way to think about that is [indiscernible] (30:12) to all our advertisers. It effectively performs the same way that a CPM product did from a fulfillment and how much budget can you get out of that $300. There are some marginal differences depending on categories. But we're not in a situation where somebody is delivering a 25% when it would have been 100% at the CPM.

102.     This statement was materially false and/or misleading because it failed to disclose that a cohort of less engaged advertisers added in 1Q'16 as the Company transitioned to CPC did not see a material benefit and were unsatisfied with the return on the advertising, and as a result: (i) the Company experienced a material number contract terminations in January and February of 2017 when this cohort's annual contracts expired; (ii) the Company had implemented a team to improve engagement and retention amongst this cohort, (iii) the Company put measures into place to make sure its sales force were no longer calling on these less engaged businesses to sell ads, and (iv) the Company was entering 2017 with a smaller book of business and less than forecasted recurring revenues.

## VII.     LOSS CAUSATION

103.     Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic losses suffered by Plaintiffs and the Class.

104.     The truth regarding Yelp's Q4'16 and Q1'17 performance and the cause of the Company's downgrade to its 2017 guidance was revealed, and/or the concealed risks materialized, on or about May 9, 2017.  As a direct result of these disclosures, the price of Yelp's stock declined precipitously, often on heavy trading volume.

105.     On this news, shares of Yelp declined $6.37 per share, or 18.36%, to close on May 10, 2017, at $28.33 per share, on unusually heavy volume.

106.    During the Class Period, investors were focused on the Company's ability to add new paying advertising accounts and retain older accounts as it made the transition from CPM to CPC pricing.

107.    The damage suffered by Plaintiffs and other members of the Class was a direct result of Defendants' fraudulent scheme to issue false information and withhold material information from Yelp's investors, and the subsequent significant decline in the value of Yelp's securities when the truth was revealed.

108.    On May 10, 2017, research firm JMP published a report entitled "Advertiser Churn Results in Lowered Full-Year Guidance, Although Traffic Growth is Accelerating." The report stated, "Following 1Q17 results with revenue relatively in line with expectations and EBITDA above, 2017 guidance was meaningfully below consensus given greater advertiser churn, leading to shares of Yelp declining ~28% in after-hours trading to $24.89; we maintain our Market Perform rating. At issue was retention among Yelp's core Paying Advertising Account base (PAAs are replacing Local Advertiser Accounts (LAAs) as the primary advertiser metric going forward) as many reached their yearly anniversary in 1Q and chose not to renew due to, among other things, lower overall ROI, in our view. While management suggested retention trends have since improved in March and April as a result of corrective actions, given the outsized impact of 1Q on revenue and profitability for the full year, Yelp lowered 2017 revenue and EBITDA guidance relative to consensus by 5% and 14%, respectively."

## VIII.    POST-CLASS PERIOD DISCLOSURES

109.    On a February 7, 2018 earnings call, Defendant Stoppelman admitted that Defendants were aware that Q1'17 would see substantial churn, stating, "[T]he retention issues that we had in the first quarter of 2017 . . . related to cohort of advertisers we brought on in 2016. . . . [A]dvertisers brought on in the early part of 2016 who never really established the normal level of engagement with their Yelp advertising program. ***We anticipated that they would churn off and they churned off at the end of the year [(i.e., the end of 2016)] at a higher rate than we'd anticipated. And that set us back at the start of 2017.***"

IX.   **ADDITIONAL SCIENTER ALLEGATIONS**

110.   As alleged herein, Defendants acted with scienter since they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and/or misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly or substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  As set forth elsewhere herein detail, Defendants Stoppelman, Baker, and Nachman, by virtue of their receipt of information reflecting the true facts regarding Yelp, their control over, and/or receipt and/or modification of Yelp's allegedly materially misleading statements and/or their associations with the Company which made them privy to confidential proprietary information concerning Yelp, participated in the fraudulent scheme alleged herein.

111.   Defendants Stoppelman, Baker, and Nachman knew or recklessly disregarded the false and misleading nature of the information they caused to be disseminated to the investing public.  The fraudulent scheme described herein could not have been perpetuated during the Class Period without the knowledge and complicit or, at least, the reckless disregard of the personnel at the highest level of the Company, including Defendants Stoppelman, Baker and Nachman.

112.   The following additional facts five rise to a strong inference that the Defendants acted with scienter.

A.   **Defendant Stoppelman's Suspicious Stock Sales Support Scienter**

113.   Despite telling investors on February 9, 2017 that no reason existed to be concerned about Yelp's retention rates, Defendants later admitted that during January and February 2017 the Company was experiencing lower retention rates with a distinct cohort of less engaged advertising customers added in 1Q'16 when the Company transitioned from CPM to CPC.

114.   Defendant Stoppelman was further motivated to engage in this course of conduct so that he could sell a substantial number of Yelp shares at artificially inflated prices, before reporting negative information to the market on May 9, 2017.

AMENDED CLASS ACTION COMPLAINT
Case No. 3:18-cv-00400-EMC

115.   Defendant Stoppelman owned 3,986,310 shares of Yelp common stock in the Stoppelman Trust.  At all relevant times, Defendant Stoppelman maintained sole voting and dispositive power over all the shares held by the Stoppelman Trust.

116.   On September 23, 2016, Defendant Stoppelman sold 263,000 shares of Yelp stock held by the Stoppelman Trust for $40 per share for total proceeds of $10,520,000.   This was Defendant Stoppelman's first stock sale in over a year – the previous being made on July 15, 2015 when he sold 8,000 shares of Yelp for $35.6097 for total proceeds of $284,877.60.

117.   Thereafter, between September 23, 2016 and February 7, 2017, Defendant Stoppelman sold Yelp shares in allotments of 13,000 during times the price of Yelp traded above $40.  The sale of 117,000 shares of Yelp stock during this time amounted to approximately 3 percent of the Stoppelman Trust's holdings of 3,710,310 shares common stock as of September 23, 2016 when the sales commenced.  Specifically, Defendant Stoppelman made the following sales during that time:

| Date | Shares | Price Per Share | Total Proceeds |
| --- | --- | --- | --- |
| 9/29/2016 | 13,000 | $41.52 | $539,740.50 |
| 10/4/2016 | 13,000 | $41.53 | $539,899.10 |
| 12/27/2016 | 13,000 | $40.00 | $520,000.00 |
| 1/5/2017 | 13,000 | $40.00 | $520,000.00 |
| 1/12/2017 | 13,000 | $40.43 | $525,590.00 |
| 1/17/2017 | 13,000 | $40.32 | $524,163.90 |
| 1/25/2017 | 13,000 | $42.58 | $553,540.00 |
| 2/2/2017 | 13,000 | $42.98 | $558,733.50 |
| 2/7/2017 | 13,000 | $41.93 | $545,090.00 |
| **Total** | **117,000** | **$41.25 (average)** | **$4,826,757.00** |

118.   In February 2017, days after the initial false and misleading disclosures described above, Defendant Stoppelman dramatically departed from this sales pattern in timing, amount, and price of the previous sales.  Over one month, Defendant Stoppelman sold 750,000 shares of Yelp stock in 3 allotments of 250,000 shares at an average price of $34.17 for proceeds of $25,630,400.00.  These sales reduced the Stoppelman Trust's holdings of Yelp common stock by more than 20 percent.  Specifically, Defendant Stoppelman made the following unusual sales between February 16, 2017 and March 15, 2017:

| Date | Shares Sold | Price Per Share | Total Proceeds |
|---|---|---|---|
| 2/16/2017 | 250,000 | $35.0981 | $8,774,525.00 |
| 3/3/2017 | 250,000 | $33.6794 | $8,419,850.00 |
| 3/15/2017 | 250,000 | $33.7441 | $8,436,025.00 |
| **Total** | **750,000** | **34.17 (average)** | **$25,630,400.00** |

119.    On May 9, 2017, Yelp announced its 1Q 2017 financial results and the price of Yelp stock fell to as low as $26.93 on May 10, 2017, before closing at $28.33.   The price of Yelp common stock remained below $40 until August 4, 2017. Defendant Stoppelman did not make any sales between March 16, 2017 and August 4, 2017.

120.    On August 4, 2017, Defendant Stoppelman again began selling allotments of 13,000 share of common stock at a time for prices always exceeding $40.  Specifically, beginning on August 4, 2017 and continuing until February 20, 2018, the Stoppelman Trust made the following sales:

| Date | Shares | Price Per Share | Total Proceeds |
|---|---|---|---|
| 8/4/2017 | 13,000 | $40.00 | $520,000.00 |
| 8/10/2027 | 13,000 | $41.05 | $533,691.60 |
| 8/15/2017 | 13,000 | $41.74 | $542,675.90 |
| 8/23/2017 | 13,000 | $41.94 | $545,282.40 |
| 8/31/2017 | 10,000 | $43.31 | $433,118.00 |
| 9/1/2017 | 3,000 | $42.61 | $127,832.70 |
| 9/5/2017 | 13,000 | $42.62 | $554,089.90 |
| 9/13/2017 | 13,000 | $43.54 | $566,007.00 |
| 9/21/2017 | 13,000 | $44.49 | $578,334.90 |
| 9/26/2017 | 13,000 | $42.20 | $548,577.90 |
| 10/4/2017 | 13,000 | $45.38 | $589,919.20 |
| 10/12/2017 | 13,000 | $43.66 | $567,629.40 |
| 10/17/2017 | 13,000 | $43.50 | $565,533.80 |
| 10/25/2017 | 13,000 | $43.94 | $571,248.60 |
| 11/2/2017 | 13,000 | $46.59 | $605,670.00 |
| 11/7/2017 | 13,000 | $45.58 | $592,545.20 |
| 11/15/2017 | 13,000 | $45.40 | $590,223.40 |
| 11/24/2017 | 13,000 | $47.59 | $618,624.50 |
| 11/28/2017 | 13,000 | $47.49 | $617,419.40 |
| 12/6/2017 | 13,000 | $42.61 | $553,911.80 |

AMENDED CLASS ACTION COMPLAINT
Case No. 3:18-cv-00400-EMC

| | | | |
|---|---|---|---|
| 12/14/2017 | 13,000 | $42.32 | $550,130.10 |
| 12/19/2017 | 13,000 | $43.69 | $568,018.10 |
| 12/27/2017 | 13,000 | $42.14 | $547,840.80 |
| 1/4/2018 | 13,000 | $43.23 | $561,935.40 |
| 1/9/2017 | 13,000 | $43.63 | $567,186.10 |
| 1/17/2018 | 13,000 | $43.48 | $565,221.80 |
| 1/25/2018 | 13,000 | $42.67 | $554,663.20 |
| 1/30/2018 | 13,000 | $43.63 | $567,156.20 |
| 2/7/2018 | 13,000 | $44.37 | $576,780.10 |
| 2/15/2018 | 13,000 | $41.01 | $533,130.00 |
| 2/20/2018 | 13,000 | $41.84 | $543,923.90 |
| **Total** | **390,000** | **$43.46 (average)** | **$16,958,321.30** |

121.    The sale of 390,000 shares of Yelp stock during these 7 months amounted to approximately 13.7 percent of the Stoppelman Trust's holdings of Yelp common stock as of August 4, 2017 when return to selling commenced.

122.    Defendant Stoppelman's insider sales were suspicious in timing and amount.  The sales' proximity to the end of the Class Period raises a strong inference that the Defendant Stoppelman knew that the Company was experiencing a greater than forecasted level of contract terminations in January and February of 2017, which would impact recurring revenues throughout 2017 and sold these shares to avoid the losses that would have come with selling the shares after the May 9, 2018 corrective disclosure, which caused the price of Yelp stock to decline into the mid-$20 per share for the next several months.

123.    Between February 8, 2016 and February 7, 2017, the Stoppelman Trust periodically sold Yelp shares in regular allotments of 13,000 at a time.[2]   The sales of 13,000 share allotments occurred at or near Class Period highs for Yelp's stock price and were all above $40 per share.

124.    The Stoppelman Trust only departed from selling 13,000 shares at a time during a one month period pattern between February 16, 2017 and March 15, 2017, when it sold three allotments of

---

[2] On two occasions, the Stoppelman Trust sold a total of 13,000 shares in multiple transactions on or about the same day.  The price presented on those dates (November 2, 2017 and February 15, 2018) are the weighted average of the sale price.

250,000 shares each.  The Stoppelman Trust received an average price of $34.17 per share for 250,000 share allotments.  These are the only sales that occurred below $40 per share.

### B.     Engagement And Revenue Retention Were Core Operations

125.     The fraud alleged herein relating to concealing the true state of affairs with respect to the Company's ability to achieve its 2017 guidance, and the problems it had retaining advertisers who were added when it transitioned to CPC pricing in 1Q'16, all involved Yelp's core operations, and knowledge of the fraud may therefore be imputed to Defendants Stoppelman, Baker, and Nachman. The Defendants repeatedly noted the importance of demonstrating to advertisers the return on investment on their advertising spending in retaining advertisers. The Defendants noted that the Company tracked advertisers' engagement on the platform, the performance and effectiveness of the ads, and the Company's ability to deliver clicks. These factors were key to determining whether the advertiser was seeing a return on investment and whether the Company would retain an advertiser, which in turn allowed the Company to develop its forecast its margins and revenues.

126.     The Company's 2016 10-K described the importance of its content to the Company's ability to deliver clicks and indicated that the Company knew that less engaged advertisers would see less return on investment and would be less likely to renew their contracts:

> At the heart of our business are the vibrant communities of contributors that contribute the content on our platform. These contributors provide rich, firsthand information about local businesses in the form of reviews and ratings, tips, photos and videos. Each review, tip, photo and video expands the breadth and depth of the content on our platform, which drives a powerful network effect: the expanded content draws in more consumers and more prospective contributors. Although measures of our content (including our cumulative review metric) and traffic (including our desktop and mobile unique visitors metrics) do not factor directly into the advertising arrangements we have with our advertising customers, ***this network effect underpins our ability to deliver clicks and ad impressions to advertisers. Increases in these metrics improve our value proposition to local businesses as they seek easy-to-use and effective advertising solutions.***

127.     Defendant Baker acknowledged at the November 9, 2016 RBC Technology Internet Media and Telecommunications Conference that review content was "a core part of our business."

128.     The Company's "Cumulative Reviews" metric measured engagement and was reported in SEC filings signed by Defendants Baker and Stoppelman, evidencing (a) the materiality of information regarding the amount and quality of such reviews; and (b) that each of the Defendants

knew the significance of amount and quality of such reviews.  Furthermore, during the Class Period the Defendants participated in earnings calls in which they discussed the importance of reviews at length and in detail.  Indeed, the 2016 10-K stated the metrics were used "to evaluate its business, measure performance, identify trends in the business, prepare financial projections and make strategic decisions."

129.    Nevertheless, the Company was aware, as indicated by Donaker at the March 2, 2016 Morgan Stanley Technology Media & Telecom Conference, "There is a material amount of our advertising every month that gets sold to people with either no reviews or negative reviews."

130.    Content was increasingly important when the Company transitioned from CPM to CPC, as the Company had to deliver clicks to generate revenue. The Company tracked clicks as it tried to capture or "fulfill" all of the potential revenue from its advertisers' budgets.  Furthermore, the transition from CPM to CPC was a core operation of the Company and Defendants knew or should have known the advertisers level of engagement and correlating return on investment as the Company made this transition, as these factors would have a determinative impact on retention.

131.    Defendants noted the focus on retention and the importance of demonstrating ROI to advertisers to retain their business.  The Company also regularly reported its Repeat Rate and during the Class Period Defendants discussed it at length and in detail on earnings calls, evidencing (a) the materiality of information; and (b) that each of the Defendants knew the significance of the information.

132.    At the May 25, 2016 J.P. Morgan Global Tech, Media, and Telecom Conference, Defendant Baker was discussing the importance of showing a return on investment to customer retention and stated, "So that's something we measure really carefully, which is like do you feel customers coming to your business because of your advertising on Yelp." Defendant Baker went on to indicate the importance of advertiser engagement to the return on investment, noting "And once you get them over that hump and they believe in that and they start to do their marketing spend and activities with Yelp and *their curation of their store presence on Yelp as a really important part of their marketing*…"

133.   At the June 7, 2016 Stifel Conference, Defendant Baker assured investors with regard to the new customers added in 1Q'16, that the Company was "watching how those people renew and what – how we follow-up with them to make sure they become a long-time customer of ours going forward."  A few months later, at the September 14, 2016 Deutsche Bank Technology Conference, Defendant Baker reported, "The retention of those people that we acquired in the promotional sort of cycle was about as we expected."

134.   On the 2Q'16 earnings call, Defendant Stoppelman noted the importance of "delivering compelling returns for Yelp advertisers" and that the Company was "working to maximize the efficiency of [its] ad technology to driver advertiser ROI.  To better demonstrate the value of Yelp, we're also investing in business owner tool in sales and account teams.  The results from all of these efforts have been encouraging."

135.   Defendant Stoppelman discussed the Company's ads at the November 30, 2016 Credit Suisse Technology, Media, and Telecom Conference, stating "we know they work" and [w]e see the data ourselves…" Defendant Stoppelman also noted that, "We're driving local ads forward making sure that business owners were happy and understanding the product and the ROI that they were getting."

136.   On the February 9, 2017 earnings call, Defendant Stoppelman stated the Company was "providing actionable suggestions and reminders" to businesses as part of its efforts to improve engagement and noted that "there is an element of encouraging business owners to be very responsive and that results in a more positive consumer experience." In other words, engaged advertisers see a better return on investment.

**C.     Defendants Repeatedly Touted The Visibility And Predictability Of Revenues**

137.   Yelp's multi-month or annual contracts renewed automatically on a month-to-month basis unless advertisers provided a thirty-day written notice of cancellation or paid hefty termination fees. These "recurring revenues" provided the Company with a great deal of visibility and predictability into future revenues. Having touted a substantial increase in new advertising accounts added in 1Q'16, Defendants knew or should have known these annual contracts would be expiring and advertisers could cancel without paying termination fees.

138.     On the 2Q'16 earnings call, Baker explained, "I think, sometimes there is a perception that there's a lot of in-and-out, over-and-over through our revenue base, and when you actually look at it, there is quite a bit of predictability and visibility. We have a lot of one year annual contracts, we have a lot of less than one year, but multi-month contracts. We have a really big volume of people who are coming through the self-serve channel and committing to business. And that gives us quite a bit of visibility, so we don't – we go into the quarter with a pretty good amount of visibility as I said. I don't think that's wildly different than where – I'm not trying to note that that's higher or lower or moving up or down relative to the history, I'm just saying, that's a fact of this business, that I think is an important one that allows us to be thinking about a little bit much further out frankly than just the current quarter, or even next quarter."

139.     At the September 14, 2016 Deutsche Bank Technology Conference, Defendant Baker noted at the start of a quarter the Company already has "75% of the revenue that we expect to realize in that quarter already sold in prior periods." Defendant Baker indicated this gave the Company "luxury to be planning the business, scaling the business for sort of the longer term and little bit less anxious about what's right in front of us."

140.     Given this ability to plan for the long term, Defendants knew not only that the annual contracts added in 1Q'16 would be expiring and advertisers could cancel without paying terminations fees, but also that a material number of these advertisers were less engaged and were unsatisfied with the return on investment; and therefore, were likely to terminate their contracts which would have a material negative impact the Company's recurring revenues in 2017.

141.     Another trait of Yelp's business which added predictability to future revenues was Yelp's sales force. The size of the sales force generated predictable returns as indicated by Defendant Baker at the May 25, 2016 J.P. Morgan Global Technology, Media and Telecom Conference,  "You can really predict the revenue that's going to come back from sales-driven growth if you're managing it well. You're going to hire salespeople and they should have this productivity at that many months, and they're not going to deviate from that while – and if they do, you cut your losses."

142.     Defendant Baker repeated this again on the Company's 2Q'16 earnings call, stating, "This core local sales organization of 2,000-plus reps is a large and effective team, and our local sales

1  model delivers attractive and highly predictable rates of return on the investments we're making

2  there."

3     143.   Sales Headcount was regularly reported and Defendants discussed in detail and at

4  length on the Company's earnings calls, evidencing (a) the materiality of information regarding the

5  sales headcount; and (b) that each of the Defendants knew the significance of the sales headcount.

6     144.   Given the importance of sales headcount to revenue, Defendants knew or should have

7  known that the Company had not hired enough sales reps to generate enough revenue or margin to

8  offset the loss of recurring revenue due to retention issues; and therefore, the Company's 2017

9  guidance was unachievable.

10 **X.   CLASS ACTION ALLEGATIONS**

11    145.   Plaintiffs brings this action as a class action pursuant to Federal Rule of Civil

12 Procedure 23(a) and (b)(3) on behalf of a class, consisting of all persons and entities that purchased or

13 acquired Yelp's securities during the Class Period and were damaged thereby (the "Class").

14 Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant

15 times, members of their immediate families and their legal representatives, heirs, successors or assigns

16 and any entity in which Defendants have or had a controlling interest.

17    146.   The members of the Class are so numerous that joinder of all members is

18 impracticable.  Throughout the Class Period, Yelp's securities were actively traded on the NASDAQ.

19 While the exact number of Class members is unknown to Plaintiffs at this time and can only be

20 ascertained through appropriate discovery, Plaintiffs believes that there are hundreds or thousands of

21 members in the proposed Class.  Millions of Yelp's shares were traded publicly during the Class

22 Period on the NASDAQ.  As of October 31, 2015, Yelp had 136,999,800 shares of common stock

23 outstanding.  Record owners and other members of the Class may be identified from records

24 maintained by Yelp or its transfer agent and may be notified of the pendency of this action by mail,

25 using the form of notice similar to that customarily used in securities class actions.

26    147.   Plaintiffs' claims are typical of the claims of the members of the Class as all members

27 of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is

28 complained of herein.

1    148.   Plaintiffs will fairly and adequately protect the interests of the members of the Class

2 and has retained counsel competent and experienced in class and securities litigation.

3    149.   Common questions of law and fact exist as to all members of the Class and

4 predominate over any questions solely affecting individual members of the Class.   Among the

5 questions of law and fact common to the Class are:

6        (a)    whether the federal securities laws were violated by Defendants' acts as alleged herein;

7        (b)    whether statements made by Defendants to the investing public during the Class Period

8            omitted and/or misrepresented material facts about the business, operations, and prospects of

9            Yelp; and

10       (c)    to what extent the members of the Class have sustained damages and the proper

11           measure of damages.

12    150.   A class action is superior to all other available methods for the fair and efficient

13 adjudication of this controversy since joinder of all members is impracticable. Prosecution of

14 individual actions would create a risk of inconsistent adjudications. Furthermore, as the damages

15 suffered by individual Class members may be relatively small, the expense and burden of individual

16 litigation makes it impossible for members of the Class to individually redress the wrongs done to

17 them.  There will be no difficulty in the management of this action as a class action.

18 **XI.    APPLICABILITY OF PRESUMPTION OF RELIANCE**

19    151.   The market for Yelp's securities was open, well-developed and efficient at all relevant

20 times.  As a result of the materially false and/or misleading statements and/or failures to disclose,

21 Yelp's securities traded at artificially inflated prices during the Class Period.  On [], the Company's

22 stock closed at a Class Period high of $[] per share.  Plaintiffs and other members of the Class

23 purchased or otherwise acquired the Company's securities relying upon the integrity of the market

24 price of Yelp's securities and market information relating to Yelp, and have been damaged thereby.

25    152.   During the Class Period, the artificial inflation of Yelp's stock was caused by the

26 material misrepresentations and/or omissions particularized in this Complaint causing the damages

27 sustained by Plaintiffs and other members of the Class. As described herein, during the Class Period,

28 Defendants made or caused to be made a series of materially false and/or misleading statements about

Yelp's business, prospects, and operations.  These material misstatements and/or omissions created an unrealistically positive assessment of Yelp and its business, operations, and prospects, thus causing the price of the Company's securities to be artificially inflated at all relevant times, and when disclosed, negatively affected the value of the Company stock.  Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiffs and other members of the Class purchasing the Company's securities at such artificially inflated prices, and each of them has been damaged as a result.

153.    At all relevant times, the market for Yelp's common stock was an efficient market for the following reasons, among others:

(a) Yelp's stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b) The Company had more than 79.6 million shares outstanding as of February 9, 2017. During the Class Period, on average, 2,742,605 shares of Yelp stock were traded on a daily basis, demonstrating a very active and broad market for Yelp stock and permitting a very strong presumption of an efficient market;

(c) As a regulated issuer, Yelp filed periodic public reports with the SEC;

(d) Yelp regularly communicated with public investors via established market communication mechanisms, including regular disseminations of press releases on the national circuits of major newswire services, the Internet and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

(e) Yelp was followed by many securities analysts who wrote reports that were distributed during the Class Period. Each of these reports was publicly available and entered the public marketplace; and

(f) unexpected material news about Yelp was rapidly reflected in and incorporated into the Company's stock price during the Class Period.

154.    As a result of the foregoing, the market for Yelp common stock promptly digested current information regarding Yelp from publicly available sources and reflected such information in Yelp's stock price. Under these circumstances, all purchasers of Yelp common stock during the Class

Period suffered similar injury through their purchase of Yelp common stock at artificially inflated prices, and a presumption of reliance applies.

155.    A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. U.S*., 406 U.S. 128 (1972), because the Class's claims are, in large part, grounded on Defendants' material misrepresentations and/or omissions. Because this action involves Defendants' failure to disclose material adverse information regarding the Company's business operations and financial prospects—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery.  All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## XII.    NO SAFE HARBOR

156.    Most of the false and misleading statements related to existing facts or conditions, and the Safe Harbor provisions have no applicability to such statements. To the extent that known trends should have been included in the Company's financial reports prepared in accordance with GAAP, they too are excluded from the protection of the statutory Safe Harbor. 15 U.S.C. §78u-5(b)(2)(A).

157.    Yelp's "Safe Harbor" warnings accompanying its reportedly forward-looking statements issued during the Class Period were also ineffective to shield those statements from liability. Defendants Stoppelman and Baker are liable for any false or misleading forward-looking statements because, at the time each forward-looking statements was made, the speaker knew the forward-looking statements was false or misleading and the forward-looking statements was authorized and/or approved by an executive officer and/or director of Yelp who knew that the forward-looking statements was false. In addition, the forward-looking statements were contradicted by existing, undisclosed material facts that were required to be disclosed so that the forward-looking statements would not be misleading. Finally, most of the purported "Safe Harbor" warnings were themselves misleading because they warned of "risks" that had already materialized or failed to provide meaningful disclosures of the relevant risks.

**COUNT I**
**For Violation of Section 10(b) of the Exchange Act**
**and Rule 10b-5 Against All Defendants**

158.     Plaintiffs repeats and re-alleges each allegation set forth in the above paragraphs as if fully set forth herein.

159.     Throughout the Class Period, Defendants Yelp, Stoppelman, Nachman and Baker, in pursuit of their scheme and continuous course of conduct to inflate the market price of Yelp common stock, had the ultimate authority for making, and knowingly or recklessly made, materially false or misleading statements or failed to disclose material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading.

160.     During the Class Period, Defendants Yelp, Stoppelman, Nachman and Baker, and each of them, carried out a plan, scheme, and course of conduct using the instrumentalities of interstate commerce and the mails, which was intended to and, throughout the Class Period did: (a) artificially inflate and maintain the market price of Yelp common stock; (b) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; (c) cause Plaintiffs and other members of the Class to purchase Yelp common stock at inflated prices; and (d) cause them losses when the truth was revealed. In furtherance of this unlawful scheme, plan and course of conduct, Defendants Yelp, Stoppelman, Nachman and Baker took the actions set forth herein, in violation of §10(b) of the Exchange Act and Rule 10b-5, 17 C.F.R. §240.10b-5.

161.     In addition to the duties of full disclosure imposed on Defendants Yelp, Stoppelman, Nachman and Baker as a result of their affirmative false and misleading statements to the investing public, these Defendants had a duty to promptly disseminate truthful information with respect to Yelp's operations and performance that would be material to investors in compliance with the integrated disclosure provisions of the SEC, including with respect to the Company's revenue and earnings trends, so that the market price of the Company's securities would be based on truthful, complete and accurate information. SEC Regulations S-X (17 C.F.R. §210.01, et seq.) and S-K (17 C.F.R. §229.10, et seq.)..

162.     Defendants Yelp, Stoppelman, Nachman and Baker had actual knowledge of the misrepresentations and omissions of material facts set forth herein or acted with reckless disregard for

1 the truth in that they failed to ascertain and disclose such facts, even though such facts were either

2 known or readily available to them.

3       163.    As a result of the dissemination of the materially false and misleading information and

4 failure to disclose material facts as set forth above, the market price of Yelp common stock was

5 artificially inflated during the Class Period. In ignorance of the fact that the market price of Yelp

6 common stock was artificially inflated, and relying directly or indirectly on the false and misleading

7 statements made knowingly or with deliberate recklessness by Defendants Yelp, Stoppelman,

8 Nachman and Baker, or upon the integrity of the market in which the shares traded, Plaintiffs and

9 other members of the Class purchased Yelp stock during the Class Period at artificially high prices

10 and, when the truth was revealed, were damaged thereby.

11       164.    Had Plaintiffs and the other members of the Class and the marketplace known of the

12 true facts, which were knowingly or recklessly concealed by Defendants Yelp, Stoppelman, Nachman

13 and Baker, Plaintiffs and the other members of the Class would not have purchased or otherwise

14 acquired their Yelp shares during the Class Period, or if they had acquired such shares during the

15 Class Period, they would not have done so at the artificially inflated prices which they paid.

16       165.    By virtue of the foregoing, Defendants Yelp, Stoppelman, Nachman and Baker have

17 violated §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder. 17 C.F.R. §240.10-5.

18                                   **COUNT II**
                        **For Violation of Section 20(a) of the Exchange Act**
19                          **Against the Individual Defendants**

20       166.    Plaintiffs repeats and realleges the above paragraphs as though fully set forth herein.

21       167.    Defendants Stoppelman, Nachman and Baker had control over Yelp and made the

22 material false and misleading statements and omissions on behalf of Yelp within the meaning of

23 §20(a) of the Exchange Act as alleged herein. By virtue of their executive positions and stock

24 ownership, as alleged above, Defendants Stoppelman, Nachman and Baker had the power to influence

25 and control and did, directly or indirectly, influence and control the decision making of the Company,

26 including the content and dissemination of the various statements which Plaintiffs contends were false

27 and misleading. Defendants Stoppelman, Nachman and Baker were provided with or had unlimited

28 access to the Company's internal reports, press releases, public filings, and other statements alleged by

Plaintiffs to be misleading prior to or shortly after these statements were issued, and had the ability to prevent the issuance of the statements or cause them to be corrected.

168.    In particular, Defendants Stoppelman, Nachman and Baker had direct involvement in and responsibility over the day-to-day operations of the Company and, therefore, are presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein.

169.    By reason of such wrongful conduct, Defendants Stoppelman, Nachman and Baker are liable pursuant to §20(a) of the Exchange Act. As a direct and proximate result of Defendants Stoppelman's and Baker's wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

## XIII.   PRAYER FOR RELIEF

WHEREFORE, Plaintiffs prays for relief and judgment, as follows:

(a)     A determination that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b)     An award of compensatory damages in favor of Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)     An award to Plaintiffs and the Class of their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)     Awarding such other and further relief as the Court may deem just and proper.

## XIV.   JURY TRIAL DEMANDED

Plaintiffs hereby demands a trial by jury.

1    DATED:  June 25, 2018                **GLANCY PRONGAY & MURRAY LLP**

2

3                                         By:  _s/ Robert V. Prongay_
                                          Lionel Z. Glancy
4                                         Robert V. Prongay
                                          Stan Karas
5                                         Christopher R. Fallon
                                          1925 Century Park East, Suite 2100
6                                         Los Angeles, CA 90067
                                          Telephone:  (310) 201-9150
7                                         Facsimile:   (310) 201-9160
                                          lglancy@glancylaw.com
8                                         rprongay@glanyclaw.com
                                          skaras@glancylaw.com
9                                         cfallon@glancylaw.com

10

11                                        **HOLZER & HOLZER, LLC**

12                                        Corey D. Holzer
                                          Marshall P. Dees
13                                        Alexandria P. Rankin
                                          1200 Ashwood Parkway, Suite 410
14                                        Atlanta, Georgia 30338
                                          Telephone: (770) 392-0090
15                                        Facsimile: (770) 392-0029

16
                                          *Lead Counsel for Lead Plaintiff Jonathan Davis,*
17                                        *Plaintiff Roei Azar and the Class*

18

19

20

21

22

23

24

25

26

27

28

**PROOF OF SERVICE BY ELECTRONIC POSTING**

I, the undersigned say:

I am not a party to the above case, and am over eighteen years old.  On June 25, 2018, I served true and correct copies of the foregoing document, by posting the document electronically to the ECF website of the United States District Court for the Northern District of California, for receipt electronically by the parties listed on the Court's Service List.

I affirm under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on June 25, 2018, at Los Angeles, California.

*s/ Robert V. Prongay*
Robert V. Prongay

# Mailing Information for a Case 3:18-cv-00400-EMC Azar v. Yelp, Inc. et al

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Lionel Z. Glancy**
  info@glancylaw.com,lglancy@glancylaw.com

- **Zheng He**
  jane.he@arnoldporter.com,maondca@arnoldporter.com,Gail.Boneberg@arnoldporter.com

- **Corey Daniel Holzer**
  cholzer@holzerlaw.com

- **Charles Henry Linehan**
  clinehan@glancylaw.com

- **Lesley F. Portnoy**
  LPortnoy@glancylaw.com,info@glancylaw.com

- **Robert Vincent Prongay**
  rprongay@glancylaw.com,info@glancylaw.com,robert-prongay-0232@ecf.pacerpro.com

- **Laurence M. Rosen**
  lrosen@rosenlegal.com,larry.rosen@earthlink.net

- **Gilbert Ross Serota**
  gilbert.serota@arnoldporter.com,marie.zambrano@arnoldporter.com,SFCalendar@arnoldporter.com,jeeyoung.you@arnoldporter.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)