GILBERT R. SEROTA (SBN 75305)
ZHENG (JANE) HE (ADMITTED PRO HAC VICE)
ARNOLD & PORTER KAYE SCHOLER LLP
Three Embarcadero Center, 10th Floor
San Francisco, CA 94111
Telephone:   415.471.3100
Facsimile:   415.471.3400
Email:  Gilbert.Serota@arnoldporter.com
Email:  Jane.He@arnoldporter.com

Attorneys for Defendants
YELP INC., JEREMY STOPPELMAN,
LANNY BAKER, and JED NACHMAN

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JONATHAN DAVIS and ROEI AZAR, Individually and on Behalf of All Others Similarly Situated,<br><br>    Plaintiffs,<br><br>  v.<br><br>YELP INC., JEREMY STOPPELMAN, LANNY BAKER, and JED NACHMAN,<br><br>    Defendants. | Case No. 3:18-cv-00400-EMC<br><br>**CLASS ACTION**<br><br>**DEFENDANTS' REPLY BRIEF IN SUPPORT OF THEIR MOTION TO DISMISS THE AMENDED CLASS ACTION COMPLAINT**<br><br>Date:   September 20, 2018<br>Time:  1:30 p.m.<br>Place:  Courtroom 5 - 17th Floor<br>Judge: Hon. Edward M. Chen |

# **TABLE OF CONTENTS**

**Page**

INTRODUCTION ...........................................................................................................................1

ARGUMENT ...................................................................................................................................1

I. THE OPPOSITION CONCEDES THAT YELP INFORMED INVESTORS OF THE DIFFICULTIES OF FORECASTING UNDER ITS NEW CPC MODEL AND FAILS TO REBUT APPLICATION OF THE PSLRA SAFE HARBOR. .............................1

    A. The Safe Harbor Applies Because Yelp's Forecasts Were Accompanied By Meaningful Cautionary Language.............................................................................2

    B. Yelp's Risk Disclosures Were "Meaningful" Because They Expressly Addressed The Precise Risks That Led To The Forecast Adjustment..........................................3

II. THE OPPOSITION FAILS TO IDENTIFY FACTS SHOWING THE FEBRURARY 9 FORECAST WAS MADE KNOWING IT COULD NOT BE ACHIEVED. ..................................................................................................................5

    A. Even If Defendants Were Aware Of Churn Issues On February 9, Plaintiffs Fail To Show That Defendants Had A Duty To Disclose...................................................7

III. THE REMAINING ALLEGATIONS REGARDING POST-FEBRUARY 9 STATEMENTS TO ANALYSTS FOCUS ON INACTIONABLE STATEMENTS OF OPINION. ..................................................................................................................9

IV. THE OPPOSITION FAILS TO IDENTIFY PARTICULARIZED FACTS ESTABLISHING A STRONG INFERENCE OF SCIENTER. ........................................10

    A. Plaintiffs Identify No Corroborative Stock Sales Or Any Other Facts That Show Mr. Stoppelman's Stock Sales Were Suspicious In Timing Or Amount...................11

    B. The Core Operations Theory Relied Upon By Plaintiffs Is Conclusory....................13

CONCLUSION ..............................................................................................................................15

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Batwin v. Occam Networks, Inc.*,
   No. CV 07-2750 CAS, 2008 WL 2676364 (C.D. Cal. July 1, 2008) .................................... 12, 13

*Berson v. Applied Signal Tech., Inc.*,
   527 F.3d 982 (9th Cir. 2008) ................................................................................................... 8

*City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*,
   856 F.3d 605 (9th Cir. 2017) ................................................................................................... 9

*Curry v. Yelp Inc.*,
   No. 14-cv-03547-JST, 2015 WL 7454137 (N.D. Cal. Nov. 24, 2015) ........................................ 12

*Curry v. Yelp Inc.*,
   875 F.3d 1219 (9th Cir. 2017) ................................................................................. 11, 12, 14

*Cutler v. Kirchner*,
   696 F. App'x 809 (9th Cir. 2017) .............................................................................................. 3

*Fialkov v. Microsoft Corp.*,
   72 F. Supp. 3d 1220 (W.D. Wash. 2014) ................................................................................. 9

*Flynn v. Sientra, Inc.*,
   No. CV-15-07548S-JOR-(AOx), 2016 WL 3360676 (C.D. Cal. June 9, 2016) .......................... 13

*In re Apollo Grp., Inc. Sec. Litig.*,
   No. CV-10-1735-PHX-JAT, 2011 WL 5101787 (D. Ariz. Oct. 27, 2011) ................................ 11

*In re Charles Schwab Corp. Sec. Litig.*,
   257 F.R.D. 534 (N.D. Cal. 2009) ............................................................................................ 14

*In re Copper Mountain Sec. Litig.*,
   311 F. Supp. 2d 857 (N.D. Cal. 2004) .............................................................................. 10, 15

*In re Cutera Sec. Litig.*,
   610 F.3d 1103 (9th Cir. 2010) ............................................................................................. 2, 3

*In re Leapfrog Enter., Inc. Sec. Litig.*,
   200 F. Supp. 3d 987 (N.D. Cal. 2016) ........................................................................ 3, 5, 7, 13

*In re Netflix, Inc. Sec Litig.*,
   No. C04-2978FMS, 2005 WL 1562858 (N.D. Cal. June 28, 2005) ....................................... 9, 10

*In re Oracle Corp. Sec. Litig.*,
   627 F.3d 376 (9th Cir. 2010) ................................................................................................... 2

*In re Quality Sys., Inc. Sec. Litig.*,
   865 F.3d 1130 (9th Cir. 2017) ............................................................................................. 5, 10

*In re SeeBeyond Techs. Corp. Sec. Litig.*,
   266 F. Supp. 2d 1150 (C.D. Cal. 2003) .................................................................................. 12

*In re Silicon Graphics Inc. Sec. Litig.*,
   183 F.3d 970 (9th Cir. 1999) ............................................................................................ 11, 15

*In re Splash Tech. Holdings, Inc. Sec. Litig.*,
   160 F. Supp. 2d 1059 (N.D. Cal. 2001) .................................................................................. 10

*In re Syntex Corp. Sec. Litig.*,
   95 F.3d 922 (9th Cir. 1996) ....................................................................................................... 4

*In re Toyota Motor Corp. Sec. Litig.*,
   No. CV 10-922 DSF, 2011 WL 2675395 (C.D. Cal. July 7, 2011) ........................................ 14

*In re UTStarcom, Inc. Sec. Litig.*,
   617 F. Supp. 2d 964 (N.D. Cal. 2009) .................................................................................... 13

*In re Vantive Corp. Sec. Litig.*,
   283 F.3d 1079 (9th Cir.2002) .................................................................................................. 13

*In re VeriFone Sec. Litig.*,
   11 F.3d 865 (9th Cir. 1993) ..................................................................................................... 15

*Jasin v. Vivus, Inc.*,
   No. 14-CV-03263-BLF, 2016 WL 1570164 (N.D. Cal. Apr. 19, 2016) ................................... 4

*Khoja v. Orexigen Therapeutics, Inc.*,
   No. 16-56069, -- F.3d --, 2018 WL 3826298 (9th Cir. Aug. 13, 2018) ............................ 5, 7, 8

*Kmiec v. Powerwave Techs. Inc.*,
   No. 12-CV-00222 CJC, 2013 WL 12114821 (C.D. Cal. May 16, 2013) ................................. 3

*Matrixx Initiatives, Inc. v. Siracusano*,
   563 U.S. 27 (2011) ..................................................................................................................... 7

*Metzler Inv. GmbH v. Corinthian Colls., Inc.*,
   540 F.3d 1049 (9th Cir. 2008) ............................................................................................ 11, 12

*Mulligan v. Impax Labs., Inc.*,
   36 F. Supp. 3d 942 (N.D. Cal. 2014) ................................................................................ 10, 14

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*,
   135 S. Ct. 1318 (2015) ............................................................................................................... 9

*Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*,
   759 F.3d 1051 (9th Cir. 2014) ................................................................................................... 3

DEFS' REPLY BRIEF ISO MOTION TO DISMISS                               3:18-cv-00400-EMC

*Provenz v. Miller*,
  102 F.3d 1478 (9th Cir. 1996).................................................................................................. 2

*Ronconi v. Larkin*,
  253 F.3d 423 (9th Cir. 2001).................................................................................................. 12

*S. Ferry LP, No. 2 v. Killinger*,
  542 F.3d 776 (9th Cir. 2008).................................................................................................. 13

*Schueneman v. Arena Pharmaceuticals*,
  840 F.3d 698 (9th Cir. 2016).................................................................................................... 8

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007) ............................................................................................................... 11

*Thomas v. Magnachip Semiconductor Corp.*,
  167 F. Supp. 3d 1029 (N.D. Cal. 2016) ................................................................................. 13

*Washtenaw Cnty. Employees Ret. Sys. v. Celera Corp.*,
  No. 5:10-CV-02604 EJD, 2012 WL 3835078 (N.D. Cal. Sept. 4, 2012) ................................ 3

*Wochos v. Tesla, Inc.*
  No. 17-cv-05828-CRB, 2018 WL 4076437 (N.D. Cal. Aug., 27 2018) .................................. 4

*Zeid v. Kimberley*,
  930 F. Supp. 431 (N.D. Cal. 1996) ......................................................................................... 4

**Statutes and Rules**

15 U.S.C.
  § 78u-5 .................................................................................................................................... 1
  § 78u-5(c)(1)(A)(i) .................................................................................................................. 2
  § 78u-5(c)(1)(B) ...................................................................................................................... 2

Fed. R. Civ. Proc.
  9(b) .................................................................................................................................... 5, 14

- iv -
DEFS' REPLY BRIEF ISO MOTION TO DISMISS                                          3:18-cv-00400-EMC

**INTRODUCTION**

The Memorandum of Points and Authorities in Opposition to the Motion to Dismiss ("the Opposition") is more of an exercise in obfuscation than a genuine response to the Motion.[1] The record before the Court shows that when Yelp predicted its future full-year financial results on February 9, 2017, it had already made clear to investors that forecasting revenue was difficult in the best of times and was made especially challenging by the recent change to "performance-based" advertising, *i.e.,* from CPM to CPC. Plaintiffs ignore the significance of the change of advertising models and offer no real rejoinder to the fact that Yelp's forecasts were accompanied by more than adequate cautionary language to invoke the protection of the PSLRA safe harbor. That alone is sufficient to dismiss the Complaint.

Although Plaintiffs assert that they properly plead falsity by alleging that Yelp's earnings and revenue forecast in February ignored existing advertiser retention issues, the Opposition is unable to point to any factual allegation about how the forecast was prepared, what levels of retention were assumed in its preparation, what other factors besides retention impacted Yelp's predictions, and what reports or analyses *then known to Yelp* were supposedly ignored in order to falsify it. Absent these allegations, the pleading fails to meet the particularity requirements under the PSLRA. Nor does the Opposition offer any meaningful rebuttal to its demonstrated failure to allege facts necessary to make a single defendant's pre-planned stock sales sufficient to create a strong inference of scienter. For these and other reasons, as we show below, the Complaint should be dismissed with prejudice.

**ARGUMENT**

**I.  THE OPPOSITION CONCEDES THAT YELP INFORMED INVESTORS OF THE DIFFICULTIES OF FORECASTING UNDER ITS NEW CPC MODEL AND FAILS TO REBUT APPLICATION OF THE PSLRA SAFE HARBOR.**

Plaintiffs concede that the PSLRA provides a statutory safe harbor that precludes liability for forward-looking statements, 15 U.S.C. § 78u-5, but they distort the requirements for its

---

[1] Citations to "¶ __" refer to paragraphs of the Amended Complaint; "Br. __" refer to Defendants' Memorandum of Points and Authorities in support of the Motion to Dismiss; "Ex. __" refer to exhibits attached to the Declaration of Gilbert R. Serota In Support of Defendants' Motion to Dismiss; "Opp. Br. __" refer to Plaintiffs' Opposition to Defendants' Motion to Dismiss.

application. Subsection (A) of the PSLRA's safe harbor provision provides that if a forward-looking statement is identified as such and is accompanied by meaningful cautionary language then "the state of mind of the individual making the statement is irrelevant, and *the statement is not actionable regardless of the plaintiff's showing of scienter*." *In re Cutera Sec. Litig.*, 610 F.3d 1103, 1112 (9th Cir. 2010) (emphasis added); 15 U.S.C. § 78u-5(c)(1)(A)(i). Under subsection (B), which governs unidentified forward-looking statements and forward-looking statements unaccompanied by meaningful cautionary language, a forward-looking statement may not be entitled to safe harbor protection, but only if a plaintiff can show that "the projections were made with *actual* knowledge that they were materially false or misleading." *Cutera*, 610 F.3d at 1112 (emphasis in original); 15 U.S.C. § 78u-5(c)(1)(B).

### A. The Safe Harbor Applies Because Yelp's Forecasts Were Accompanied By Meaningful Cautionary Language.

Because Plaintiffs have not contested that Yelp's financial forecasts were forward-looking statements and properly identified as such, the only relevant inquiry is whether they were accompanied by meaningful cautionary language. Plaintiffs' suggestion that they may disregard subsection (A) and skip to the issue of whether the Defendants had "actual knowledge" of risks that purportedly already came into fruition, Opp. Br. at 12-14, is erroneous as a matter of law. If adopted by this or any other Court, it would allow plaintiffs to evade the protections that Congress intended to confer on issuers that seek to make forecasts and projections.

The Ninth Circuit rejected this exact argument in *Cutera*: "[T]he [plaintiffs] argue for a conjunctive reading of the safe harbor provision, under which a sufficiently strong inference of actual knowledge would overcome a claim of safe harbor protection even for statements identified as forward-looking and accompanied by meaningful cautionary language. The difficulty with this approach is that it ignores the plain language of the statute, which is written in the disjunctive as to each subpart." 610 F.3d at 1112.[2]

---

[2] Plaintiffs rely on inapposite cases. *See, e.g.*, *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 388 n.2 (9th Cir. 2010) (Court noted that "[d]efendants have disclaimed invocation of the PSLRA safe harbor," but held that the guidance-related claims were non-actionable); *Provenz v. Miller*, 102 F.3d 1478, 1493 (9th Cir. 1996) (applying bespeaks caution doctrine, not the PSLRA safe harbor).

### B. Yelp's Risk Disclosures Were "Meaningful" Because They Expressly Addressed The Precise Risks That Led To The Forecast Adjustment.

Cautionary language is meaningful where it "identif[ies] important factors that could cause actual results to differ materially from those in the forward-looking statement[s]." *In re Leapfrog Enter., Inc. Sec. Litig.*, 200 F. Supp. 3d 987, 1004 (N.D. Cal. 2016) (Chen, J.) (quoting *Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1058 (9th Cir. 2014)).  Plaintiffs do not dispute that Yelp's disclosures meet this standard, but instead argue that the Court should ignore the robustness of Yelp's risk disclosures because the risks already came into fruition. That argument is contrary to *Cutera*, and wrong as a matter of undisputed fact.[3]

The record before this Court shows without doubt that Yelp's risk warnings not only identified important factors that could cause actual results to differ from projections, but they "identify the very risks that came to fruition here." *Leapfrog*, 200 F. Supp. 3d at 1004. There were two primary issues that Yelp attributed to the decision to adjust of its full-year revenue and EBITDA forecasts on May 9, 2017: the "carryover effect of soft sales production in the fourth quarter of [2016]"—which Plaintiffs do not dispute that Yelp previous disclosed to investors, Opp. Br. at 3-4—and "lower account retention in early 2017," or a churn bump among a cohort of advertisers who signed agreements during the transition to the CPC model in 2016. Ex. I at 5-6.

Speaking directly to the "churn" issue, there is no dispute that Yelp expressly and in a timely fashion warned investors about the risks associated with its ability to "attract and retain new advertising clients," and that the transition to "sell[ing] more performance-based advertising," *i.e.*, the transition to the CPC model, makes it more difficult to "forecast revenue and adjusted EBITDA

---

[3] Plaintiffs place reliance on *Cutler v. Kirchner*, 696 F. App'x 809, 813 (9th Cir. 2017), an unpublished memorandum opinion with no precedential value.  There, the issue was whether the risk disclosures made over the course of a year were false statements because they misrepresented operational issues that the company was already experiencing as contingencies, not whether the risk disclosures were sufficiently meaningful.  Here, Plaintiffs have not pleaded the falsity of the risk disclosures accompanying the February 9 financial forecasts; nor could they when the same disclosures were made in Yelp's quarterly and annual SEC filings that were filed well before Yelp experienced retention issues in Q1 2017.  They also rely on *Washtenaw Cnty. Employees Ret. Sys. v. Celera Corp.*, No. 5:10-CV-02604 EJD, 2012 WL 3835078 (N.D. Cal. Sept. 4, 2012), a case where the Court's erroneous reading of the PSLRA safe harbor provision has been found to be "directly rejected" by *Cutera*.  *Kmiec v. Powerwave Techs. Inc.*, No. 12-CV-00222 CJC, 2013 WL 12114821, at *3 (C.D. Cal. May 16, 2013).

accurately." Ex. D at 45; 28; Ex. E at 43.  Yelp also warned investors that it "may experience attrition in its advertisers," whose decisions to renew depended on their "satisfaction with [Yelp's] products," and about the potential harm to its revenue if it fails to "maintain and expand [its] base of customers." Ex. D at 18, 19; Ex. E at 35, 36.  Yelp specifically warned investors that "a decline in new or renewed agreements in any one quarter may not significantly impact our revenue in that quarter but will negatively affect our revenue in future quarters," Ex. D at 29; Ex. E at 44, which is why Yelp *met or exceeded* the Q1 2017 financial projections issued on February 9, 2017, but nevertheless decided to adjust its full-year forecasts on May 9.  Opp. Br. at 13-14; Ex. H.

Plaintiffs' half-hearted assertion that these robust disclosures were not meaningful is directly contradicted by their admission that the "increased difficulties forecasting under the new pricing model was well understood by investors."  Opp. Br. at 15.  Even more tellingly, they argue that Yelp's 2016 10-K, which contained the *exact same* cautionary language as the prior financial statements quoted above, was misleading because it "presented customer churn as only a potential risk" that may impact Yelp's financial forecasts rather than one that had already materialized.[4]  Opp. Br. at 15-16.  Plaintiffs cannot credibly maintain that Yelp's risk disclosures were insufficient.

Judge Breyer's recent opinion in *Wochos v. Tesla, Inc.* is instructive.  No. 17-cv-05828-CRB, 2018 WL 4076437, at *1 (N.D. Cal. Aug., 27 2018).  He acknowledged that "[f]ederal securities laws do not punish companies for failing to achieve their targets," and that "a firm's failure to meet projections is only actionable if the firm did not accompany those projections with meaningful qualifications."  Relying on judicially noticed material filed with the SEC, Judge Breyer

---

[4] Because Plaintiffs have failed to allege facts showing when Defendants realized that Yelp's February 9 full-year forecast was unachievable, their allegation that the 2016 10-K contained misleading risk disclosures fails.  Even the claims related to its recovery team efforts in 2017 fall short because Yelp "could have known of problems," "planned to remedy those deficiencies, and still thought it would achieve" the original forecasts. *In re Syntex Corp. Sec. Litig.*, 95 F.3d 922, 930 (9th Cir. 1996); *Tesla*, 2018 WL 4076437, at *6 (to show that defendants' qualifications were not meaningful, plaintiff must plead that "it was impossible for [the company] to meet its stated production goals, not merely highly unlikely").  Courts routinely dismiss falsity allegations relating to risk disclosures where, as here, a plaintiff "fail[s] to allege that these warnings were baseless or wrong." *Jasin v. Vivus, Inc.*, No. 14-CV-03263-BLF, 2016 WL 1570164, at *18 (N.D. Cal. Apr. 19, 2016), *aff'd*, 721 F. App'x 665 (9th Cir. 2018); *Zeid v. Kimberley*, 930 F. Supp. 431, 437 (N.D. Cal. 1996) (same, characterizing plaintiffs' risk disclosures falsity allegations as "absurd.").

1  found that Tesla had repeatedly warned investors of the difficulties of projecting manufacturing
2  rates for a new model. *Id.* at *4.

3  Like in *Tesla*, Yelp repeatedly warned investors about the difficulties of forecasting under
4  the new CPC pricing model and about the potential harm to its business if dissatisfied advertisers
5  failed to renew their agreements. Because Yelp's risk disclosures were meaningful, the Court does
6  not need to reach the issue of falsity or scienter to dismiss Plaintiffs' forecasting claims. In any
7  event, as we discuss below, Plaintiffs fall far short of showing that Defendants' statements were
8  made with actual knowledge of falsity.[5]

## II. THE OPPOSITION FAILS TO IDENTIFY FACTS SHOWING THE FEBRUARY 9 FORECAST WAS MADE KNOWING IT COULD NOT BE ACHIEVED.

Pleading falsity requires Plaintiffs to allege the "the 'who, what, when, where, and how' of the fraud." *Khoja v. Orexigen Therapeutics, Inc.*, No. 16-56069, -- F.3d --, 2018 WL 3826298, at *15 (9th Cir. Aug. 13, 2018) (citation omitted). "[M]issed guidance alone generally does not render Defendants' financial project[ion]s false or misleading." *Leapfrog*, 200 F. Supp. 3d at 1006. Plaintiffs fail to respond meaningfully to their demonstrated failure to plead with specificity facts showing that Yelp's financial forecasts and statements to analysts were inconsistent with what Defendants knew at the time. Br. at 7-10. While the Court must interpret the facts in favor of the plaintiff on a motion to dismiss, it is not required to turn a blind eye to glaring deficiencies like the ones present here. The PSLRA and Rule 9(b) require a rigorous examination of the Complaint to see if there are facts–not speculations or supposition–that demonstrate falsity.

---

[5] Plaintiffs also fail to rebut Defendants' arguments that Yelp's forward-looking statements to analysts are protected by the PSLRA safe harbor. While the PSLRA does not protect the non-forward looking portions of mixed statements, Plaintiffs have identified no "materially false or misleading statements about current or past facts." *In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1142 (9th Cir. 2017). The statement that "executing well on these priorities sets Yelp up for continued growth in 2017" was made in the context of discussing Yelp's progress in "increasing awareness and engagement" among consumers, not advertisers, in 2016. ¶ 75. The statement that "we like the returns in that business" refers to Yelp's Mr. Stoppelman's belief that growing Yelp's local sales team is a "fairly proven model" for which the returns "tend to be predictable over time." ¶ 91. Plaintiff does not challenge that investing in Yelp's sales force was important to its growth, or that the returns Yelp saw were not predictable over time.

The Opposition seeks to establish falsity based on guesswork related to pre-Class period statements about monitoring customer engagement and retention metrics, Opp. Br. at 12-14, and on Mr. Nachman's May 9, 2017 statement that "we addressed this kind of acute problem in January and February. We put this recovery team on higher response rates, put a lot of focus on that particular cohort and the numbers have kind of spoken for themselves as we've gotten into March and April." Opp. Br. at 7-8, 17-18; Ex. I at 12. These facts do not establish that Yelp's February 9 forecast was false when made, let alone knowingly false. The fact that Yelp was experiencing some unanticipated customer attrition in January and February falls far short of pleading that Yelp *then knew* that "churn" would be higher than that accounted for in its full-year forecasts, or that its full-year forecasts would be unreachable based on facts known at the time. Plaintiffs have not pleaded what rate of advertising attrition was assumed in the forecast—much less any other factors material to the forecasts—or why such assumptions were knowingly false when issued on February 9.

Plaintiffs concede that Defendants' statements "show that some level of customer churn was expected."[6] Opp. Br. at 13. Even construed in the most favorable light, Plaintiffs cannot point to any facts indicating that the Yelp did not factor the advertiser attrition rate it was seeing into the financial projections issued on February 9. Nor does it plead facts that show that the early trend became so sufficiently pronounced by February 9 such that Defendants recognized Yelp would be unable to meet those projections despite the corrective efforts of its sales team.[7] The Opposition's only theory of falsity relies on the speculation that Defendants had this knowledge by February 9. Even worse, it is directly contradicted by the very facts relied upon in the Complaint–that Defendants "recognized the churn issue about halfway through the quarter," which is after February

---

[6] The forecast hardly served to "inflate" the stock price. Rather, it is undisputed that Yelp's stock price *dropped* from $41.41 to $35.74 in the two trading days following the announcement of the February 9 forecast, which indicates that investors were not bullish on Yelp's financial outlook based on the forecasts and other information they received.

[7] For the same reason, Plaintiffs' allegation that Yelp "began to see the churn problems in December 2016 for those contracts that terminated in January 2017" because advertisers had to provide thirty-day written notice is baseless. Opp. Br. at 18 n.11. Plaintiffs fail to plead with particularity that these terminations were *not* factored into Yelp's financial guidance, much less the number of advertisers that informed Yelp of their intent to terminate their agreements in December, and whether this surpassed Yelp's internal projections.

9, and Plaintiffs make no attempt to identify any other data that Yelp used to create its challenged forecasts.[8]  ¶ 64.

The Opposition makes clear that Plaintiffs' allegations are indistinguishable from those found to be insufficient in *Leapfrog*, where this Court dismissed the complaint because it failed to "allege any specific evidence demonstrating that the Defendants did not believe their assessment of the inventory problem at the time the statements were made."  200 F. Supp. 3d at 1004.  The Court highlighted that "there are no specific figures given about the current level of inventory at the time of each particular statement that would demonstrate falsity (and hence knowledge thereof) at the time," and the complaint "cites no specific evidence or cites any reports that would have alerted Defendants in advance that inventory problems were going to exceed what they had disclosed."  *Id.*  Based on these failures, this Court concluded that "Plaintiffs' theory is basically an assertion of fraud by hindsight—judging the statements on how things actually turned out subsequently.  Such proof is not adequate to state a claim."  *Id.* at 1005.

### A. Even If Defendants Were Aware Of Churn Issues On February 9, Plaintiffs Fail To Show That Defendants Had A Duty To Disclose.

Aside from their failure to establish falsity as to Yelp's projections, the Opposition also fails to show that Defendants' statements to analysts on February 9 were inconsistent with what they knew at the time about advertiser retention issues.  First, the Court must address the question of whether what was said to analysts gave rise to any duty to disclose actual advertiser attrition in January and early February 2017.  The Opposition fails to do so.  As the Ninth Circuit recently reiterated, companies are not required to disclose any and all information to the market, they "can control what they have to disclose . . . by controlling what they say to the market."  *Khoja*, 2018 WL 3826298, at *15 (quoting *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 45 (2011)).  It is only when "defendants [choose] to tout positive information to the market" that "they [are] bound to

---

[8]  Contrary to Plaintiffs' assertion, this statement poses no factual dispute for the Court to resolve in their favor.  As Plaintiffs concede, recognizing the churn issue "about halfway through the first quarter" and developing a recovery plan soon afterwards means these events occurred in or about mid-February.  That is fundamentally inconsistent with their proposed inference that "the high customer churn was well recognized and companywide efforts were underway to develop a response before February 9, 2017."  Opp. Br. at 7.

do so in a manner that wouldn't mislead investors." *Khoja*, 2018 WL 3826298 at *15 (citation omitted).

Plaintiffs argue that the duty to disclosure arose because Defendants "boasted about Yelp's success retaining advertising customers," and made "rosy statements about present success retaining customers" on February 9. Opp. Br. at 6-8. But the paragraphs they cite in the Complaint fail to provide support for these assertions: ¶ 75 relates to Yelp's success in meeting its 2016 goals for increasing awareness and engagement among consumers who use its platform, not advertisers; ¶ 79 merely states that Yelp does not plan on making any structural changes to its business in 2017, and Mr. Baker's inactionable opinion that it's "still pretty small in terms of long-term opportunity"; ¶ 81 discloses the sales slowdown that occurred in Q4 2016; and ¶ 83 states defendants were not "alarmed in any way about kind of where we are in the repeat rate," which is "the percentage of local advertising accounts from which [Yelp] recognized revenue in the immediately preceding 12-month period," ¶ 36, and does not necessarily correlate to the advertiser retention rate.[9]

Because Plaintiffs have failed to identify any specific facts that render false anything Yelp "touted" to analysts, the cases they rely on are inapposite.[10]

---

[9] The repeat rate does not measure advertiser attrition as assumed by Plaintiffs. Rather, it provides an indication of Yelp's total mix of long-term versus new advertisers. For example, if Yelp's repeat rate is 100% (the mix consists entirely of existing customers), and half of them decide not to renew, then the repeat rate would still be 100% if Yelp did not sign any new clients. If Yelp's sales team signs up new customers without losing any existing advertisers in any given quarter, then the repeat rate would drop. Thus, the repeat rate is not necessarily correlated with churn or revenue retention. Plaintiffs have not alleged that Yelp's repeat rate was not at an all-time high as of February 9, and the full quote makes clear that while defendants were "encouraged by our kind of strong, embedded client base," they also cautioned investors not to read too much into the repeat rate because of the importance of adding new advertisers, and that there was "another chunk [of advertisers] who we haven't documented well enough for them the value of Yelp's advertising" for them to remain with Yelp. ¶ 83.

[10] In the cases cited, the courts relied on particularized *facts* that were known to defendants and that directly contradicted what they told investors, not plaintiffs' mere speculation. *See*, *e.g.*, *Khoja*, 2018 WL 3826298, at **16, 20 (known information from the FDA and steering committee directly contradicted the rosy picture defendants painted regarding the clinical trials for a new drug); *Schueneman v. Arena Pharmaceuticals*, 840 F.3d 698, 707-709 (9th Cir. 2016) (similar); *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 987 (9th Cir. 2008) (company touted its earning potential on its backlog of contracted for but unperformed work when major customers had already stopped work on those contacts and were highly likely to cancel them).

### III. THE REMAINING ALLEGATIONS REGARDING POST-FEBRUARY 9 STATEMENTS TO ANALYSTS FOCUS ON INACTIONABLE STATEMENTS OF OPINION.

Plaintiffs also fail to demonstrate that Defendants had any duty to disclose any churn issue during analyst calls on February 14 and March 1, 2017. Under an omissions theory, plaintiffs "must identify particular (and material) facts going to the basis for the issuer's opinion—facts about the inquiry the issuer did or did not conduct or the knowledge it did or did not have—whose omission makes the opinion statement at issue misleading to a reasonable person reading the statement fairly and in context." *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 135 S. Ct. 1318, 1332 (2015); *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605, 616 (9th Cir. 2017). Although Plaintiffs urge the Court to examine the context of the post-February 9 statements were made, that context does not help Plaintiffs.

Instead of showing that a duty to disclose arose, the Opposition actually shows that many of the statements in the Complaint have nothing to do with advertiser retention. Mr. Stoppelman's statement that "it was just about focusing on the core. And that was the message that was delivered to the teams at the start of [2016] is, hey, there's nothing fundamentally wrong with our business. We just need to execute even better. And so we really did that and I think it paid off" is an opinion regarding Yelp's successful performance in 2016. ¶ 87. Similarly, ¶ 91 relates to Mr. Stoppelman's belief that growing Yelp's local sales team is a "fairly proven model" for which the returns "tend to be predictable over time" from a business perspective. Plaintiff fails to show why Mr. Stoppelman was required to disclose Yelp's advertiser retention issues occurring in Q1 2017, which was not the predicate of either of these opinions. Put another way, the omission of a non sequitur does not render the alleged statements misleading.

Mr. Nachman's statement that "we've got a really strong client base that's recurring and they love our product"—which was made in the context of discussing Yelp's acquisitions as a prospective source for growth, not revenue retention or advertiser churn—is also not actionable. ¶ 97. *See Fialkov v. Microsoft Corp.*, 72 F. Supp. 3d 1220, 1231 (W.D. Wash. 2014), *aff'd*, 692 F. App'x 491 (9th Cir. 2017) (statement "customers love Surface" constitutes mere puffery); *In re Netflix, Inc. Sec Litig.*, No. C04-2978FMS, 2005 WL 1562858, *7 (N.D. Cal. June 28, 2005)

("consumers love our service"). Plaintiffs make no meaningful effort to distinguish these cases, which address purportedly misleading statements regarding positive customer demand and retention, and are thus directly analogous to the context here. Courts routinely dismiss references to "strong" performance or demand as inactionable. *See, e.g.*, *In re Copper Mountain Sec. Litig.*, 311 F. Supp. 2d 857, 879 (N.D. Cal. 2004) (dismissing statements characterizing business as "'strong,' 'solid' and 'on track' to meet revenue and earnings expectations"); *In re Splash Tech. Holdings, Inc. Sec. Litig.*, 160 F. Supp. 2d 1059, 1077 (N.D. Cal. 2001) (rejecting allegations of "strong demand," "better than expected" or "robust" performance.)

Mr. Nachman's optimistic opinions not only fail to state whether Yelp was seeing greater or fewer recurring advertisers, but what he said is incapable of being objectively verified. That is another basis on which to find it not actionable.[11]

Plaintiffs do not attempt to show that any other statements made after February 9 were false or misleading, thus they have conceded that those are non-actionable. Accordingly, those claims must also be dismissed.

**IV.  THE OPPOSITION FAILS TO IDENTIFY PARTICULARIZED FACTS ESTABLISHING A STRONG INFERENCE OF SCIENTER.**

Plaintiffs do not dispute that, at minimum, they must plead with particularity Defendants' *actual* knowledge of falsity for any forward-looking statements. As shown above, Plaintiffs have failed to plead that any of Defendants' statements were false, much less knowingly so. In addition,

---

[11] In the cases cited by Plaintiffs, the statements at issue offered points of comparison about the company's performance that were objectively verifiable. In *Quality Systems*, the Court explained that defendants' opinions were actionable because they provided "a concrete description of the past and present state of the [Company's] pipeline" by repeatedly assuring investors that "the number and type of prospective sales in the pipeline was unchanged, or even growing, compared to previous quarters" when they knew this was not the case. 865 F.3d at 1144. Similarly, in *Mulligan v. Impax Labs., Inc.*, 36 F. Supp. 3d 942 (N.D. Cal. 2014), this Court found defendants' repeated assurances that remedial efforts to address "pervasive, recurring, and long-standing" issues identified in FDA warning letters, which jeopardized the company's very existence and alarmed investors, were "well underway" or nearly completed to be material. *Id.* at 961, 968. This Court found that these statements "contain [the] factual representations at their core" that defendants had in fact responded to the FDA's concerns when particularized allegations indicated the opposite was true. *Id.* at 967. In doing so, this Court expressly distinguished the statements at issue from "vague assertions of corporate optimism" such as "strong demand metrics and good momentum," which are directly analogous to the representations that Mr. Nachman made here. *Id.* at 967-8.

1   the cases cited by Plaintiffs do not support their argument that a strong inference of scienter may be
2   drawn from Mr. Stoppelman's stock sales and the fact that advertising was one of Yelp's core
3   operations. As shown in the following subsections, the scienter allegations fall far short of the
4   standard set forth in *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314 (2007).

### A. Plaintiffs Identify No Corroborative Stock Sales Or Any Other Facts That Show Mr. Stoppelman's Stock Sales Were Suspicious In Timing Or Amount.

The Opposition and the Complaint rely on allegedly suspicious stock sales by only one Defendant. But, in the Ninth Circuit, sales of stock by one defendant is not enough to establish a strong inference of scienter. Rather, courts generally require "corroborative stock sales by other defendants." *Metzler Inv. GmbH v. Corinthian Colls., Inc.*, 540 F.3d 1049, 1067 (9th Cir. 2008); *In re Apollo Grp., Inc. Sec. Litig.*, No. CV-10-1735-PHX-JAT, 2011 WL 5101787, at *11 (D. Ariz. Oct. 27, 2011) (dismissing as insufficient sales ranging from 14%-34% by four defendants where the remaining five sold none).

Second, the Ninth Circuit also endorses consideration of 10b5-1 plans to resolve scienter allegations on a motion to dismiss. *See, e.g.*, *Metzler*, 540 F.3d at 1067 n.11 (considering Form 4s showing sales were made pursuant to a 10b5-1 plan on a motion to dismiss, and finding that "[s]ales according to pre-determined plans may 'rebut [ ] an inference of scienter.'") (citation omitted); *Curry v. Yelp Inc.*, 875 F.3d 1219, 1227 n.2 (9th Cir. 2017); *see also In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970, 986 (9th Cir. 1999), *as amended* (Aug. 4, 1999) (holding it was proper for the district court to consider Form 4s on motion to dismiss under the incorporation by reference doctrine). Plaintiffs' argument that this is an affirmative defense is nonsense. Mr. Stoppelman has not been sued for insider trading and has no reason to assert an affirmative defense. Rather, the 10b5-1 plan is an appropriate factor to consider in the overall assessment of the alleged.

Plaintiffs concede that the challenged stock sales were made pursuant to a 10b5-1 plan. Opp. Br. at 20-21. In *Curry*, the Ninth Circuit reviewed the identical Form-4 disclosure language for Mr. Stoppelman and noted that "[t]he Form 4s in the record indicate that the vast majority of Individual Defendants' stock sales were made pursuant to a Rule 10b5-1 plan, which allows for stock sales over a predetermined period without concern for the market." 875 F.3d at 1227 n.2.

1    But, even if the Court finds that the absence of corroborative stock sales and the existence of
2    the 10b5-1 plan are not dispositive on the issue of scienter, Plaintiffs fail to show that Mr.
3    Stoppelman's sales were suspicious in timing or amount.  First, contrary to Plaintiffs' assertion, Mr.
4    Stoppelman *did not* sell his shares "near the stock's peak" and "just prior to the stock decline."
5    Opp. Br. at 20.  The average shares prices at which Mr. Stoppelman sold his shares during the class
6    period were all made between $33.68 and $35.10, ¶118, which is nowhere near Yelp's peak price of
7    $41.49 on February 9 during the purported class period.  Thus, even disregarding the 10b5-1 plan,
8    Plaintiffs have failed to show that these sales were made at "times calculated to maximize the
9    personal benefit from undisclosed inside information."  *Curry*, 875 F.3d at 1226 (citation omitted).

10   Plaintiffs also fail to plead facts showing that the sales were suspicious in amount, and their
11   attempts to distinguish *Metzler* and *Ronconi v. Larkin*, 253 F.3d 423 (9th Cir. 2001) are wholly
12   unavailing.  Opp. Br. at 21 n.16.  In *Meztler*, the Court stated the defendant sold "only 37% of his
13   total stock holdings during the Class Period. We typically require larger sales amounts . . . to allow
14   insider trading to support scienter."  540 F.3d at 1067.  Here, Plaintiffs have not pleaded stock sales
15   greater than 37% typically required.  In *Ronconi*, the Court concluded that a sale of 17% was "not
16   suspicious in amount" without any reference to the defendant's trading history or a 10b5-1 plan.
17   253 F.3d at 435.  In *Curry*, a different Yelp defendant sold 22.76% of his total holdings—more than
18   Mr. Stoppelman sold here—and the Court held that "the overall percentages of . . . shares sold by
19   Defendants do not support an inference of scienter."  No. 14-cv-03547-JST, 2015 WL 7454137, at
20   *13 (N.D. Cal. Nov. 24, 2015).  The stock sale allegations here are *far weaker* than those dismissed
21   as insufficient in *Curry*.

22   The two cases cited by plaintiff that smaller stock sales may be sufficient are inapposite.
23   Neither of those cases involved sales made pursuant to a 10b5-1 plan, and in both, there were
24   particularized allegations of scienter beyond sales of stock, most notably detailed confidential
25   witness testimony about the defendants' actual knowledge and warnings by the companies' auditors
26   about improper accounting practices and GAAP violations.  *See In re SeeBeyond Techs. Corp. Sec.*
27   *Litig.*, 266 F. Supp. 2d 1150, 1168 (C.D. Cal. 2003); *Batwin v. Occam Networks, Inc.*, No. CV 07-
28   2750 CAS (SHx), 2008 WL 2676364, at *13 (C.D. Cal. July 1, 2008) (where two defendants sold

all the common stock they owned, and the 7% cited included vested stock options). In light of the detailed allegations presented by the plaintiffs in those cases, it is not surprising that those courts considered stock sales as *additional evidence* of scienter. Here, however, Plaintiffs' allegations rest *solely* on Mr. Stoppelman's stock sales and their own speculations about what Yelp's internal data showed. The cases cited by Plaintiffs reveal the inadequacy of their scienter allegations.[12]

### B. The Core Operations Theory Relied Upon By Plaintiffs Is Conclusory.

As Plaintiffs concede, drawing an inference of scienter based on core operations is reserved for the "rare circumstances where the nature of the relevant fact is of such prominence that it would be 'absurd' to suggest that management was without knowledge of the matter." *S. Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 786 (9th Cir. 2008). None of the cases cited support a finding that Plaintiffs have pleaded the particularized facts necessary to make such a showing.

While Mr. Baker stated in June 2016 that Yelp would be "watching how [advertisers added during the Q1 2016 promotional period] renew and how we follow up with them to make sure they become long time customers of ours going forward," Opp. Br. at 17; ¶ 48, Plaintiffs fail to allege any facts showing that Yelp's February 9 forecast ignored historic data then available to Yelp. As discussed above under Point II, *supra* 6-7, speculating from the updated May 9, 2017 forecast adjustment that damaging reports existed much earlier and that Defendants must have been aware of them is not enough. This Complaint must be dismissed because plaintiffs have failed to "cite to any specific report, to mention any dates or contents of reports, or to allege their sources of information about any reports." *Leapfrog*, 200 F. Supp. 3d at 1004 (quoting *In re Vantive Corp. Sec. Litig.*, 283 F.3d 1079, 1088 (9th Cir.2002)).[13]

---

[12]   The other cases cited by Plaintiffs offer much more than a single defendant's sales to infer scienter, such as unheeded warnings by auditors followed by financial restatements or similarly probative showings of scienter. *See, e.g.*, *Thomas v. Magnachip Semiconductor Corp.*, 167 F. Supp. 3d 1029, 1046 (N.D. Cal. 2016) (inferring scienter in light of "very obvious" GAAP violations, a restatement, and several defendants' positions on the audit committee); *In re UTStarcom, Inc. Sec. Litig.*, 617 F. Supp. 2d 964, 975 (N.D. Cal. 2009); *see also Flynn v. Sientra, Inc.*, No. CV-15-07548S-JOR-(AOx), 2016 WL 3360676, at *14 (C.D. Cal. June 9, 2016) (in-house investigation concluded there were quality control issues).

[13]   As discussed above, Plaintiffs' assertion that Yelp's implementation of a recovery team in mid-February supports the conclusion that Defendants "knew the churn rate was proceeding at a higher than expected rate throughout January 2017" is wholly speculative and based on hindsight. The more credible inference is that Yelp addressed the issue with a recovery team as soon as it was
*Footnote continued on next page*

Plaintiffs' reliance on this Court's opinion in *Mulligan v. Impax Laboratories* is misplaced. In that case, a pharmaceutical company's management received repeated warnings from the FDA detailing the "significant objectionable conditions" observed at their drug manufacturing and quality control facilities, which were further corroborated by the accounts of numerous confidential witnesses who testified as to the "pervasive and systematic nature of Impax's problems and the purposefulness in failing to address and remedy these problems." 36 F. Supp. 3d at 963. The Court found a strong inference of scienter given the importance to a pharmaceutical company of these areas of operation, and of FDA warnings regarding the safety of product manufacturing. *Id.* at 970. Similarly, the defects at issue in *In re Toyota Motor Corp. Sec. Litig.*, No. CV 10-922 DSF (AJWx), 2011 WL 2675395 (C.D. Cal. July 7, 2011) were "overwhelming, both in its potential catastrophic result and the number of vehicles involved," and had been the subject of at least eight regulatory investigations and intense media scrutiny. *Id.* at *4.

In both those cases, the plaintiffs made credible, factual showings that there were significant issues with potentially devastating consequences to the companies' lines of business, and that defendants were put on notice of these issues by regulators. In contrast, all Plaintiffs offer here are baseless speculations about when Defendants became aware that the issues with advertiser retention would render Yelp unable to meet its previous full-year financial guidance.[14] Even considered as a whole, Plaintiffs' allegations fail to meet the "demanding standards set for" pleading scienter because "[n]one of the allegations forms a nexus between the wrongful behavior and Individual Defendants' knowledge." *Curry*, 875 F.3d at 1228.

---

*Footnote continued from previous page.*, identified to be potentially significant halfway through Q1 2017, after its February 9 forecast. Moreover, this allegations does nothing to establish that Yelp somehow knew its February 9 guidance was false at the time Yelp provided it.

[14] Plaintiffs' loss causation arguments fail because of their failure to plead deceptive acts, and they have failed to meaningfully respond to Defendants' argument that they cannot establish loss causation with respect to any alleged misstatements made after February 9. The sole case cited is inapposite. It relates to risks that defendants failed to disclose, which is not the case here. Further, that case involved a Section 11 claim that is neither subject to Rule 9(b)'s particularity requirement nor requires a prima facie showing of loss causation. *In re Charles Schwab Corp. Sec. Litig.*, 257 F.R.D. 534, 547 (N.D. Cal. 2009).

# CONCLUSION

Plaintiffs have failed to request leave to amend or "set forth any facts which [they] could add to save [their] complaint." *Silicon Graphics,* 183 F.3d at 991; *In re VeriFone Sec. Litig.*, 11 F.3d 865, 872 (9th Cir. 1993) (same). Moreover, because their challenged statements are "immunized by the PSLRA's safe harbor provision" leave to replead should not be given. *In re Copper Mountain*, 311 F. Supp. 2d at 883 (complaint dismissed with prejudice).

DATED: September 6, 2018                ARNOLD & PORTER KAYE SCHOLER LLP

By:    */s/ Gilbert R. Serota*
Gilbert R. Serota
gilbert.serota@arnoldporter.com
Zheng (Jane) He
jane.he@arnoldporter.com

Attorneys for Defendants
YELP INC., JEREMY STOPPELMAN,
LANNY BAKER, and JED NACHMAN