UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ROEI AZAR, et al.,<br><br>　　　　　Plaintiffs,<br><br>　　v.<br><br>YELP, INC., et al.,<br><br>　　　　　Defendants. | Case No.　18-cv-00400-EMC<br><br>**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS**<br><br>Docket No. 31 |

Plaintiffs, investors in Yelp stock, bring this putative securities class action against Defendants Yelp, Inc., its CEO Jeremy Stoppelman, CFO Lanny Baker, and COO Jed Nachman (collectively, "Defendants"). The crux of Plaintiffs' complaint is that Yelp made false and misleading statements regarding its expected revenues for fiscal year 2017, particularly in relation to its advertising program with local businesses. Yelp allegedly touted the program's strong advertiser retention rate and optimistic growth projections through early 2017, despite knowing that a significant number of the local advertisers were not renewing their contracts. When Yelp made downward adjustments to its projections and disclosed those retention problems in May 2017, its stock prices fell. Plaintiffs assert that Defendants' actions violate Sections 10(b) and 20(a) of the Securities Exchange Act, as well as Rule 10b-5 promulgated thereunder.

Pending before the Court is Defendants' motion to dismiss the class action complaint. For the reasons discussed below, the motion is **GRANTED IN PART** and **DENIED IN PART**.

## I.　　FACTUAL AND PROCEDURAL BACKGROUND

Named Plaintiffs Roie Azar and Jonathan Davis filed the operative amended complaint on June 25, 2018, seeking to represent the "class of persons and entities that purchased or acquired Yelp securities between February 10, 2017 and May 9, 2017." Docket No. 29 ("FAC") ¶ 1. The

complaint alleges that Yelp made materially false and misleading statements regarding its expected 2017 earnings.

A.     Yelp's Business and Advertising Model

Yelp is an "online platform devoted largely to reviews of businesses." FAC ¶ 2. It derives revenue from businesses advertising on its platform. *Id.* ¶¶ 3, 19. According to Plaintiffs, advertising from "small and medium sized businesses" accounted for approximately 70% of Yelp's advertising revenues in 2016. *Id.* ¶ 20. Beginning in 2015, the company started transitioning from charging advertisers on a cost-per-impression ("CPM") basis, whereby advertisers pay a predetermined fee for every 1,000 ads shown, to a cost-per-click ("CPC") basis, whereby advertisers pay only if users click on their ads. *Id.* ¶¶ 23–25. While it has benefits, the CPC model has the downside that ads that are not successful at generating clicks are quickly sidelined and stop receiving impressions. *Id.* ¶ 25. This means that ads with high levels of customer engagement perform better in the CPC model because they are more likely to drive clicks, but ads with lower levels of engagement do not perform as well. *Id.*

In addition to adopting the CPC model, Yelp made the "local ads business" a "top priority" for 2016. *Id.* ¶ 39. The company increased its sales force substantially going into the year, *id.* ¶ 38, and through the end of the third quarter of 2016 touted its results in the local advertising segment, *id.* ¶¶ 40–45. However, Plaintiffs claim the reality was not so rosy. "A large portion of the local revenue growth was due to businesses attracted to Yelp by various promotional offers" Yelp implemented in 2016. *Id.* ¶ 41. These businesses were encouraged to sign up for year-long advertising contracts. *Id.* ¶ 3. A "significant percentage" of them experienced low engagement with their advertising on Yelp, and "were thus far less likely to remain with Yelp after the expiration of their initial contracts." *Id.* ¶ 41. Yelp discouraged early contract terminations by imposing hefty fees, but the local advertisers who signed on with Yelp at the beginning of 2016 would be able to cancel their contracts in late 2016 and the first quarter of 2017 without being subject to termination fees. *Id.* ¶ 3. Thus, Plaintiffs believe that Yelp created a cohort of local advertisers in 2016 who were likely to cancel their contracts in late 2016 and early 2017.

B.     Yelp's February and March 2017 Statements

On February 9, 2017, Yelp issued a press release announcing its financial results for 2016 and its guidance for 2017. *Id.* ¶ 55. The press release reported that Yelp's "local revenue" grew by 39% in 2016, and spoke of "how Yelp has become deeply integrated into consumers' daily habits and increasingly essential to local business owners." *Id.* Yelp also provided its outlook for the year ahead. It predicted net revenue in the range of $195 million to $199 million for the first quarter of 2017, and growth of approximately 25% compared to the first quarter of 2016. *Id.* For the full year of 2017, the company predicted net revenue in the range of $880 million to $900 million, and growth of approximately 25% compared to 2016. *Id.*

Yelp held a conference call on the same day with investors, analysts, and the public. *Id.* ¶ 56. On the call, Defendant Nachman discussed the company's "repeat rate," stating that it "is a mix of folks who have advertised with us in the past and that's at an all-time high right now, and while we're really encouraged by our kind of strong, embedded client base and that's a really kind of healthy number to understand that those folks are coming back." *Id.* ¶ 59. Defendant Baker stressed the opportunity for growth in the local advertising market by noting that "we're still pretty small in terms of the long-term opportunity" because "[w]e've got 138,000 advertisers in a market that is 20 million local businesses . . . . [a]nd I'd point out, 3.4 million claimed businesses on Yelp." *Id.* ¶ 79.

Plaintiffs allege that Defendants made similarly optimistic pronouncements at a February 14, 2017 conference, *id.* ¶¶ 87–92; on an annual report filed with the Securities and Exchange Commission ("SEC") on March 1, 2017, *id.* ¶¶ 93–96; and at a March 1, 2017 conference, *id.* ¶¶ 97–102.

C.     Yelp's May 2017 Statements

On May 9, 2017, Yelp issued a press release announcing its financial results for the first quarter of 2017 and revising the revenue guidance it had initially issued in February. *Id.* ¶ 60. The company lowered its revenue projection from a range of $880–$900 million to a range of $850–865 million. *Id.* Yelp's stock price dropped by more than 18% on heavy volume on May 10. *Id.* ¶ 61.

Also on May 9, 2017, Yelp held a conference call to discuss the press release. *Id.* ¶ 62. During the call, Stoppelman admitted that "we did see a decline in retention that has impacted our outlook," and explained that "[g]iven the disproportionate impact first quarter performance has on our annual results, we've reduced our outlook for the balance of the year." *Id.* Baker stated that Yelp "experienced weaker than expected revenue retention in our local ad business in the first quarter," which was "at the upper end of the range we normally see." *Id.* ¶ 63. Nachman added that the company was "able to tie [the retention issue] back actually to a distinct cohort of advertisers that came on Yelp about a year ago as we're making the transition from CPM to CPC." *Id.* ¶ 64. He spoke of how Yelp had "put a team in place to focus on that particular cohort and that particular profile," reporting that it had been "able to really course-correct in a pretty short period of time and [Yelp] saw progressively better results" in March and April. *Id.* Nachman termed this team the "recovery team. *Id.* ¶ 67.

D.    <u>Allegations of Fraud</u>

     Plaintiffs allege that the statements made by Defendants prior to Yelp's revised guidance on May 9, 2017 were false or misleading because Defendants were already aware when they issued the February 9, 2017 guidance that Yelp was experiencing a higher than anticipated "churn rate"—the rate at which local advertisers were not renewing their contracts—that would disproportionately impact expected revenue for the year. To support their contentions, Plaintiffs point to various aspects of Yelp's business model. First, the type of advertising contract that Yelp frequently entered into—year-long with hefty early-termination fees—"provided the Company with significant visibility into future revenue growth," because "it was economically reasonable for customers who wished to stop advertising with Yelp to wait until the termination of their contract term to cancel." *Id.* ¶¶ 27–28. In fact, "Defendants repeatedly emphasized their ability to accurately predict future revenue." *Id.* ¶ 28. Second, Yelp reviews a number of "real-time metrics" that provide Defendants with "immediate insights into customer retention trends, including the likelihood of contract terminations." *Id.* ¶ 32. Defendants "repeatedly indicated that they monitored and were aware of retention rates." *Id.* ¶ 46. Third, the local advertising program, and the attendant work of tracking engagement and advertisers' returns from the program, are such

4

"core operations" of Yelp that knowledge of the program metrics "may . . . be imputed to Defendants Stoppelman, Baker, and Nachman." *Id.* ¶¶ 125–36.

Plaintiffs also rely on Defendants' statements to infer knowledge. First, according to Plaintiffs, Nachman "effectively conceded that the brunt of the problem had occurred before February 2017" when he said on the May 9, 2017 conference call that Yelp "recognized the churn issue about halfway through the [first] quarter" of 2017. *Id.* ¶ 64. Second, Baker acknowledged that "retention has a big impact [on revenue] over the course of the forward 12-month period," such that weak retention at the beginning of the year affects revenue projections for the rest of the year. *Id.* ¶ 66. Third, on a February 7, 2018 earnings call, Stoppelman explained that the "retention issues that we had in the first quarter of 2017 . . . related to cohort of advertisers we brought on in 2016 . . . . who never really established the normal level of engagement with their Yelp advertising program." *Id.* ¶ 72. He proceeded to claim that Yelp "anticipated that they would churn off and they churned off at the end of the year . . . at a higher rate than we'd anticipated." *Id.*

Finally, Plaintiffs assert that a series of three sales of Yelp shares made by Stoppelman in the period between February 9 and May 9, 2017 were "suspicious in timing and amount" and support an inference of scienter. *Id.* ¶¶ 113–24. "These sales reduced the Stoppelman Trust's holdings of Yelp common stock by more than 20 percent." *Id.* ¶ 118.

Plaintiffs allege that Defendants' misconduct led to a "precipitous[]" drop in the price of Yelp stock and "directly and proximately caused the economic losses suffered by Plaintiffs and the Class." *Id.* ¶¶ 103–04. They propose a class "consisting of all persons and entities that purchased or acquired Yelp's securities during the Class Period [February 10, 2017 to May 9, 2017, inclusive] and were damaged thereby." *Id.* ¶ 145.

E.    Procedural History

Plaintiffs filed this suit in January 2018. *See* Docket No. 1. On April 27, 2018, the Court granted Movant Jonathan Davis's motion to be appointed interim lead plaintiff and for Glancy Prongay & Murlay LLP and Holzel & Holzel LLC to be appointed interim co-lead counsel under the Private Securities Litigation Reform Act, 15 U.S.C. § 78u-4 ("PSLRA"). *See* Docket No. 23.

Plaintiffs filed their amended class action complaint on June 25, 2018. *See* Docket No. 29.

Defendants filed the instant motion to dismiss on August 2, 2018. *See* Docket No. 31 ("Mot.").

## II. REQUESTS FOR JUDICIAL NOTICE

Before reaching the merits, the Court first addresses Defendants' requests for judicial notice. Defendants ask the Court to take judicial notice of the following categories of documents (attached as exhibits to the Declaration of Gilbert R. Serota, Docket No. 31-2) or to consider them under the doctrine of incorporation by reference.

| Exhibit A | Yelp SEC Form 10-K for the year ended 2016 | Filed March 1, 2017 |
|---|---|---|
| Exhibit B | Request withdrawn. *See* Docket No. 38 at 3 n.1. | |
| Exhibit C | Jeremy Stoppelman Form 4 filings submitted to SEC | Filed Feb. 21, 2017 March 7, 2017 March 17, 2017 |
| Exhibit D | Yelp SEC Form 10-K for the year ended 2015 | Filed Feb. 24, 2016 |
| Exhibit E | Yelp SEC Form 10-Q for the quarter ended Sept. 30, 2016 | Filed Nov. 8, 2016 |
| Exhibit F | Yelp SEC Form 8-K | Filed Feb. 9, 2017 |
| Exhibit G | Yelp FQ4 2016 Earnings Call | Held Feb. 9, 2017 |
| Exhibit H | Yelp SEC Form 8-K | Filed May 9, 2017 |
| Exhibit I | Yelp FQ1 2017 Earnings Call | Held May 9, 2017 |
| Exhibit J | Yelp FQ4 2017 Earnings Call | Held Feb. 7, 2018 |
| Exhibit K | Yelp Company Conference Presentation at Morgan Stanley Technology, Media & Telecom Conference | Held March 7, 2017 |
| Exhibit L | Yelp Company Conference Presentation at Goldman Sachs Technology and Internet Conference | Held Feb. 14, 2017 |
| Exhibit M | Report by JPM Securities LLC entitled "Advertiser Churn Results in Lowered Full-Year Guidance, Although Traffic Growth is Accelerating" | Published May 10, 2017 |
| Exhibit N | Yahoo! Finance chart showing Yelp's historical stock prices between Feb. 9, 2017 and May 10, 2017 | February 9, 2017 to May 10, 2017 |

A court may take judicial notice of a fact that is not "subject to reasonable dispute in that it is either (1) generally known within the jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b). Alternatively, under the incorporation-by-reference doctrine, a court may "take

into account documents whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached [to] the [plaintiff's] pleading." *Knievel v. ESPN*, 393 F.3d 1068, 1076 (9th Cir. 2005) (quoting *In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970, 986 (9th Cir. 1999)).

Plaintiffs do not object to the introduction of Exhibits A, D, F, and H. *See* Docket No. 35 at 1. These Exhibits are all filings Yelp has made with the SEC, and "[c]ourts can consider securities offerings and corporate disclosure documents that are publicly available." *In re Am. Apparel, Inc. S'holder Litig.*, 855 F. Supp. 2d 1043, 1060 (C.D. Cal. 2012) (citing *Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1064 n.7 (9th Cir. 2008)). Furthermore, the doctrine of incorporation by reference allows a court to "properly consider [a document] in its entirety" if the document is referenced in the complaint. *In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1058 n.10 (9th Cir. 2014); *Knievel v. ESPN*, 393 F.3d 1068, 1076 (9th Cir. 2005) (Courts may take into account "documents whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the [plaintiff's] pleading."). A court "may treat such a document as part of the complaint, and thus may assume that its contents are true for purposes of a motion to dismiss under Rule 12(b)(6)." *United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003). Here, Plaintiffs expressly relied on Exhibits A, F, and H as sources of allegedly fraudulent statements. *See, e.g.*, FAC ¶¶ 73, 93–96. Accordingly, the Court **GRANTS** judicial notice of Exhibits A, D, F, and H.

Plaintiffs also do not object to the introduction of Exhibit N. *See* Docket No. 35 at 1. Exhibit N shows Yelp's stock prices during the proposed class period. "[S]tock price is public information 'capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned' and are the proper subject of judicial notice in a motion to dismiss." *In re Finisar Corp. Derivative Litig.*, 542 F. Supp. 2d 980, 990 (N.D. Cal. 2008) (quoting Fed. R. Evid. 201(b)). Accordingly, the Court **GRANTS** judicial notice of Exhibits N.

Plaintiffs object to the introduction of Exhibit C, which consists of three separate Form 4 filings made by Stoppelman to the SEC to report the sales of his securities during the proposed class period. Plaintiffs rely in part on Stoppelman's "suspicious" stock sales to argue that

7

Defendants made the allegedly fraudulent statements with scienter. *See* FAC ¶¶ 113–24.

Defendants counter that the Forms 4 reflect that Stoppelman's sales were made pursuant to a Rule

10b5-1 plan adopted prior to the alleged fraud, and these Forms 4 reflect that. *See* Docket No. 32

at 4. The Supreme Court has specifically instructed that "courts must consider the complaint in its

entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions

to dismiss, in particular, documents incorporated into the complaint by reference, and matters of

which a court may take judicial notice" in determining whether the allegations in a § 10(b) claim

"give rise to a strong inference of scienter." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S.

308, 322–23. Courts in this circuit have routinely taken judicial notice of Forms 4 to determine

whether insider stock sales raise an inference of scienter to support a § 10(b) action. *See, e.g.*,

*Curry v. Yelp Inc.*, 875 F.3d 1219, 1226 n.2 (9th Cir. 2017); *City of Royal Oak Ret. Sys. v. Juniper

Networks, Inc.*, 880 F. Supp. 2d 1045, 1059 (N.D. Cal. 2012); *Wietschner v. Monterey Pasta Co.*,

294 F. Supp. 2d 1102, 1109 (N.D. Cal. 2003).

Plaintiffs counter by citing two cases in which courts have declined to take judicial notice

of Forms 4 at the motion to dismiss stage. Those courts reasoned that the relevant SEC regulation

recognizes the existence of a prior "contract, instruction, or plan" to sell stocks as an affirmative

defense to a suit under § 10(b) and Rule 10b-5, but only where "the plan was 'entered in good

faith.'" *Stocke v. Shuffle Master, Inc.*, 615 F. Supp. 2d 1180, 1193 (D. Nev. 2009) (quoting 17

C.F.R. § 240.10b5-1(c)(1)(i)). "Therefore, a 10b5-1 trading plan does not provide an absolute

defense to a claim of insider trading. Rather, it requires an additional factual finding of good

faith," which a court cannot make when considering a motion to dismiss. *Id.*; *In re UTStarcom,

Inc. Sec. Litig.*, 617 F. Supp. 2d 964, 976 n.16 (N.D. Cal. 2009). Although there is some merit to

this position, it is out of step with the weight of authority in the Ninth Circuit. "Looking to Forms

4 also seems congruent with the requirement that we consider plausible nonculpable explanations

for the defendants' conduct" when assessing scienter. *Alaska Elec. Pension Fund v. Asar*, 898

F.3d 648, 658 (5th Cir. 2018) (observing that "district courts are divided on" whether courts "may

look to a Form 4 for plausible explanations of potentially suspicious trades at the pleading stage,"

but concluding that it is appropriate to "look to publically filed SEC documents implicitly

incorporated into a complaint"). Accordingly, given Plaintiffs' reliance on Stoppelman's stock sales to plead scienter, the Court **GRANTS** judicial notice of Exhibit C.

Exhibits G, I, J, K, and L are transcripts of Defendants' earnings calls and presentations at two conferences, all of which are referenced in the complaint. Plaintiffs, citing the Ninth Circuit's recent decision in *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988 (9th Cir. 2018), argue that Defendants' attempt to introduce these exhibits "exploit the judicial notice procedures to defeat adequately stated claims at the pleading stage," Docket No. 35 at 1. In *Khoja*, the Ninth Circuit cautioned that the "overuse and improper application of judicial notice and the incorporation-by-reference doctrine . . . can lead to unintended and harmful results," especially in "SEC fraud matters," because allowing the "unscrupulous use of extrinsic documents [by defendants] to resolve competing theories against the complaint risks premature dismissals of plausible claims that may turn out to be valid after discovery." *Khoja*, 899 F.3d at 998. In particular, *Khoja* held that "[i]t is improper to judicially notice a transcript when the substance of the transcript is subject to varying interpretations, and there is a reasonable dispute as to what the [transcript] establishes." *Id.* at 1000 (citation and internal quotation marks omitted). The court also warned against allowing defendants to use the incorporation-by-reference doctrine to introduce a document that "did not necessarily form the basis of the complaint," but rather "creates a defense to the well-pled allegations in the complaint." *Id.* at 1002.

Plaintiffs echo *Khoja* in urging the Court to reject the transcripts as being "subject to varying interpretations" and containing facts that are "subject to reasonable dispute." Docket No. 35 at 1–2. But *Khoja* found that an investor call transcript was subject to varying interpretations and therefore improperly noticed because it was internally inconsistent. *See Khoja*, 899 F.3d at 1000. Here, in contrast, Plaintiffs have merely made the bare assertion that the transcripts are subject to dispute, without identifying any disputed statement or inconsistency. Moreover, Plaintiffs rely extensively on these transcripts in their complaint to allege that Defendants made fraudulent statements, *see* FAC ¶¶ 75–86 (quoting from February 9, 2017 call), ¶¶ 87–92 (quoting from February 14, 2017 conference), ¶¶ 97–102 (quoting from March 1, 2017 conference), and to allege that Defendants knew the statements to be false at the time they were made, *see id.* ¶¶ 62–

69 (quoting from May 9, 2017 call), ¶ 72 (quoting from February 7, 2018 call). Because "the plaintiff refers extensively to the document[s] [and] the document[s] form[] the basis of the plaintiff's claim," the Court **GRANTS** judicial notice of Exhibits G, I, J, K, and L. *Khoja*, 899 F.3d at 1002 (quoting *Ritchie*, 342 F.3d at 907).

Next, Plaintiffs rely on Exhibit M, a report published by a research firm concerning the drop in Yelp's stock prices after Yelp issued its May 9, 2017 revised guidance, to establish the loss causation element of their § 10(b) claim. *See* FAC ¶ 108. Accordingly, the Court **GRANTS** judicial notice of Exhibit M.

Finally, the Court **DECLINES** to take judicial notice of Exhibit E because it is not necessary to this decision.

### III.      LEGAL STANDARD

In considering a Rule 12(b)(6) motion to dismiss, a court must take all allegations of fact as true and construe them in the light most favorable to the nonmoving party, although "conclusory allegations of law and unwarranted inferences are insufficient to avoid a Rule 12(b)(6) dismissal." *Cousins v. Lockyer*, 568 F.3d 1063, 1067 (9th Cir. 2009). In general, "a complaint need not contain detailed factual allegations . . . it must plead 'enough facts to state a claim to relief that is plausible on its face'" to survive a motion to dismiss. *Id.*

However, "[s]ecurities fraud class actions must meet the higher, more exacting pleading standards of Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act ('PSLRA')." *Oregon Pub. Employees Ret. Fund v. Apollo Grp*. Inc., 774 F.3d 598, 604 (9th Cir. 2014). Rule 9(b) dictates that the "circumstances constituting fraud or mistake shall be stated with particularity." Fed. R. Civ. Proc. 9(b). It is not enough for a plaintiff merely to identify an allegedly fraudulent statement made by defendants. *In re GlenFed, Inc. Securities Litigation*, 42 F.3d 1541, 1548 (9th Cir. 1994) (en banc). Plaintiffs must allege "why the disputed statement was untrue or misleading when made." *Id.* at 1549. Moreover, "the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u–

4(b)(1)(B).

The PSLRA additionally requires a complaint to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind" with respect to each alleged false statement or omission. 15 U.S.C. § 78u-4(b)(2)(A). Plaintiffs alleging securities fraud must plead all the elements of a securities fraud action with particularity. *Oregon Pub. Employees*, 774 F.3d at 605.

## IV.     RELEVANT STATUTORY AND REGULATORY PROVISIONS

Section 10(b) of the Securities Exchange Act makes it unlawful for any person to

> use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [Securities and Exchange] Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j(b).

The SEC promulgated Rule 10b-5 to implement Section 10(b) by making it unlawful

> (a) To employ any device, scheme, or artifice to defraud,
>
> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
>
> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.

The PSLRA also erects "an additional barrier at the pleading stage in the form of a safe harbor for 'forward-looking statements.'" *In re Cutera Sec. Litig.*, 610 F.3d 1103, 1111 (9th Cir. 2010). It provides, in relevant part:

> [A] person . . . shall not be liable with respect to any forward-looking statement, whether written or oral, if and to the extent that—
>
> (A) the forward-looking statement is—
>
> > (i) identified as a forward-looking statement, and is accompanied by meaningful cautionary statements

identifying important factors that could cause actual
results to differ materially from those in the forward-
looking statement; or

(ii) immaterial; or

(B) the plaintiff fails to prove that the forward-looking statement—

    (i) if made by a natural person, was made with actual
knowledge by that person that the statement was false
or misleading; or

    (ii) if made by a business entity;[,] was—

        (I) made by or with the approval of an executive
officer of that entity; and

        (II) made or approved by such officer with actual
knowledge by that officer that the statement
was false or misleading.

15 U.S.C. § 78u–5(c)(1). A "forward-looking statement" is defined as "any statement regarding (1) financial projection, (2) plans and objectives of management for future operations, (3) future economic performance, or (4) the assumptions 'underlying or related to' any of these issues." *No. 84 Employer-Teamster Joint Council Pension Trust Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 936 (9th Cir. 2003).

## V.    <u>DISCUSSION</u>

To prevail on a claim that a defendant "made material misrepresentations or omissions in violation of § 10(b) and Rule 10b-5, [plaintiffs] must prove (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37–38 (2011). Defendants move for dismissal on the basis that Plaintiffs have failed to sufficiently allege material misrepresentations or omissions by Defendants, scienter, and loss causation. The Court analyzes each element in turn.

A.   <u>Material Misrepresentations or Omissions</u>

    1.   <u>Forward-Looking Statements</u>

A number of Defendants' challenged statements are immunized by the PSLRA safe harbor provision.

Most notably, Yelp's February 9, 2017 financial guidance announcing the company's

expected revenue and growth for 2017 is an "earnings projection [that] is by definition a forward-looking statement." *In re Cutera*, 610 F.3d at 1111. It was accompanied by meaningful cautionary language that "identif[ies] important factors that could cause actual results to differ materially from those in the forward-looking statement." *Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1058 (9th Cir. 2014); *In re Cutera*, 610 F.3d at 1110–11. The press release expressly notified investors that it "contains, and statements made during the above referenced conference call will contain, forward-looking statements relating to, among other things, the future performance of Yelp . . . and involve risks and uncertainties." Mot., Exh. F at 11. The cautionary language identified an extensive list of "[f]actors" that could cause "Yelp's actual results [to] differ materially from those predicted or implied," including "maintaining and expanding Yelp's base of advertisers" and "Yelp's ability to deal with the increasingly competitive local search environment." *Id.* The press release also referred investors to more detailed discussions of risk factors in Yelp's most recent Form 10-K Annual Report, which specifically addressed the additional unpredictability generated by the new CPC advertising model:

> These risks and difficulties include our ability to . . . forecast revenue and adjusted EBITDA accurately, which may be more difficult as we sell more performance-based advertising, as well as appropriately estimate and plan our expenses.
>
> . . . .
>
> As our traffic growth rate slows, our success will become increasingly dependent on our ability to increase levels of user engagement on our platform. This dependence may increase as the portion of our revenue derived from performance-based advertising increases. If user engagement decreases, our advertisers may stop or reduce the amount of advertising on our platform and our results of operations would be harmed.

Mot., Exh. D at 45. "These warnings identify the very risks that came to fruition here," *In re Leapfrog Enter., Inc. Sec. Litig.*, 200 F. Supp. 3d 987, 1004 (N.D. Cal. 2016), since it was allegedly Yelp's troubles with maintaining its base of local advertisers under the CPC model that impacted the company's financial performance.

In addition, portions of many of Stoppelman and Baker's statements on the conference call

that followed the February 9, 2017 press release concerned "plans and objectives of management for future operations," "future economic performance," and "the assumptions 'underlying or related to' them," and were therefore forward-looking. *No. 84 Employer-Teamster*, 320 F.3d at 936; *see Leapfrog*, 200 F. Supp. 3d at 1004 (holding that "multiple statements expressly refer[ring] to what 'will' happen in the future" are forwarding-looking "[b]ecause they discuss future plans and expectations"). The relevant portions of the statements are listed below.

- "Executing well on these priorities set Yelp up for continued growth in 2017 and we're excited about the potential we see in the year ahead." FAC ¶ 75.

- "This operating leverage is . . . a source of investment resources to help drive long-term revenue growth." FAC ¶ 77.

- "[W]hen we turn and we look at the opportunity ahead of Yelp . . . we're still pretty small in terms of long-term opportunity, we believe." FAC ¶ 79.

- "So, our long-term prospects for profitability at Yelp are outstanding and . . . it just makes all the sense in the world to continue to invest in our product, our marketing and our sales to get after that." FAC ¶ 85.

Because these forward-looking statements were also accompanied by the meaningful cautionary language in the press release and Yelp's Form 10-K, they are covered by the safe harbor provision. *See* Mot. Exh. F at 11 ("[S]tatements made during the above referenced conference call will contain, forward-looking statements relating to, among other things, the future performance of Yelp . . . and involve risks and uncertainties."). As forward-looking statements "identified as such and accompanied by meaningful cautionary statements," they are "not actionable regardless of the plaintiff's showing of scienter." *In re Cutera*, 610 F.3d at 1112.

Defendants made one further forward-looking statement relating to Yelp's plans and objectives for future operations at a subsequent Goldman Sachs conference on February 14, 2017.

- "The movement from CPM to CPC is all about making the sort of monetization mindset and product mindset at Yelp to be about, hey, it doesn't matter that we sold it; it has to work for the business. We have to drive the leads for local businesses and CPC is the format to do that." FAC ¶ 89.

14

This statement was not covered by the cautionary language in the February 9 press release, and Defendants have not pointed to any other cautionary language accompanying it. However, the statement is not misleading because it did not say anything about the performance of the local advertising program; it alerted investors to the transition from CPM to CPC advertising and expressed Defendants' faith that CPC would be the right model to "drive the leads for local businesses" going forward. To be sure, this statement was made on February 14, when Defendants were allegedly already aware of the churn problems surfacing. However, even forward-looking statements unaccompanied by cautionary language are not actionable unless they were "made with actual knowledge ... that [they were] false or misleading." *In re Cutera*, 610 F.3d at 1108 (quoting 15 U.S.C. § 78u–5(c)(1)(B)(i) & (ii)(II)). Actual knowledge is a higher standard than the deliberate recklessness standard applied to non-forward-looking statements. A company that makes forecasts knowing that a problem exists is not liable if it could still have believed that the problem was surmountable and the forecast could still be met. *See, e.g.*, *In re Syntex Corp. Sec. Litig.*, 95 F.3d 922, 930 (9th Cir. 1996); *In re Connetics Corp. Sec. Litig.*, 542 F. Supp. 2d 996, 1008 (N.D. Cal. 2008); *In re CBT Grp. PLC Sec. Litig.*, No. C-98-21014 RMW, 1999 WL 1249287, at *3 (N.D. Cal. July 21, 1999). Plaintiffs here have not alleged that by February 14, 2017, Defendants already had actual knowledge that the CPC model as a whole could not succeed, or that the remedial actions taken by Yelp (*e.g.* the recovery team) could not be effective long-term.

Accordingly, Defendants' motion to dismiss is **GRANTED** with respect to the February 9, 2017 financial guidance quoted in FAC ¶ 73, the above-quoted portions of their statements on the February 9, 2017 conference call quoted in FAC ¶¶ 75, 77, 79, and 85, and the statement quoted in FAC ¶ 89.

      2.    <u>Non-Forward-Looking Statements</u>

The remaining statements cited in the complaint were either non-forwarding looking or "mixed." Mixed statements are those "containing non-forward-looking statements about current and past facts as well as forward-looking statements." *In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1141 (9th Cir. 2017). The Ninth Circuit recently instructed that "where defendants make

mixed statements . . . the non-forward-looking statements are not protected by the safe harbor of the PSLRA." *Id.* at 1142. Thus, the Court proceeds to analyze the purely non-forward-looking statements and the non-forward-looking portions of mixed statements to determine whether they contained material misrepresentations or omissions under § 10(b).

Plaintiffs' claims in this case are premised on alleged omissions. *See, e.g.*, FAC ¶¶ 74, 88, 94, 98 (alleging that Defendants' statements were false or misleading because they "failed to disclose" information). "To be actionable under the securities laws, an omission must . . . affirmatively create an impression of a state of affairs that differs in a material way from the one that actually exists." *Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002). An omission is material when there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Basic Inc. v. Levinson*, 485 U.S. 224, 231–32 (1988).

      a.   February 9, 2017 Statements

      i.   Inactionable Statements

Plaintiffs allege that several statements made by Defendants on the February 9, 2017 conference call about the local advertising program were inconsistent with Yelp's May 9, 2017 admission that they "recognized the churn issue [in the program] about halfway through the quarter." Docket No. 34 ("Opp.") at 7–8. But a review of those statements shows that they did not constitute material omissions. Most of the statements made no reference at all to Yelp's local advertising program, the retention or churn rates within that program, or the program's effects on Yelp's financial performance.

- Stoppelman spoke generally about "great results" in "[i]ncreasing awareness and engagement" in 2016, including expanding the reach of Yelp's "ad campaigns" among "consumers on television and online," "servicing the best content," and "propel[ling]" Yelp's popularity in "Apple's app store." FAC ¶ 75. This statement concerned consumer experiences with Yelp, not advertiser experiences.

- Baker stated that "[f]or the full year of 2016, 31% of revenue growth flowed through to an increase in adjusted EBITDA," and that Yelp's "incremental profitability was even

stronger in the second half of the year." FAC ¶ 77. This statement simply reported general growth and profitability figures.

- Baker, in response to a question about margin guidance and "elective investments . . . in product development," stated "I don't think there's anything structurally changing in the business. We had kind of a 30% plus incremental profitability in 2016, which I think is the best in four, five years for the company. And you saw in the second half the incremental profitability north of 50%, even while the revenue has grown pretty well. So, we were in a year in which we were increasing our brand spend in 2016, a year in which we were walking away from brand advertising revenue dollars and showed that kind of leverage. And I think that's inherent and unchanged in the model." FAC ¶ 79. This statement discussed general profitability and brand spend figures. It did not speak specifically about anticipated revenues from the local advertising program based on the CPC model.

- Baker, in response to a question about "margin improvement" and whether Yelp "[c]an . . . still grow like you have been," responded: "I think that the margin leverage that we saw last year I think gives you a really good representation of sort of the inherent earnings power of the business. And it also gives us, in thinking about the long-term, a great pool of resources to continue to invest. So I think we had a year in which 30% of the revenue went down to the bottom line. We had a second half of the year in which 50% of the revenue went down to the bottom line." FAC ¶ 85. As above, this statement spoke in general terms about Yelp's revenue figures, not about revenue generation from CPC advertising.

Plaintiffs characterize these statements as "materially false and/or misleading" because they "fail[]" to disclose" the contract terminations Yelp was experiencing in January 2017 among the cohort of advertisers added in the first quarter of 2016 and the effects those terminations would have on the revenue projections. *See* FAC ¶¶ 74, 88, 94, 98. However, because these statements made no representations about Yelp's local advertising program, omitting mention of the churn issues within the program did not "affirmatively create an impression" about the program's

performance that "differ[ed] in a material way from the one that actually exist[ed]." *Brody*, 280 F.3d at 1006. Where a defendant "said nothing about" the subject of the alleged omission, "there is no duty to disclose, as [§ 10(b)] does not contain a freestanding completeness requirement." *In re Yahoo! Inc. Sec. Litig.*, No. C 11-02732 CRB, 2012 WL 3282819, at *9 (N.D. Cal. Aug. 10, 2012), *aff'd*, 611 F. App'x 387 (9th Cir. 2015). Therefore, these statements do not violate securities laws. They were not specific enough to impose a more fulsome duty to disclose the economics of the CPC model.

One other statement tangentially references local advertising, but is so "vague that no reasonable investor would rely on it when considering the total mix of available information." *In re Splash Tech. Holdings, Inc. Sec. Litig.*, 160 F. Supp. 2d 1059, 1076 (N.D. Cal. 2001) (citation and internal quotation marks omitted):

- We've got 138,000 advertisers in a market that is 20 million local businesses. And I'd point out 3.4 million claims businesses on Yelp. So we've got a strong brand, we've got a great product experience for consumers and businesses, and we think it makes sense to continue investing in that. . . ." FAC ¶ 79.

Plaintiffs argue that the claim that "we've got a strong brand, we've got a great product experience for consumers and businesses" is misleading. To the contrary, courts in this District have found that describing "past results" using words such as "strong," "robust," and "improved" is "vague and nonactionable." *Id.* at 1077. Similarly, "we've got a great product experience for consumers and businesses" rings similar to statements like "consumers love our service." *In re Netflix, Inc. Sec. Litig.*, No. C04-2978 FMS, 2005 WL 1562858, at *7 (N.D. Cal. June 28, 2005). Such "vague and amorphous statements do not give rise to liability for securities fraud, since reasonable investors do not consider such puffery material when making an investment decision." *Id.*

Accordingly, Defendants' motion to dismiss is **GRANTED** with respect to these portions of their statements on the February 9, 2017 conference call quoted in FAC ¶¶ 75, 77, 79, and 85.

ii.     Actionable Statements

In contrast, the two remaining February 9, 2017 statements directly addressed local advertising.

- In response to a question about "local active accounts," Nachman stated:

  > If I were to point to a weakness and a slowness, it's potentially around kind of the local sales force in the fourth quarter [of 2016] and particularly – it was a modest slowdown that, quite frankly, we think the election and a period around the election both from an output and productivity perspective from the sales force and that kind of bled into vacation time. *It's not something we're super concerned about kind of coming into 2017 and feel like the fundamentals are in place and really strong*.

  FAC ¶ 81 (emphasis added).

- In response to a question about "local advertisers that do not finish their relationship with Yelp," Nachman stated:

  > Obviously, repeat rate is a mix of folks who have advertised with us in the past and *that's at an all-time high right now*, and while *we're really encouraged by our kind of strong, embedded client base and that's a really kind of healthy number to understand that those folks are coming back*. You know it's a double-edged sword because we also think that making sure that we get enough new clients into the pipeline is a really important initiative for the company. *And so we're not alarmed in any way about kind of where we are in the repeat rate side*, but you'd love to see, again, adding the number of local advertising accounts.

  > Even if we were up in the 7,000, 8,000, 10,000 range, based on the opportunity that we actually have in this marketplace with millions of businesses that have claimed their presence on Yelp, we think we're still in the very early stages and we've got to look at both sides of the coin here, making sure that we're driving new business and *taking advantage of kind of the existing client base that has very nice trends behind it*.

  FAC ¶ 83 (emphases added).

Both of these statements dismissed concerns about the viability of the local advertising program. In reassuring investors that "the fundamentals are in place and really strong" and "we're not alarmed in any way about kind of where we are in the repeat rate[1] side," Defendants indicated that Yelp's local advertising model was sound at its core and sustainable. Indeed, Defendants, by

---

[1] Defendants assert that this statement does not implicate a duty to disclose any information about Yelp's churn problems because "the repeat rate does not necessarily correlate to the advertiser retention rate," but rather "provides an indication of Yelp's total mix of long-term versus new advertisers." Docket No. 37 at 8 & n.9. The Court is not persuaded by this distinction. Even if repeat rate is not perfectly correlated with retention rate, advertiser retention indisputably factors into the repeat rate calculation, and the exchange between the analyst and Defendant Nachman in FAC ¶ 83 suggests that the repeat rate is meaningfully impacted by "local advertisers that do not finish their relationship with Yelp."

attributing the "modest slowdown" in the fourth quarter of 2016 to "the election" and "vacation time," conveyed the impression that these were one-off aberrations rather than any kind of a systemic problem with the local advertising program as a whole. But these statements would have been inconsistent with any awareness Defendants had at this point that local advertisers were dropping out of the program in high numbers due to engagement issues with Yelp's CPC platform. Thus, if Plaintiffs' allegations about scienter are true, these statements were misleading, because they characterized retention problems as "as-yet-unrealized risks and contingencies" that were not a cause for concern when in fact "some of these risks may already have come to fruition." *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982 (9th Cir. 2008) (finding company's financial filings misleading where they notified investors of a risk that the company might not get paid on certain projects when it had already received stop-work orders on those projects).

In *Shenwick v. Twitter, Inc.*, 282 F. Supp. 3d 1115 (N.D. Cal. 2017), the court held that statements similar to the above-quoted ones from FAC ¶¶ 81 and 83 made in a similar context were misleading. There, Twitter, the defendant, described a particular user engagement metric as "one of its 'major growth drivers,'" and "tied a projected $500 million in revenue growth to a 3% increase" in that metric, triggering a 6% increase in Twitter's stock price. *Id.* at 1126. Twitter subsequently acknowledged lower than expected user engagement growth, "but described signs of a rebound" to investors using optimistic language: that the "trend ha[d] already turned around" and that "we're in a great place there." *Id.* at 1127 (alteration in original). Twitter attributed the purported turnaround to "a combination of seasonality or return to organic growth and the set of product initiatives [Twitter] created to drive growth." *Id.* However, "[s]imultaneously, Twitter was experiencing flat or declining [user engagement] trends and other problems with user engagement." *Id.* at 1137. The *Shenwick* court found Twitter's statements about rebounding user engagement trends actionable under § 10(b), because "disclosure of the fact that [the relevant metric] was flat or declining during the Class Period would have put investors on alert that . . . the aggressive [growth] projections announced at Analyst Day were unlikely to materialize." *Id.* at 1139.

Likewise, here, Defendants' statements that "we're not alarmed in any way about kind of

20

where we are in the repeat rate side," that "the fundamentals are in place and really strong" when it came to local sales, and that "the existing client base . . . has very nice trends behind it" were belied by the troubling churn rates among local advertisers that Defendants allegedly knew about at the time.

Defendants' failure to disclose the churn problems "affirmatively create[d] an impression of a state of affairs that differ[ed] in a material way from the one that actually exist[ed]." *Brody*, 280 F.3d at 1006. Moreover, Plaintiffs allege that advertising from "small and medium sized businesses" accounted for approximately 70% of Yelp's advertising revenues, FAC ¶ 20, and Defendants themselves have acknowledged "the disproportionate impact first quarter performance has on our annual results," *Id.* ¶ 62. Given the importance of local advertising revenue to Yelp's financial health, Defendants' omission was material because there was "a substantial likelihood that the disclosure of the [churn issues] would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Basic Inc.*, 485 U.S. at 231–32; *see Shenwick*, 282 F. Supp. 3d at 1139 ("In the absence of [user engagement] data, investors interpreted Defendants' statements as reassurances that the Company had experienced and would continue to experience positive growth and engagement trends.").

Defendants contend that the comments in FAC ¶ 81 are non-actionable puffery. However, even "'general statements of optimism, when taken in context, may form a basis for a securities fraud claim' when those statements address specific aspects of a company's operation that the speaker knows to be performing poorly." *In re Quality Sys.*, 865 F.3d at 1143 (quoting *Warshaw v. Xoma Corp.*, 74 F.3d 955, 959 (9th Cir. 1996)). Defendants assured investors that "the fundamentals are in place and really strong" in the context of responding to a specific question about the local advertising program that Defendants allegedly knew was performing poorly. That makes the statement actionable.

Accordingly, Defendants' motion to dismiss is **DENIED** with respect to the statements made on the February 9, 2017 conference call quoted in FAC ¶¶ 81 and 83.

        b.    <u>February 14, 2017 Statement</u>

Two of the challenged statements made at the February 14, 2017 Goldman Sachs

conference also specifically discussed Yelp's local advertising efforts.

- In response to a question about the "really strong growth in local advertising revenue" in 2016, Stoppelman responded:

> I think, really, it was just about focusing on the core. And that was the message that was delivered to the teams at the start of the year is, hey, *there's nothing fundamentally wrong with our business. We just need to execute even better. And so we really did that and I think it paid off.*

FAC ¶ 87 (emphasis added).

- In response to a question about the financial guidance issued on February 9, 2017, Baker stated:

> On the sales side, we continue to want to grow our local sales team and expand that at a double-digit clip this year. *That's a fairly proven model that we feel we're pretty good at operating. We like the returns in that business.* They tend to be predictable over time.

FAC ¶ 91 (emphasis added).[2]

Both of these statements expressed confidence in the fundamental soundness of Yelp's local advertising program. In touting the use of a local sales team to sign up local advertisers as "a fairly proven model" that Yelp is "pretty good at operating" and tends to produce favorable returns that are "predictable over time," Defendant Baker suggested to investors that the model would continue to reliably generate revenue going forward. Similarly, while FAC ¶ 87 addressed 2016 results, Defendant Stoppelman's pronouncement that Yelp "execute[d] even better" with respect to local advertising and that doing so "paid off" gave the impression that the "strong growth" in the program was sustainable. If Defendants were aware of the systemic retention challenges within the CPC program when they made these statements, their failure to disclose that information runs afoul of § 10(b) for reasons the Ninth Circuit explained in *Berson*, 527 F.3d at 982.

In *Berson*, the defendant company reported backlogged work projects it had been

---

[2] Defendants incorrectly assert that the statement in FAC ¶ 91 is protected by the PSLRA safe harbor. Mot. at 16. While the first part of the statement ("we continue to want to grow our local sales team") is forward looking, the second part ("[t]hat's a fairly proven model that we feel we're pretty good at operating") is not, since it is about "current and past facts." And "where defendants make mixed statements . . . the non-forward-looking statements are not protected by the safe harbor of the PSLRA." *In re Quality Sys.*, 865 F.3d at 1142.

contracted to perform but had not yet completed as a way of demonstrating to investors it had sources of future income, even though the company knew that the projects had already been stopped and would likely be cancelled. *Id.* at 985. The Ninth Circuit ruled that "[h]ad defendants released no backlog reports, their failure to mention the stop-work orders might not have misled anyone." *Id.* at 987. "But once defendants chose to tout the company's backlog, they were bound to do so in a manner that wouldn't mislead investors as to what that backlog consisted of." *Id.*

In this case, once Defendants chose to tout Yelp's local advertising model as "fairly proven," omitting any mention of the churn issues that would likely significantly and negatively impact revenue "affirmatively create[d] an impression of a state of affairs that differ[ed] in a material way from the one that actually exist[ed]." *Brody*, 280 F.3d at 1006. Such an omission was material for the same reasons as detailed with respect to the statements in FAC ¶¶ 81 and 83. *See* Part V.A.2.a.(ii), *supra*.

Accordingly, Defendants' motion to dismiss is **DENIED** with respect to the statements made at the February 14, 2017 conference quoted in FAC ¶¶ 87 and 91.

### c.     2016 Form 10-K Filed on March 1, 2017

Plaintiffs allege that statements made in Yelp's Annual Report for fiscal year 2016, filed in a Form 10-K on March 1, 2017, are misrepresentations. In particular, Plaintiffs highlight the following two sections of the report:

- FAC ¶ 93.

> *Ability to Attract and Retain Advertisers.* Our revenue growth is driven by our ability to attract and retain local business that purchase our advertising products. Our largest sales and marketing expenses consist of the costs associated with acquiring advertisers. We spent a majority of our sales and marketing expense for 2016 on initiatives related to advertiser acquisition and expect to continue to expend significant amounts to attract additional advertisers. At the same time, our advertising agreements increasingly provide for performance-based cost-per-click payment terms, which may make it more difficult to forecast advertising revenue accurately. In addition, our advertisers typically do not have long-term obligations to purchase our products, and their decisions to renew depend on the degree of satisfaction with our products as well as a number of factors that are outside of our control, including their ability to continue their operations and spending levels. The small and medium-sized businesses on which we heavily rely often have limited advertising budgets and may be disproportionately affected

by economic downturns. As a result, a worsening economic outlook would likely cause businesses to decrease investments in advertising, which could adversely affect our revenue.

- FAC ¶ 95.

    Advertising revenue increased $173.8 million, or 37%, in 2016 compared to 2015, and $136.0 million, or 41% in 2015 compared to 2014. The increase in both periods was primarily due to a significant increase in the number of customers purchasing advertising plans as we expanded our sales force to reach more businesses. The growth in both periods was driven primarily by purchases of cost-per-click advertising.

These allegations of the FAC do not state a claim under § 10(b). The Annual Report is exactly that—a report of Yelp's financial information from the past year. Plaintiffs do not allege that the contents of the report are untrue. Indeed, their complaint affirms that in 2016 Yelp saw "a significant increase in the number of customers purchasing advertising plans as [it] expanded [its] sales force to reach more businesses." FAC ¶¶ 38–45. Rather, Plaintiffs take issue with the statement because it "failed to disclose" the retention issues manifesting in January and February of 2017. *Id.* ¶ 94. "In other words, [Plaintiffs] fault[] [Yelp] for not providing a more fulsome report." *Intuitive Surgical*, 759 F.3d at 1061. In *Intuitive Surgical*, an SEC annual report that was factually accurate as to the previous year's results allegedly failed to disclose known downward trends in product sales. The Ninth Circuit held that the omission was not actionable because it did not "affirmatively create" a misimpression of the company's financial health. *Id.* As the court explained, "[t]he securities laws do not demand such reporting. Rule 10b–5 prohibits '*only* misleading and untrue statements, not statements that are incomplete.'" *Id.* (emphasis in original) (quoting *Brody*, 280 F.3d at 1006). Similar to *Intuitive Surgical*, Yelp's Form 10-K statements "accurately reflect the company's growth in [2016]; they do not purport to speak to any trends in [Yelp]'s growth or revenues." *Id.* They therefore do not oblige Defendants to disclose additional information regarding Yelp's projected financial performance in 2017.

Accordingly, Defendants' motion to dismiss is **GRANTED** with respect to the statements quoted in FAC ¶¶ 93 and 95.

### d. Statements at March 1, 2017 Morgan Stanley Conference

Plaintiffs next allege that Defendants made three false or misleading statements at the

24

March 1, 2017 Morgan Stanley conference.  Each is analyzed below.

- Nachman stated:

> And then you also look at our existing client base as well. And so from a – really focusing on retention and up-sell and the [ph] LCP group that's kind of shown that that's a really – we've been purely focused on acquisition for kind of a very long time. And we've got a really strong client base that's recurring and they love our product. And you look at things like [Request-a-Quote] and I know we'll get into it a little bit, but really promising looking forward.

FAC ¶ 97.

This statement appears to address Yelp's client base generally, and Plaintiffs do not allege that it specifically refers to local advertiser retention.  Moreover, the comment "we've got a really strong client base that's recurring and they love our product," like the references to a "strong brand" and a "great product experience for consumers" in FAC ¶ 79, is non-actionable puffery.  *See Splash Tech. Holdings*, 160 F. Supp. 2d at 1076–77 (statements about company's "strong demand" and "solid" position are puffery); *In re Netflix*, 2005 WL 1562858, at *7 (statement that "consumers love our service" is puffery).

- Baker stated,

> And so our marketing dynamic is starting to get more involved around bringing customers back and bringing customers into and bringing them throughout the Yelp experience for all of these transactional elements.
>
> . . .
>
> So it's really about making product and marketing investments at a heartier clip than we made them in the second half of last year. Second half of last year, in which 50% of the revenue growth dropped down to the bottom line, gives an indication of the margin and leverage that's inherent in the business. *But the revenue opportunity that sits out there with 3 million claimed businesses and only 140,000 paid advertisers really merits the investment activity that would – we think merits the investment activity on the product and marketing side that we're making this year*. Little things kind of seesaw back and forth. *Last year, there was an acceleration in revenue growth in 2016*, an acceleration in investment activity in 2017. And I think that's all part of the long-term plan.

FAC ¶ 99 (emphases added).

This statement talks up the "revenue opportunity" from increased advertising that Yelp can expect, and justifies the "investment activity" in attracting advertisers on that basis.  It points to the

"acceleration in revenue growth in 2016" from advertising as evidence that such investment activity is merited. This statement is potentially misleading because it paints a promising picture wherein increased investment in Yelp's advertising program would lead to revenue growth based on past results, without disclosing the risk that growth could be limited by the sensitivity of the CPC model to low user engagement, and indeed that the touted "acceleration in revenue growth in 2016" was already showing signs of being short-lived. Thus, this statement "affirmatively create[d] an impression of a state of affairs that differ[ed] in a material way from the one that actually exist[ed]." *Brody*, 280 F.3d at 1006.

- Baker responded to the question, "Now that you've transitioned the monetization to CPC ads, how sensitive is your revenue growth going forward to the usage of the platform?" by stating:

> Well, it's a lot more sensitive to it than it was in the past. And so in particularly some high-value categories where the advertisers are super jazzed to get Yelp leads, there is an ability to drive traffic there and really have an impact on revenue. So the model is much more responsive to traffic than it has been in the past. We're at a place today where with 24 million monthly active users of the app and 138,000 advertisers at the end of last quarter, we got a lot more users and a lot more usage than we do advertiser demand and interest and budget right now. So the reality is although the model is more responsive, we're not at a place where if we had a lot more usage kind of sprinkled all across Yelp, it probably wouldn't drive a big change in the short term in the financial performance.

FAC ¶ 101.

This statement does not reference the local advertiser program. Its emphasis is the strong user numbers on the Yelp platform, not advertising performance.

Accordingly, Defendants' motion to dismiss is **GRANTED** with respect to the statements quoted in FAC ¶¶ 97 and 101, and **DENIED** with respect to the statement quoted in FAC ¶ 99.

B.    Scienter

In sum, Defendants made potentially misleading statements on February 9 (FAC ¶¶ 81 and 83), February 14 (FAC ¶¶ 87 and 91), and March 1 (FAC ¶ 99) of 2017. For the statements to be actionable, Plaintiffs must additionally establish that Defendants acted with scienter when the statements were made on those three dates.

To adequately plead scienter, the complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2)(A). To be "strong," an inference of scienter "must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs*, 551 U.S. at 314. But it "need not be irrefutable, *i.e.*, of the 'smoking-gun' genre." *Id.* at 324. The inference must be that "the defendant[ ] made false or misleading statements either intentionally or with deliberate recklessness." *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 991 (9th Cir. 2009). "In the securities context, an actor is reckless if he had reasonable grounds to believe material facts existed that were misstated or omitted, but nonetheless failed to obtain and disclose such facts although he could have done so without extraordinary effort." *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 390 (9th Cir. 2010) (citation omitted).

"[W]e conduct a two-part inquiry for scienter: first, we determine whether any of the allegations, standing alone, are sufficient to create a strong inference of scienter; second, if no individual allegation is sufficient, we conduct a 'holistic' review of the same allegations to determine whether the insufficient allegations combine to create a strong inference of intentional conduct or deliberate recklessness." *Curry*, 875 F.3d at 1226 (citation omitted). Here, Plaintiffs base their inferences regarding scienter on statements made by Defendants, Stoppelman's stock sales, and the core operations doctrine.

1. Defendants' Statements

Plaintiffs contend that Defendants made admissions that raise a strong inference that they knew their statements in February and March of 2017 were false or misleading. First, Plaintiffs point to statements in which Defendants touted the predictability in Yelp's business model and the visibility it provided into future revenues, as well as the metrics that Yelp monitors relating to advertiser retention rates. In most of these statements, Defendants were discussing how they monitored return on investment, rather than advertiser retention rate. *See, e.g.*, FAC ¶¶ 47, 68. But in one, Defendants specifically represented that "we'll be watching how [local advertisers] renew." FAC ¶ 48. This prospective statement does not on its own establish that Defendants in

fact monitored how local advertisers renewed their contracts, or that such information was available to Defendants in real-time. Nevertheless, it does tend to show that Yelp had plans to monitor advertiser retention rates, and thus can be considered in conjunction with other allegations to support a finding of scienter. *See Local 731 I.B. of T. Excavators & Pavers Pension Tr. Fund v. Swanson*, No. CIV.A. 09-799, 2011 WL 2444675, at *12 (D. Del. June 14, 2011) (statements by defendants about how they "closely monitor[ed] why advertisers reduce or cancel their programs" contributed to finding of scienter).

Second, Plaintiffs identify statements in which Defendants allude to specific times when they became aware of the churn issues in late 2016 and early 2017.

- On the February 9, 2017 conference call, Nachman stated:

  > "So on the local account side, certainly, we are happy with the revenue side of the equation in Q4. . . . *If I were to point to a weakness and a slowness, it's potentially around kind of the local sales force in the fourth quarter* and particularly – it was a modest slowdown . . . .

  FAC ¶ 81 (emphases added).

- On the May 9, 2017 conference call, Nachman stated:

  > *So we recognized the churn issue about halfway through the quarter and we're able to tie it back actually to a distinct cohort of advertisers that came on Yelp about a year ago* as we're making the transition from CPM to CPC. . . . It was all hands on deck, obviously, at that point, and we put a team in place to focus on that particular cohort and that particular profile.

  FAC ¶ 64 (emphasis added).

- On the May 9, 2017 conference call, Nachman also stated:

  > So, specifically as it relates to the retention issue, it was concentrated obviously in a cohort that surfaced around the beginning of last year. . . . *And we addressed this kind of acute problem in January and February.* We put this recovery team on higher response rates, put a lot of focus on that particular cohort and the numbers have kind of spoken for themselves as we've gotten into March and April.

  FAC ¶ 67 (emphasis added).

These statements do suggest that Defendants were aware of the retention issues by the time they made the misleading statements identified in Part V.A.2, *supra*. The first statement shows

28

that by February 9, Defendants already knew that there was at least a "modest slowdown" in the local sales force in the fourth quarter of 2016. Such a slowdown would likely have a negative impact on the retention of local advertisers going into 2017. The third statement explicitly acknowledged "the retention issue" with the local advertising cohort that joined Yelp in early 2016 and asserted that Yelp "addressed this . . . problem *in January and February*"—that is, Defendants were already aware of the problem and working to remedy it by January, before they issued the financial guidance on February 9. This conclusion is reinforced by Defendant Nachman's revelation that the efforts of the "recovery team" Yelp implemented in response to the retention issues was already bearing fruit in "March and April." The parties debate whether "halfway through the quarter" in the second statement refers to before or after February 9; read in conjunction with the third statement, the term suggests that Defendants recognized the churn issue and were already working to rectify it no later than February 9. In any event, even if "halfway through the quarter" were read in isolation, it would at least encompass the misleading statements made on February 14, which marked almost the exact halfway point of the first quarter of 2017. It would also unquestionably encompass the misleading statement made on March 1.

Based on these statements, it is fair to conclude that Defendants "had reasonable grounds to believe material facts [about the churn issues] existed" when they attested to Yelp's "strong, embedded client base" that was renewing in "healthy number[s]" on February 9, "fairly proven model" for local advertising on February 14, and belief in the value of continuing investments in local advertising on March 1. *In re Oracle Corp.*, 627 F.3d at 390. Defendants "nonetheless failed to . . . disclose such facts although [they] could have done so without extraordinary effort." *Id.* Accordingly, the inference that Defendants made the misleading statements with deliberate recklessness is "at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs, Inc.*, 551 U.S. at 314.

    2.    Stock Sales

Stock sale allegations cannot raise an inference of scienter unless the sales were "dramatically out of line with prior trading practices at times calculated to maximize the personal benefit from undisclosed inside information." *Ronconi v. Larkin*, 253 F.3d 423, 435 (9th Cir.

2001) (citation omitted). Among the relevant factors for a court to consider are: 1) the amount and percentage of shares sold by insiders; 2) timing of the sales; and 3) whether the sales were consistent with the insider's prior trading history. *Id.*

According to Plaintiffs, Stoppelman made one sale of 263,000 shares of Yelp stock on September 23, 2016. FAC ¶ 116. Between September 29, 2016 and February 7, 2017, he sold Yelp shares in allotments of 13,000 during times the shares traded above $40, for a total of 117,000 shares sold. *Id.* ¶ 117. The 117,000 shares amounted to approximately 3 percent of Stoppelman's Yelp holdings. *Id.* Stoppelman's sales then apparently departed from this regular pattern. In the course of the month from February 16 to March 15, 2017—after the issuance of Yelp's 2017 financial guidance and before the issuance of the revised guidance—he sold 3 allotments of 250,000 shares each at an average price of $34.17. *Id.* ¶ 118. These sales of 750,000 total shares amounted to approximately 20 percent of his holdings. *Id.* Stoppelman made no sales between March 16, 2017 and August 4, 2017. *Id.* ¶ 119. Starting from August 4, 2017 and continuing until February 20, 2018, he "again began selling allotments of 13,000 share [sic] of common stock at a time for prices always exceeding $40." *Id.* ¶ 120. During this period, his sales totaled 390,000 shares that amounted to approximately 13.7 percent of his holdings. *Id.*

In Plaintiffs' view, Stoppelman's stock sales during the proposed class period "dramatically departed from [the] sales pattern in timing, amount, and price of the previous sales," and thus "raise[] a strong inference" that he "knew that the Company was experiencing a greater than forecasted level of contract terminations in January and February of 2017, which would impact recurring revenues throughout 2017 and sold these shares to avoid the losses that would have come with selling the shares after the May 9, 2018 corrective disclosure." *Id.* ¶ 122.

Defendants respond by pointing to Stoppelman's SEC Form 4 filings reporting each of the three allegedly suspicious sales. *See* Mot. at 19. To be sure, stock sales made "according to pre-determined plans *may* rebut an inference of scienter." *Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1067 n.11 (9th Cir. 2008) (emphasis added). But all that can be gleaned from the Forms 4 is that Stoppelman's "[s]hares were sold pursuant to a duly adopted 10b5-1 trading plan." Mot., Exh. C. Defendants assert that the trading plan was "executed prior to the alleged

fraud," Mot. at 19, but nothing before the Court establishes when precisely the trading plan was adopted. Defendants have not sought to introduce the actual 10b5-1 plan. SEC regulations recognize "a written plan for trading securities" as an affirmative defense to insider trading allegations only if the insider adopted the plan "[b]efore becoming aware of the [material nonpublic] information." 17 C.F.R. § 240.10b5-1(c)(1)(i); *see Applestein v. Medivation, Inc.*, No. C-10-0998 EMC, 2011 WL 3651149, at *7 (N.D. Cal. Aug. 18, 2011) (concluding that the "fact that the sales were made pursuant to Rule 10b5–1 plans does not preclude a finding of fraud because, at the time the plans were adopted . . . the individual defendants were allegedly already aware of the unblinding").

Moreover, the regulations require the trading plan to either "[s]pecif[y] the amount of securities to be purchased or sold and the price at which and the date on which the securities were to be purchased or sold," or to "[i]nclude[] a written formula or algorithm, or computer program, for determining the amount of securities to be purchased or sold and the price at which and the date on which the securities were to be purchased or sold." 17 C.F.R. § 240.10b5-1(c)(1)(i)(B). Without reviewing Stoppelman's actual trading plan, the Court cannot determine whether these requirements were met, and cannot conclude that the plan negates any inference of scienter.

Setting aside the 10b5-1 plan, Stoppelman's stock sales were sufficiently out of line with his prior trading patterns to lend some support to an inference of scienter, although the support is not particularly strong because the amount and timing of the sales were not necessarily suspicious. The amount of his sales during the class period—totaling approximately 20 percent of his Yelp holdings—is not alone sufficient to infer scienter.[3] *See, e.g.*, *Metzler*, 540 F.3d at 1067 (holding that courts "typically require larger sales amounts . . . to allow insider trading to support scienter," and finding no scienter where one defendant "sold only 37% of his total stock holdings during the

[3] The two cases Plaintiffs cite inferring scienter from smaller sales of stock are distinguishable. *In re SeeBeyond Techs. Corp. Sec. Litig.*, 266 F. Supp. 2d 1150 (C.D. Cal. 2003) did not find a 7.6% stock sale suspicious in itself; the court there inferred scienter based on a combination of factors, including that the defendants "admittedly lied to analysts and investors." *Id.* at 1169. And the scienter finding in *Batwin v. Occam Networks, Inc.*, No. CV 07-2750 CAS (SHX), 2008 WL 2676364 (C.D. Cal. July 1, 2008) was primarily premised on the defendant's "significant violations" of Generally Accepted Accounting Principles over an extended period of time, and the "timing and circumstances" of the stock sale rather than the amount. *Id.* at *13–14.

Class Period"); *Ronconi*, 253 F.3d at 435 (holding that defendants' sales of "only 10 percent and 17 percent, respectively, of their total number of shares and options" were "not suspicious in amount"). It does, however, provide some supporting evidence, at least in the absence of rebuttal by the 10b5-1 plan.

The timing of the sales does not clearly indicate that they were "calculated to maximize the personal benefit from undisclosed inside information." *Ronconi*, 253 F.3d at 435. The average price per share of Stoppelman's three sales was $34.17, FAC ¶ 118, and Yelp's share price largely hovered between $32 and $35 during the class period, Mot. Exh. N (Yelp historical stock prices). Thus, on the one hand, "the price at which the sale occurred" does not appear to show that Stoppelman "deliberately attempted to seize on artificially high prices." *Splash Tech. Holdings*, 160 F. Supp. 2d at 1084 (citation omitted). And courts have observed that "[o]fficers of publicly traded companies commonly make stock transactions following the public release of quarterly earnings and related financial disclosures." *Lipton v. Pathogenesis Corp.*, 284 F.3d 1027, 1037 (9th Cir. 2002); *In re FVC.COM Sec. Litig.*, 136 F. Supp. 2d 1031, 1040 (N.D. Cal. 2000) (finding that officers' sale of shares following press release announcing anticipated increase in quarterly revenues is not suspicious).

On the other hand, that the share prices were not unusually high when Stoppelman made his sales does not necessarily negate suspicion, because the purpose of withholding unfavorable news from the investors could simply be to keep share prices steady. Further, Stoppelman began selling his shares approximately a week after Yelp issued its financial guidance on February 9, 2017, and the temporal proximity between the sales and the release of the optimistic projections could support an inference of scienter. *See In re Intuitive Surgical Sec. Litig.*, 65 F. Supp. 3d 821, 839 (N.D. Cal. 2014) (finding that allegations that "Defendants sold their shares at times after [defendant company] learned of information that would adversely affect [its] stock, but before the public learned the information" supported inference of scienter). On balance, the timing of the sales lends mild support for a finding of scienter.

However, Stoppelman's sales during the class period were inconsistent with his prior trading patterns. The magnitude and sale prices of his three sales of 250,000 shares at below $40

32

United States District Court
Northern District of California

per share did not align with his pattern of selling allotments of 13,000 shares when prices were above $40.  *See* FAC ¶ 116.  Moreover, although he had also made one substantial sale of 263,000 shares less than six months before the class period began, the sales during the class period were significantly greater—750,000 total shares—and took place within the span of a mere month from February 16 to March 15, 2017.  These inconsistencies are somewhat mitigated by the fact that Stoppelman was the only defendant alleged to have made suspicious sales, even though Plaintiffs allege the other individual defendants also had knowledge of Yelp's retention problems.  *See Metzler*, 540 F.3d at 1067 ("We typically require . . . corroborative sales by other defendants [] to allow insider trading to support scienter").

Based on the above, Stoppelman's stock sales support, albeit not strongly, an inference of scienter.

### 3.  Core Operations

The core operations doctrine—the theory that "facts critical to a business's 'core operations' . . . are known to a company's key officers"—"can be one relevant part of a complaint that raises a strong inference of scienter."  *South Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 784 (9th Cir. 2008).  The Ninth Circuit has explained that the doctrine on its own may support a strong inference of scienter in two circumstances: (1) the allegations are particular and suggest that defendants had actual access to the disputed information; (2) the allegations may conceivably satisfy the PSLRA standard in a more bare form, without accompanying particularized allegations, in rare circumstances where the nature of the relevant fact is of such prominence that it would be "absurd" to suggest that management was without knowledge of the matter.  *Id.* at 785–86 (citations and internal quotation marks omitted).

As to the first prong, Plaintiffs have alleged, based on statements made by Defendants at various time, that Yelp carefully monitors advertisers' returns on investment, which impacts whether they continue advertising with Yelp, and that Yelp said it would track whether the 2016 cohort of local advertisers would renew their contracts.  *See, e.g.*, FAC ¶¶ 47, 49.  Plaintiffs have also alleged that Yelp reviews a number of "real-time metrics" that provides Defendants with "immediate insights into customer retention trends."  *Id.* ¶ 32.  However, a careful review of these

allegations reveals that none of the metrics was retention rate itself.  Instead, these metrics all related to advertisers' "return on investment" from their advertising on Yelp and their "engagement on the platform."  *See, e.g.*, FAC ¶¶ 125–26, 128–32.  Thus, Plaintiffs are unable to point to any "specific admissions from top executives" that they monitored the local advertiser retention rate in particular.  *In re Daou Sys., Inc.*, 411 F.3d 1006, 1022 (9th Cir. 2005).  And even if Baker's prospective statement that "we'll be watching how [the local advertisers] renew" tends to show that Defendants did in fact monitor the renewal rate, it does not indicate when Defendants became aware that the churn rate was higher than expected.  Thus, although Plaintiffs have included some "details about the defendants' access to information within the company," *South Ferry LP*, 542 F.3d at 785, they have not provided enough to meet the high standard of particularity required to show Defendants had access to local advertiser retention data in real-time.

However, as to the second prong, Plaintiffs have made sufficient allegations to indicate that the local advertiser program is such a central component of Yelp's operations that Defendants can be presumed to have knowledge of the problems within the program.  According to the complaint, the local advertising segment "accounted for approximately 70% of [Yelp's] advertising revenues in 2016," and that advertising revenues in turn accounted for "approximately 90%" of Yelp's total revenue.  FAC ¶¶ 20, 22.  Assuming the truth of these figures, significantly more than half of Yelp's revenue derives from the local advertiser program, enough to suggest that the program's operation is "prominent enough that it would be 'absurd to suggest' that top management was unaware of" the advertiser churn issues.  *Berson*, 527 F.3d at 989 (finding it "hard to believe that [the CEO and CFO] would not have known about stop-work orders that allegedly halted tens of millions of dollars of the company's work"); *In re Montage Tech. Grp. Ltd. Sec. Litig.*, 78 F. Supp. 3d 1215, 1226 (N.D. Cal. 2015) (making inference of scienter under core operations theory based in part on allegations that defendant company did not disclose that a distributor accounting for 71% of its revenue was in fact owned and controlled by an affiliate of defendant company).

Moreover, "viewed holistically, along with other allegations in the complaint," Plaintiffs' core operations allegations are sufficient to raise a strong inference of scienter.  *Reese v. Malone*,

34

747 F.3d 557, 575 (9th Cir. 2014), *overruled on other grounds by City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605 (9th Cir. 2017).  Although Defendants' repeated statements about tracking the return on investment for local advertisers fall short of establishing real-time knowledge of retention rates, they suggest that Defendants would have had some awareness of potential retention problems going into the first quarter of 2017 when considered in conjunction with their admission that return on investment is closely correlated with retention.  *See* FAC ¶ 68 (Defendant Stoppelman explaining that "the higher ROI fundamentally that [an] engaged advertiser is getting is going to lead to, over the long term, better retention"); *In re Wells Fargo & Co. S'holder Derivative Litig.*, 282 F. Supp. 3d 1074, 1101 (N.D. Cal. 2017) (concluding that "it would be 'absurd' to suggest that management was without knowledge" of allegedly fraudulent cross-selling practices at Wells Fargo given "the 'prominence' of cross-selling in Wells Fargo's business" and "the close manner in which it was monitored").  The Court finds that these statements, together with Defendants' statements about recognizing the churn issues and taking corrective action "in January and February" of 2017, raise the inference that Defendants issued the misleading statements on February 9, February 14, and March 1 with scienter "at least as compelling as any opposing inference of nonfraudulent intent."  *Tellabs*, 551 U.S. at 314.

In sum, Defendants' statements regarding when they became aware of the churn issues, Stoppelman's stock sales during the proposed class period, and Plaintiffs' allegations that local advertising is a core operation for Yelp "combine to create a strong inference" of scienter on Defendants' part in making the allegedly misleading statements.  *Curry*, 875 F.3d at 1226.

C.     Loss Causation

"To prove loss causation, the plaintiff must demonstrate a causal connection between the deceptive acts that form the basis for the claim of securities fraud and the injury suffered by the plaintiff."  *Ambassador Hotel Co., Ltd. v. Wei–Chuan Inv.*, 189 F.3d 1017, 1027 (9th Cir. 1999).  "A plaintiff is not required to show that a misrepresentation was the *sole* reason for the investment's decline in value," but it must set forth facts that "'if assumed true, are sufficient to provide [the defendant] with some indication that the drop in [defendant's] stock price was

causally related to [the defendant's] financial misstatement[s]." *In re Daou*, 411 F.3d at 1025–26 (citation and internal quotation marks omitted). "So long as the complaint alleges facts that, if taken as true, plausibly establish loss causation, a Rule 12(b)(6) dismissal is inappropriate." *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1057 (9th Cir. 2008).

According to Defendants, Plaintiffs are required to show that their losses were caused by the market responding to revelations of fraudulent conduct. Mot. at 22. For this proposition, Defendants rely on *Metzler*, in which the Ninth Circuit stated that loss causation is adequately pled where a complaint "allege[s] that the market learned of and reacted to [the] fraud, as opposed to merely reacting to reports of the defendant's poor financial health generally." 540 F.3d at 1063. If this were the only way to show loss causation, Plaintiffs' allegations might be problematic. The complaint alleges that once Yelp's "downgrade to its 2017 guidance was revealed . . . . the price of Yelp's stock declined precipitously," and that an analyst report published the day after the May 9 guidance revision attributed the drop in Yelp's share prices to "greater advertising churn" than expected. FAC ¶¶ 104, 108. These allegations merely show that the market was reacting to the news that Yelp's financial performance was worse than previously projected; they do not show that the market became aware that Yelp's previous statements were *fraudulent* for concealing unfavorable information about advertiser churn rates.

But that is not the only way to show loss causation. The Ninth Circuit has explained that it is "well established" that "a plaintiff can satisfy loss causation by showing that 'the defendant misrepresented or omitted the *very facts* that were a substantial factor in causing the plaintiff's economic loss.'" *Nuveen Mun. High Income Opportunity Fund v. City of Alameda, Cal.*, 730 F.3d 1111, 1120 (9th Cir. 2013) (quoting *McCabe v. Ernst & Young, LLP.*, 494 F.3d 418, 425 (3d Cir. 2007)) (emphasis in original); *see also In re Vivendi Universal, S.A. Sec. Litig.*, 634 F. Supp. 2d 352, 364 (S.D.N.Y. 2009) (holding that loss causation can be established by an event that "disclose[s] part of the truth that was previously concealed by the fraud," even if the event does "not identify specific company statements as false or misleading"). For example, loss causation has been found to be sufficiently alleged where a plaintiff purchased security that was "readjusted to a lower, more accurate level following the materialization of the risk" that was previously

36

undisclosed, "causing Plaintiff to lose money." *Cement & Concrete Workers Dist. Council Pension Fund v. Hewlett Packard Co.*, 964 F. Supp. 2d 1128, 1146 (N.D. Cal. 2013); *see also Thomas v. Magnachip Semiconductor Corp.*, 167 F. Supp. 3d 1029, 1046 (N.D. Cal. 2016) (loss causation established where "stock steadily declined" as defendant company postponed releasing a financial report and then released a "restatement of its financial results").

Plaintiffs have adequately alleged loss causation under this approach. First, Defendants' statements from February 9 and 14 failed to mention the retention problems manifesting in late 2016 and early 2017. *See* Part V.A.2, *supra*. Second, there is no dispute that the revelation of the retention problems was a substantial factor in causing the drop in Plaintiffs' Yelp shares. Defendants concede that it was the "decline in retention that . . . impacted [Yelp's] outlook." FAC ¶ 62. Accordingly, Plaintiffs have "demonstrate[d] a causal connection between [Defendants' allegedly] deceptive acts . . . and the injury suffered by the" Plaintiffs. *Ambassador Hotel*, 189 F.3d at 1027 (9th Cir. 1999).

D.     Section 20(a) Claim as to Individual Defendants

In addition to their claims under § 10 (b), Plaintiffs allege that Stoppelman, Nachman, and Baker violated § 20(a) of the Securities Exchange Act in their individual capacities. Section 20(a) "provides for derivative liability; that is, it 'makes certain 'controlling' individuals also liable for violations of section 10(b) and its underlying regulations.'" *Westley v. Oclaro, Inc.*, 897 F. Supp. 2d 902, 912 (N.D. Cal. 2012) (citing *Zucco Partners*, 552 F.3d at 990). Because the Court finds that Plaintiffs have stated a claim for § 10(b) violations with respect to several of Defendants' statements, the Individual Defendants' motion to dismiss the § 20(a) claims against them is **DENIED**.

///
///
///
///
///
///

# VI.    CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss is **DENIED** with respect to the statements quoted in FAC ¶¶ 81, 83, 87, 91, and 99, and **GRANTED** with respect to the other challenged statements.

This order disposes of Docket No. 31.

**IT IS SO ORDERED**.

Dated: November 27, 2018

_____

EDWARD M. CHEN
United States District Judge