1
2
3
4                                  UNITED STATES DISTRICT COURT
5                                NORTHERN DISTRICT OF CALIFORNIA
6

7    JONATHAN DAVIS, et al.,                          Case No.  18-cv-00400-EMC

8                       Plaintiffs,                   **PUBLIC REFILING**

9            v.                                       **ORDER DENYING DEFENDANTS'**
                                                     **MOTION FOR SUMMARY**
10   YELP, INC., et al.,                              **JUDGMENT**

11                      Defendants.                   Docket No. 132
12
13

14          Plaintiffs, investors in Yelp stock, bring this putative securities class action against

15   Defendants Yelp, Inc. ("Yelp"), its Chief Executive Officer (CEO) Jeremy Stoppelman, Chief

16   Financial Officer (CFO) Lanny Baker, and Chief Operating Officer (COO) Jed Nachman.  The

17   crux of Plaintiffs' complaint is that Defendants made false or misleading statements regarding its

18   expected revenues for fiscal year 2017, particularly in relation to its ability to retain local

19   advertisers.  Defendants allegedly touted the company's strong local advertiser retention rate and

20   optimistic growth projections through early 2017, despite knowing that a significant number of the

21   local advertisers were canceling their contracts.  When Defendants made downward adjustments

22   to Yelp's projections and disclosed those retention problems in May 2017, its stock prices fell.

23   Plaintiffs assert that Defendants' actions violated Sections 10(b) and 20(a) of the Securities

24   Exchange Act of 1934, 15 U.S.C. §§ 78j(b), 78t(a), as well as Rule 10b-5 promulgated thereunder.

25          Pending before the Court is Defendants' motion for summary judgment pursuant to

26   Federal Rule of Civil Procedure 56.  *See* Docket No. 132 ("Summ. J. Mot.").  For the following

27   reasons, the Court **DENIES** the motion.

28

United States District Court
Northern District of California

# I.    FACTUAL BACKGROUND

A.    Yelp's New Business Model

Yelp is an "online platform devoted largely to reviews of businesses."  Docket No. 29 ("FAC") ¶ 2.  It derives revenue from businesses advertising on its platform.  *Id.* ¶¶ 3, 19. Beginning in 2015, the company transitioned from charging advertisers on a cost-per-impression ("CPM") basis, whereby advertisers pay a predetermined fee for every 1,000 ads shown, to a cost-per-click ("CPC") basis, whereby advertisers pay only if users click on their ads.  *Id.* ¶¶ 23–25; Pls.' Ex. 14 at 4.  Advertisers initially welcomed the transition to CPC, leading Yelp to sell a record number of new CPC contracts to local (often smaller and unreviewed[1]) businesses at the end of 2015.  *See* Pls.' Ex. 21 at 93371; Pls.' Ex. 28 ("Dean Dep.") at 77:19-78:4; Pls.' Ex. 33; Pls.' Ex. 34 ("Sullivan Dep.") at 135:5–12; Pls.' Ex. 47 at 155479–80.

Starting in 2016, however, Yelp started to see a significant increase in revenue churn[2] caused by the company's failure to retain local advertisers.  Plaintiffs' theory is that the company's failure to retain these local advertisers—and thus its failure to control churn—was caused in part by the transition from a CPM to a CPC model.  Unlike CPM contracts, Yelp only earned revenue in a CPC contract if it "fulfilled" its advertisers' "budget" by delivering the promised number of clicks.  Dean Dep. at 47:23–48:3, 230:18–231:4.  The problem was that ads of local, often unreviewed businesses were less appealing to Yelp's users, which meant fewer clicks and thus slower fulfillment.  *See* Pls.' Ex. 23; Pls.' Ex. 24 ("Yao Dep.") at 109:1–7, 183:3–6, 189 15–20; Pls.' Ex. 25 ("Baker Dep.") at 84:12–85:2; Pls.' Ex. 37; Pls.' Ex. 38 ("Halprin Dep.") at 96:14– 98:10; Pls.' Ex. 17 ("Galos-Alioto Dep.") at 65:22–70:14.  To mitigate this problem, Yelp started using a technique known as "knobs" in September 2016, whereby Yelp increased the rate at which its algorithm attempted to fulfill a local advertiser's budget to ensure that budget was fulfilled by

[1] "Unreviewed businesses" are those "that don't have reviews, that don't have consumer content." Pls.' Ex. 28 ("Dean Dep.") at 63:1–5.

[2] Yelp defines "churn" as "lost revenue which comes in the form of cancellations or downgrades . . . plus [] new revenue, from the existing book which is upgrades, divided by . . . monthly managed revenue.  It's expressed as a percentage."  Defs.' Ex. 6 ("Sullivan Dep. 2") at 21:15–19. In turn, "monthly managed revenue" is the "amount of revenue" Yelp "expect[ed] to build that month from [its existing] customers."  *Id.* at 27:16–20.

the end of the month.  *See* Yao Dep. at 100:22–103:19, 110:25–111:10, Pls.' Ex. 26 ("Heil Dep.")

at 150:19–151:16, 156:13–17, 158:12–18; Pls.' Ex. 46 at 277407.  Knobs made it less likely that

lower traffic for less popular local advertisers would drive down Yelp's fulfillment of those

advertisers' budgets, and therefore Yelp's revenue.  Yao Dep. at 110:25–111:10, 145:3–22.  But

knobs also resulted in dramatic cost-per-click increases.  Pls.' Ex. 46 at 277407; Heil Dep. at

151:1–151:16; Yao Dep. at 186:19–24; 189:12–20.  For example, the cost-per-click of a local

advertiser in Utah jumped from ███ per click to ███ per click in one month.  *See* Pls.' Ex. 37.  As a

result of knobs, local advertisers paid a much higher cost-per-click but received fewer clicks and

less business from advertising on Yelp.  Pls.' Ex. 23; Pls.' Ex. 37; Pls.' Ex. 56.  Importantly,

advertisers did not know Yelp was using knobs to fulfill their CPC contracts or that their cost-per-

click could fluctuate, let alone that knobs increased their cost-per-click.  Heil Dep. at 151:14–16,

156:25–157:5; 158:12–18; Pls.' Ex. 46 at 403–07.

B.    Defendants Knew Yelp Had a Systemic Problem Retaining Local Advertisers In the
      Second Half of 2016

      Yelp began consistently bleeding local advertisers in the second half of 2016, causing its

churn rate to spike.  Dean Dep. at 28:23–29:1.  In fact, Yelp's internal model showed that the

churn rate of local unreviewed advertisers was ███ *as high* as the churn rate of reviewed

advertisers.  Defs.' Ex. 21 at 3746.  By the summer of 2016, Yelp recognized that local

unreviewed businesses were "growing as a proportion of sales," were "show[ing] a concerning

downward trend in retention," and were leading to churn rates "above historical levels."  Pls.' Ex.

45 at 234815.  There was also significant evidence pointing to the CPC model as the culprit for the

low retention rate among local advertisers.  In fact, Yelp did not fully compensate its sales

personnel for selling contracts to local businesses because those accounts "[were] more likely to

churn out as [cost-per-click] increase[d] in an effort to fulfill" those contracts.  Pls.' Ex. 61 at

141425.  As stated in an internal audit conducted by a Yelp data executive: "[m]ultivariate churn

models controlling for other factors show a *strong [cost-per-click]/churn relationship*" and that

"high [cost-per-click] variability might be a risk factor."  Defs.' Ex. 22 at 3633 (emphasis added).

United States District Court
Northern District of California

Regardless of whether it was caused by the transition from CPM to CPC, some other systemic problem, or a combination of factors, by the summer of 2016 Defendants were well aware of the significant increase in the churn rate among local advertisers.  In fact, the churn rate among local advertisers for the fall of 2016 was much higher than it was for the fall of 2015—especially for non-legacy local advertisers—as shown in internal charts the company presented to the board of trustees in February 2017:



Note:  Overall churn dips down to ███ by end of Q3 as more revenue moves to Legacy, which has a lower churn rate.

United States District Court
Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1    *See* Defs.' Ex. 17 at 4937–39.  The first two graphs—for the overall churn rate among all local

2    advertisers and the churn rate among non-legacy local advertisers—show a sharp increase in churn

3    in June 2016, which is not seen in any other year.  *Id.* at 4937–38.  This sharp jolt, followed by a

4    consistent increase thereafter, underscores that Yelp's problem with retaining local advertisers was

5    systemic an ongoing throughout the fall of 2016, and not tied to one-off events like the November

6    2016 election or the December holiday season.

7        Below is a timeline of events and internal communications confirming Defendants were

8    well aware that Yelp had a systemic problem retaining local advertisers in the fall of 2016:

9    • **July 2016:**  Defendants delivered a presentation to Yelp's board of directors titled

10       "Churn/Revenue Retention BOD," in which they stated that "account churn [] remains

11       above historical levels," that "[u]nreviewed businesses are growing as a proportion of sales

12       and also show a concerning downward trend in retention," and that "retention for [twelve-

13       month] advertisers has been on the decline for cohorts starting in [the second quarter of

14       2015]."  Pls.' Ex. 45 at 815, 820.

15   • **September 7, 2016:**  Defendants received an email from Matthew Halprin, Yelp's Senior

16       Vice-President of Business Operations, attaching "a really solid analysis of churn over

17       [the] last couple of years."  Pls.' Ex. 47 at 155479.  The "Executive Summary" of this

18       revenue churn "diagnosis" made clear that the increase in local unreviewed advertisers was

19       leading to higher revenue churn.  Pls.' Ex. 47 at 155479–80.

20   • **September 21, 2016:**  Defendants delivered another presentation to Yelp's board of

21       directors listing "increased advertising churn" experienced "in recent months" as one of the

22       "Things Keeping [Them] Up At Night."  Pls.' Ex. 49 at 273113.

23   • **October 8, 2016:**  Defendant Baker received an email from an internal analyst stating that

24       "[Yelp] noticed an increase in the downgrade rate over the past year which [put] upward

25       pressure on [its] overall monthly revenue churn figures."  Pls.' Ex. 50.  About ■% of the

26       increase in "downgrades" came from a "mix shift" in Yelp's customers to include more

27       local and unreviewed businesses.  *Id.*

28   • **December 12, 2016:**  Defendant Stoppelman sent a concerned email to Defendant

United States District Court
Northern District of California

6

Nachman asking to "make it clear [churn] is a p0[3] item within the company" because he "did not feel like everyone [was] on the same page." Pls.' Ex. 66 at 6938. He also asked Defendant Nachman to "kick off a down with churn effort again (upgrading from churn checkin)," "solicit any new ideas that are out there that haven't been focused on," and "provide [Kayti Sullivan[4]] more support to make sure [her team was] doing all the right things" to reduce churn among local businesses. *Id.* Defendant Stoppelman wanted to make sure it was clear to Ms. Sullivan "[h]er key result needs to be churn, not hiring [numbers], or other things that are easier to achieve." *Id.* Defendant Nachman "[a]gree[d] that [churn] needs to be a p0." *Id.*

- **December 13, 2016:** Ms. Sullivan assembled a "Down with Churn P0 . . . cross-functional team" to "answer the question: why has churn increased, and what can/should [Yelp] do about it?" Pls.' Ex. 67 at 90476. In her welcome email to the team, Ms. Sullivan underscored that

> [Defendant Stoppelman] has asked that we treat churn as a P0 and ensure all functions are thinking about this challenge. Churn (account and revenue churn) *is a major lever in our model, and has been on the rise in 2016 (worsening in [the second half])*. The two charts embedded below catalyzed the creation of this group, since the trends July-Nov *have shaved a significant amount of revenue off our current 2017 forecast* if we don't reverse them.

*Id.* (emphases added).

C.   Defendant Stoppelman Amended His Trading Plan in December 2017

On December 6, 2016, Defendant Stoppelman amended his Rule 10b5-1 trading plan to add three sales of 250,000 Yelp shares at $30.00 per share minimum. Pls.' Ex. 65 at 712–13. The sales were scheduled to and did take place on February 16, March 3, and March 15, 2017. *Id.*

D.   Defendants Knew Local Churn Continued To Be A Systemic Problem In January and February 2017

Defendants were so concerned about revenue churn among local businesses at the end of

---

[3] "P0" stands for "priority zero," which means that something is of the utmost importance or priority.

[4] Ms. Sullivan was Yelp's Vice President of Account Management/Customer Success.

United States District Court
Northern District of California

1    January 2017 that they established an unprecedented "recovery team," which was a group of

2    account managers led by Ms. Sullivan whose sole job was to get in touch immediately with local

3    advertisers who were requesting to cancel their Yelp accounts to "walk them through the value of

4    the advertising program in hopes to change their minds about cancelling."  Defs.' Ex. 6 ("Sullivan

5    Dep.") at 76:3–11; Pls.' Ex. 92; Defs.' Ex. 15 at 228946.  The recovery team came out of an

6    internal analysis, conducted by Ms. Sullivan in the fall of 2016, showing that local advertisers

7    were twice as likely to change their minds about cancelling their accounts if an account manager

8    got in touch with them within twenty-four hours of their cancellation request.  *Id.* at 76:15–77:1.

9    The size of the recovery team eventually doubled between February and May 2017 as Yelp saw

10   "success in the ability to reverse more accounts."  *Id.* at 83:14–18.

11           Although the January 2017 revenue numbers improved somewhat from November and

12   December 2016, internal communications confirm Defendants continued to see the high churn rate

13   among local advertisers as a systemic issue going into February 2017:

14   • **January 31, 2017:**  Ms. Sullivan emailed Defendant Nachman with "all pretty good news"

15        about the January 2017 revenue numbers but explaining that "churn [was] at ██% and

16        declining (thanks to upsells from [local client partners (LCPs)] and reversals from [account

17        managers])."  Pls.' Ex. 72.  Her expectation was that the company would "finish at █% flat

18        on churn" in January 2017.  *Id.*  At the same time, and at the risk of "rain[ing] on the

19        January parade (which [was] a damned exciting parade indeed)," Ms. Sullivan warned that

20        the company might "be starting [February] with about ██% more revenue set to cancel."

21        *Id.*

22   • **February 1, 2017:**  Ms. Sullivan emailed Defendants with the final January sales and

23        churn numbers.  She notes the team had a "hard fought battle to land [them] ██% Revenue

24        Churn and ██% Cancel Loss" in January 2017 and that "[Yelp] live[d] to see another

25        day—time to do it all again in Feb[ruary]!"  Defs.' Ex. 18.

26   • **February 1, 2017:**  Ms. Sullivan sends Defendants a second email noting the company

27        "ended under ██% monthly loss" for the first time since "November 2015," which is

28        roughly when Yelp transitioned from CPM to CPC.  Pls.' Ex. 73.  Although the January

8

United States District Court
Northern District of California

2017 churn rate was lower than the churn rate in November and December 2016, it was higher than the churn rate in January 2016 and was *likely to increase* in February 2017. Defs.' Ex. 17 at 4397.  In fact, a member of the sales team acknowledged in the same email chain that "February is sure to be a big test, with ███ cancels already in the hopper for $██████ (compare to January, with $██████ on day one)."  *Id.*  The email noted that the newly established "Recovery Teams" had "their work cut out for them."  *Id.*

- **February 6, 2017:**  Allie Dalglish, Yelp's Manager of Investor Relations, emailed other executives on behalf of Defendant Baker asking whether, "[g]iven the 'weakness' in the [fourth quarter local advertising accounts] metric," Defendant Baker could make a statement at the upcoming investors meeting "along the lines of 'January is off to a good start in line with historical trends.'"  Pls.' Ex. 12 at 3210.  The problem with revenue churn was so serious that Defendants were struggling with how to convey it to investors and analysts at the upcoming February 9, 2017 investor conference call.  The response email from Brian Dean, Yelp's Senior Director of Business Operations & Strategy, was tentative at best.  He confirmed that even if the company saw a small net gain in local advertising accounts in January 2017, that gain was smaller than January 2016's gain because "[t]he January [2017] number [was] still getting hammered by the really bad November and December [2016] performance (both production + churn) and November and December 2016 were worse along all these same dimensions [as compared to] November and December 2015.]"  *Id.* at 3210.  To be sure, Mr. Dean also explained that Yelp "unequivocally [] had a 'solid' (not great) January [2017] from a revenue production standpoint" and, importantly, "January [2017] churn returned to normal levels, but that's more indicative of what we'll experience in February (the churn metric is forward-looking by about a month)."  *Id.* at 3209.  Given these lackluster recovery numbers for January 2017, Mr. Dean's recommendation was that "*[m]aybe if you squint enough* [Defendant Baker] can say something like 'January is off to a good start'?"  *Id.* (emphasis added).

- **February 6, 2017:**  Ms. Sullivan's "Weekly update" email to executives noted that "Feb[ruary 2017] loss numbers are anomaly high" and that they were "hoping the launch

9

1    of [the] Recovery team can help combat [that] (although most gains from recovery will be
2    felt in March)."  Pls.' Ex. 75 at 2987.

3    • **February 8, 2017:**  An internal team presented to Defendants and the company's board of
4    directors on the company's ongoing churn problem among local advertisers.  Defs.' Ex. 15
5    at 228947.  The presentation noted that "it[ was] too early to gauge impact of recovery
6    launch on  monthly reversal rate," but the February 2017 churn numbers were higher than
7    in February 2016 and February 2015.  *Id.* at 228947-48.  The presentation also confirmed
8    that "cancel requests entering February [were] at highest level since Jan[uary 2016]."  *Id.*
9    at 228954.  Finally, the presentation noted that the uptick in cancellations in the second
10   half of 2016 might have been "driven by a few one-off events," including "system
11   improvements (led to catch-up of 60+ day delinquent advertisers," the "end of [the]
12   [American Express]/Costco relationship (advertisers not updating [credit cards])," and
13   "December seasonality."  *Id.* at 228950.  There was no mention of the 2016 election as a
14   contributing factor to the rise in cancellations.

15   E.    The February and March Statements

16   Far from simply stating that "January [was] off to a good start," Defendants made much

17   more optimistic statements about "the fundamentals" of Yelp's local advertising program at the

18   February 9, 2017 investor conference call.  When someone asked Defendants "how [they] should

19   be thinking about [the local active accounts] metric going forward," Defendant Nachman

20   responded:

21           If I were to point to a weakness and a slowness, it's potentially
22           around kind of the local sales force in the fourth quarter, and
             particularly—it was *a modest slowdown* that, quite frankly, we think
23           *the election* and a period around the election both from an output
             and productivity perspective from the sales force and that kind of
24           bled into *vacation time*.  It's *not something we're super concerned*
             *about* kind of coming into 2017.  *We feel like the fundamentals are*
25           *in place and really strong*.

26   Defs.' Ex. 7 at 9 (emphases added).  Another analyst asked why "local advertisers [] do not

27   finish their relationship with Yelp."  *Id.*  Defendant Nachman again responded:

28           Obviously, repeat rate is a mix of folks who have advertised with us

10

> in the past and *that's at an all-time high right now*, and *while we're really encouraged by our kind of strong, embedded client base and that's a really kind of healthy number to understand that those folks are coming back.* You know it's a double-edged sword because we also think that making sure that we get enough new clients into the pipeline is a really important initiative for the company. *And so we're not alarmed in any way about kind of where we are in the repeat rate side,* but you'd love to see, again, adding the number of local advertising accounts.
>
> Even if we were up in the 7,000, 8,000, 10,000 range, based on the opportunity that we actually have in this marketplace with millions of businesses that have claimed their presence on Yelp, we think we're still in the very early stages and we've got to look at both sides of the coin here, making sure that we're driving new business and *taking advantage of kind of the existing client base that has very nice trends behind it.*

*Id.* at 10–11 (emphases added).

Defendants also issued a press release extolling that Yelp's "local revenue" grew by 39% in 2016 and that "Yelp has become deeply integrated into consumers' daily habits and increasingly essential to local business owners."  FAC ¶ 55.  The press release also predicted net revenue in the range of $195 to $199 million for the first quarter of 2017, and growth of approximately 25% compared to the first quarter of 2016.  *Id.*  For the full year of 2017, the company predicted net revenue in the range of $880 to $900 million, and growth of approximately 25% compared to 2016.  *Id.*

On February 13, 2017, Brigitte Ehman, Yelp's Senior Analyst of Business Operations and Strategy, stated in an email to Ms. Sullivan that Yelp would miss its February 2017 target churn rate of ███% (███% for legacy businesses and ███% for non-legacy businesses).  Pls' Ex. 77. She explained that "[Yelp was] coming in over" these targets: ███% for legacy businesses (█% higher than the January 2017 final number) and ███% for non-legacy businesses (█% percent higher than the January final number).  *Id.*  That same day, Ms. Sullivan reported to the rest of Yelp's executives that the February 2017 churn rate was ██% thus far, slightly "higher than Jan[uary's], but not as high as Q4 [2016] peaks."  Pls.' Ex. 78 at 2964.

Despite the negative signs for the month of February, Defendants attended a Goldman Sachs conference on February 14, 2017, where they specifically discussed Yelp's local advertising efforts.  Defendant Stoppelman stated:

11

> I think, really, it was just about focusing on the core. And that's why the message that was delivered to the teams at the start of the year was, *'Hey, there's nothing fundamentally wrong with our business. We just need to execute even better.'*  And so we really did that, and *I think it paid off.*

Defs.' Ex. 36. at 7–8 (emphasis added).  During that same conference, Defendant Baker responded to a question about the importance of sales and marketing by stating:

> On the sales side, I think we continue to want to grow our local sales team and expand that at a double-digit clip this year.  *That's a fairly proven model that we are -- we feel we're pretty good at operating. We like the returns in that business.*  They tend to be *predictable over time.*

*Id.* at 9 (emphases added).

On February 27, 2017, A couple of weeks after the conference, Ms. Sullivan updated the February 2017 revenue churn rate to ██%, and forecasted it would ultimately be ██%, slightly higher than the under-██% rate in January.  Pls.' Ex. 80.  She also predicted that the loss rate for February 2017 would be ██%, slightly higher than January's ██% loss rate.  *Id.*  Ms. Sullivan also projected that "March cancels [were] set to come in high on volume basis . . . higher than Feb[uary], which was [about a] 6 month high."  *Id.*  In sum, cancellations among local advertisers were on the rise.

Again, despite negative February numbers and Ms. Sullivan's worrying projection that March might bring even more cancelations among local business, Defendants attended a second Goldman Sachs conference on March 1, 2017, during which they made optimistic statements about Yelp's local advertising prospects.  FAC ¶ 97.  When asked "about [Yelp's] main areas of investment spending," Defendant Baker responded:

> So it's really about making product and marketing investments at a heartier clip than we made them in the second half of last year.  Second half of last year, in which 50% of the revenue growth dropped down to the bottom line, gives an indication of the margin and leverage that's inherent in the business.  *But the revenue opportunity that sits out there with 3 million claimed businesses and only 140,000 paid advertisers really merits the investment activity that would – we think merits the investment activity on the product and marketing side that we're making this year.*  Little things kind of seesaw back and forth.  *Last year, there was an acceleration in revenue growth in 2016*, an acceleration in investment activity in 2017.  And I think that's all part of the long-term plan.

1   Defs.' Ex. 37 at 7–9 (emphases added).

2   F.      The January and February Churn Rate Negatively Affected Yelp's 2017 Revenue Forecast

3           On March 15, 2017, Defendants received an updated internal forecast in advance of the

4   upcoming board of directors meeting, confirming the "higher-than-expected churn" in February

5   2017 was a "key contributor[] to the $4M and $12M lower revenue forecast for the quarter and

6   year, respectively." Defs.' Ex. 19 at 4252. Indeed, Yelp had to lower its full-year internal revenue

7   forecast from $903.1 million to 891.1 million, and its EBITDA[5] forecast from $156.3 million to

8   $142.1 million, in large part due to higher-than-expected revenue churn in February 2017. *Id.*

9   The forecast was not optimistic, noting that "churn [was] higher in Feb[ruary] actuals and Mar[ch]

10   forecast] [compared to] prior [forecast] partly [because] cancel rates ha[d] really gone up," even

11   though "[e]fforts to reverse/recover cancels [were] underway and should see some results in

12   March." *Id.* at 4252. The forecast also placed "higher churn" as a high "risk" to the company's

13   revenue that "requires action to mitigate." *Id.* at 4260. This internal forecast was shared with the

14   board of directors as part of the materials distributed in advance of their regularly scheduled

15   meeting. Defs.' Exs. 20; 21.

16           Other materials presented at the board's meeting also underlined that the high churn rate

17   among local businesses in February 2017 played a big part in reducing the annual revenue

18   forecast. For example, one slide noted the "$██ reduction in bottom line is from folding in

19   $██ from the prior [forecast]" including "$██ relate[d] to higher churn in Feb[ruary]/Mar[ch]

20   extrapolated to rest of year ($██ lower Feb[ruary] rev[enue] is believed to be driven by churn as

21   attrition and production were closely in line . . .)." Defs.' Ex. 21 at 3722. The next slide

22   contained a graph showing "cancel request volume has increased" in February 2017, "elevating

23   revenue churn." *Id.* at 3723. Yet another slide showed that the trends were not good, with the

24   January 2017 ██% churn rate being slightly better than expected (██%), whereas the February

25   2017 ██% churn rate not only being higher than January's, but also *worse* than expected (██%).

26   Defs.' Ex. 21 at 3754.

27

28   _____
    [5] "EBITDA" stands for "earnings before interest, taxes, depreciation, and amortization."

United States District Court
Northern District of California

1    Later that day, Defendant Stoppelman asked Matt Halprin via email for an "analysis of

2    LCP impact on churn."  Pls.' Ex. 81.  In that email chain, Defendant Stoppelman asked Mr.

3    Halprin whether he could "get a sense for whether LCP has had a negative impact" on revenue

4    churn because "[c]hurn does seem to rise quickly around the time [Yelp] fully scaled LCP."  *Id.*

5    Tellingly, Defendant Stoppelman noted that "any insight would be appreciated" because he

6    "want[ed] to make sure [LCP is] not the smoking gun driving up churn," which was a "[h]uge

7    lever on the business that's *been going in the wrong direction for last few months.*"  *Id.* (emphasis

8    added).  In a subsequent email to Defendant Nachman about bringing back the "Down With

9    Churn" meetings, Defendant Stoppelman expressed frustration and a serious concern with Yelp's

10   inability to stem churn among local advertisers:

> By the grace of God, why don't we have a definitive smoking gun on the *churn spike over the last 4-5 [months]*?  *This is a huge problem, one which the Board double underlined for us.*

> Why do I have to be the one looping in ███████ who is at least on par with ████████ in terms of ability to contribute insight into churn and bring resources to the problem?

> If ███████ had this particular idea, how come it wasn't already in motion?  I get that ███ wants to save the day, but the simple fact is that ██ has a giant people operation to worry about (which requires a ton of change management and fixing—which ██ is aggressively tackling). But ██ doesn't have a background in analytics, data science, and experimentation . . .  which is really what we need right now.  I don't care about hurt feelings or people being left out, *all I care about is getting to the root of this problem and fixing it immediately (or mitigating to the extent possible) through any means available.*

21   Pls.' Ex. 82 at 3619 (emphases added).

22   G.    The May 9, 2017 Corrective Disclosure

23   On May 9, 2017, Yelp issued a press release announcing its financial results for the first

24   quarter of 2017 and revising the revenue guidance it had initially issued in February.  *Id.* ¶ 60.

25   The company lowered its revenue projection from a range of $880–$900 million to a range of

26   $850–865 million.  *Id.*

27   Defendants also held a conference call on the same day with investors, analysts, and the

28   public, during which each of them acknowledged that retention of local businesses did not

14

improve in the first quarter of 2017, leading to a "churn bump during January and February of the first quarter." Pls.' Ex. 13 at 7. Defendant Stoppelman admitted that "we did see a decline in retention that has impacted our outlook," and explained that "[g]iven the disproportionate impact first quarter performance has on our annual results, we've reduced our outlook for the balance of the year." *Id.* at 2. Defendant Baker stated that Yelp "experienced weaker than expected revenue retention in our local ad business in the first quarter," which was "at the upper end of the range we normally see." *Id.* at 4. Defendant Nachman added that the company was "able to tie [the retention issue] back actually to a distinct cohort of advertisers that came on Yelp about a year ago as we're making the transition from CPM to CPC." *Id.* at 6. He also noted that Yelp "put [the recovery] team in place to focus on that particular cohort and that particular profile," reporting that it had been "able to really course-correct in a pretty short period of time and [Yelp] saw progressively better results" in March and April. *Id.* at 6, 9.

Following the press release and the conference call, Yelp's stock price fell 18% from $34.70 on May 9 to $28.33 on May 10, 2017. Pls.' Ex. 2 ("Nye Report") ¶ 27.

## II.   PROCEDURAL BACKGROUND

Named Plaintiffs Roie Azar and Jonathan Davis filed the operative amended complaint on June 25, 2018, alleging Defendants made several materially false or misleading statements about the strength and viability of Yelp's local advertising program because at the time Defendants knew, but failed to disclose, that Yelp was experiencing a higher-than-anticipated "churn rate" that would disproportionately impact expected revenue in 2017. *See generally* FAC. Plaintiffs also allege that Defendants' misconduct led to a "precipitous[ ]" drop in the price of Yelp stock after the May 9, 2017 corrective disclosure, which "directly and proximately caused the economic losses suffered by Plaintiffs and the Class." *Id.* ¶¶ 103–04. They propose a class "consisting of all persons and entities that purchased or acquired Yelp's securities during the Class Period [February 10, 2017 to May 9, 2017, inclusive,] and were damaged thereby." *Id.* ¶ 145.

On November 18, 2018, the Court dismissed nine of the fourteen statements Plaintiffs alleged were false or misleading either because they were forward-looking, and therefore immunized by the Private Securities Litigation Reform Act's (PSLRA's) safe harbor provisions,

15

15 U.S.C. § 78u-5(c)(1), or because they could not constitute material omissions.  *See Azar v. Yelp, Inc.* ("*Azar I*"), No. 18-CV-00400-EMC, 2018 WL 6182756, at *7–*16 (N.D. Cal. Nov. 27, 2018).  The Court allowed the case to proceed as to only the remaining five statements discussed in more detail below.  *Id.*

On May 21, 2017, after extensive discovery, Defendants filed the instant motion for summary judgment.  Summ. J. Mot.

### III.      LEGAL STANDARD

Rule 56 provides that a "court shall grant summary judgment [to a moving party] if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  An issue of fact is genuine only if there is sufficient evidence for a reasonable jury to find for the nonmoving party.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986).  "The mere existence of a scintilla of evidence . . . will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmoving party]."  *Id.* at 252.  At the summary judgment stage, evidence must be viewed in the light most favorable to the nonmoving party and all justifiable inferences are to be drawn in the nonmovant's favor.  *See id.* at 255.  Where a defendant moves for summary judgment based on a claim for which the plaintiff bears the burden of proof, the defendant need only point to the plaintiff's failure "to make a showing sufficient to establish the existence of an element essential to [the plaintiff's] case."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

### IV.      RELEVANT STATUTORY AND REGULATORY PROVISIONS

Section 10(b) of the Securities Exchange Act makes it unlawful for any person to

> use or employ, in connection with the purchase or sale of any
> security registered on a national securities exchange or any security
> not so registered . . . any manipulative or deceptive device or
> contrivance in contravention of such rules and regulations as the
> [Securities and Exchange] Commission may prescribe as necessary
> or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j(b).

The Securities and Exchange Commission (SEC) promulgated Rule 10b-5 to implement Section 10(b) by making it unlawful

United States District Court
Northern District of California

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.

## V.      DISCUSSION

To prevail on a claim that a defendant "made material misrepresentations or omissions in violation of § 10(b) and Rule 10b-5, [plaintiffs] must prove (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37–38 (2011).  Defendants move for summary judgment only on the basis that Plaintiffs cannot raise a genuine issue of material fact as to whether Defendants (1) made material misrepresentations or omissions in their February and March 2017 statements; or (2) that they made those statements with scienter.  The Court disagrees.

A.      Material Omissions

Plaintiffs' claims are premised on alleged omissions.  *See, e.g.*, FAC ¶¶ 74, 88, 94, 98 (alleging that Defendants' statements were false or misleading because they "failed to disclose" information).  "To be actionable under the securities laws, an omission must . . . affirmatively create an impression of a state of affairs that differs in a material way from the one that actually exists." *Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002).  An omission is material when there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Basic Inc. v. Levinson*, 485 U.S. 224, 231–32 (1988).  For the following reasons, the Court concludes that there is, at the very least, a genuine issue of material fact as to whether Defendants' February 9, February 14, and March 1, 2017 statements contained

United States District Court
Northern District of California

misleading material omissions.

    1.    <u>The February 9 and 14, 2017 Statements</u>

During the February 9, 2017 conference call, someone asked Defendants "how [they] should be thinking about [the local active accounts] metric going forward." Defs.' Ex. 7 at 9. Defendant Nachman responded:

> If I were to point to a weakness and a slowness, it's potentially around kind of the local sales force in the fourth quarter, and particularly—it was *a modest slowdown* that, quite frankly, we think *the election* and a period around the election both from an output and productivity perspective from the sales force and that kind of bled into *vacation time*. It's *not something we're super concerned about* kind of coming into 2017. *We feel like the fundamentals are in place and really strong*.

*Id.* (emphases added). Another analyst asked why "local advertisers [] do not finish their relationship with Yelp." *Id.* Defendant Nachman again responded:

> Obviously, repeat rate is a mix of folks who have advertised with us in the past and *that's at an all-time high right now*, and *while we're really encouraged by our kind of strong, embedded client base and that's a really kind of healthy number to understand that those folks are coming back*. You know it's a double-edged sword because we also think that making sure that we get enough new clients into the pipeline is a really important initiative for the company. *And so we're not alarmed in any way about kind of where we are in the repeat rate side*, but you'd love to see, again, adding the number of local advertising accounts.
>
> Even if we were up in the 7,000, 8,000, 10,000 range, based on the opportunity that we actually have in this marketplace with millions of businesses that have claimed their presence on Yelp, we think we're still in the very early stages and we've got to look at both sides of the coin here, making sure that we're driving new business and *taking advantage of kind of the existing client base that has very nice trends behind it.*

*Id.* at 10–11 (emphases added).

On February 14, 2017, Defendants attended a Goldman Sachs conference where they specifically discussed Yelp's local advertising efforts. Defendant Stoppelman stated:

> I think, really, it was just about focusing on the core. And that's why the message that was delivered to the teams at the start of the year was, *'Hey, there's nothing fundamentally wrong with our business. We just need to execute even better.'* And so we really did that, and I think it paid off.

Defs.' Ex. 36. at 7–8 (emphasis added).  During that same conference, Defendant Baker responded
to a question about the importance of sales and marketing by stating:

> On the sales side, I think we continue to want to grow our local sales
> team and expand that at a double-digit clip this year.  *That's a fairly
> proven model that we are -- we feel we're pretty good at operating.
> We like the returns in that business.*  They tend to be *predictable
> over time.*

*Id.* at 9 (emphases added).

A trier of fact could reasonably conclude that these statements were misleading because
there is ample evidence in the record that Defendants made these statements knowing that Yelp
had a systemic problem with retaining local advertisers.  First, far from being "a modest
slowdown," as early as July 2016, Defendants acknowledged internally that the churn rate among
local advertisers "ha[d] been on the rise in 2016 (worsening in the [second half])," and was "above
historical levels" by the end of 2016.  Pls.' Ex. 45 at 234815.  Given this trend, on December 12,
2016, Defendant Stoppelman was so worried about churn that he told Defendant Nachman that he
needed to "make it clear" to Ms. Sullivan that "[churn was] a p0" and that "[h]er key result
need[ed] to be [reducing] churn, not . . . other things that are easier to achieve."  Pls.' Ex. 66 at
6938.  He also asked Mr. Nachman to "kick off a down with churn effort," "solicit any new ideas
that are out there that haven't been focused on," and "provide [Ms. Sullivan] more support to
make sure [her team was] doing all the right things" to reduce churn among local businesses.  *Id.*
Defendant Stoppelman later recognized, on March 15, 2017, that revenue churn was "a *huge*
problem" that had "spiked" since November 2016.  Pls.' Ex. 82 at 3619 (emphasis added).  More
importantly, although the January 2017 churn rate was slightly better than the all-time-high
November and December 2016 churn rates, Defendants knew it was very likely to increase again
in February 2017, because Ms. Sullivan's January 31 and February 1, 2017 emails warned
Defendants that Yelp would "be starting [February] with about ■% more revenue set to cancel"
than January.  *See* Pls.' Exs. 72; Defs.' Ex 18; Pls.' Ex. 73.  Ms. Sullivan's February 6, 2017
weekly update, which Defendants received three days before making the statements, also noted
that "Feb[ruary 2017] loss numbers [were] anomaly high."  Pls. Ex. 75 at 2987.  Not to mention
that the February 8, 2017 churn presentation to the board of directors—delivered *one day* before

1   the February 9 statements—also forecasted the February 2017 churn numbers would be higher

2   than in February 2016, and that "cancel requests entering February [were] at highest level *since*

3   *Jan[uary] 2016.*"  Defs.' Ex. 15 at 228947–48, 228954 (emphasis added).  There was therefore

4   little basis to characterize the dramatic decrease in retention of local businesses in the fall of 2016

5   and early 2017 as "modest."

6        Second, although there was mention at the February 8 internal churn presentation that the

7   high churn rate in the fall of 2016 was influenced by "December seasonality," there is simply no

8   evidence that the December season had anything to do with it.  Defs.' Ex. 15 at 228950.  In fact,

9   Yelp's internal charts show a stark spike in churn among local advertisers in June 2016, followed

10  by a consistent increase thereafter throughout the fall of 2016.  *See* Defs.' Ex. 17 at 4937–39.

11  More importantly, several internal communications show Defendants had been consistently

12  concerned with low retention rates of local advertisers since the summer of 2016.  By attributing

13  the increase in cancellations from local advertisers in the fourth quarter of 2016 to "the election"

14  and "vacation time," Defendants conveniently avoided telling investors what they told Yelp's

15  board as early as July 2016:  that "account churn [] remain[ed] above historical levels," that

16  "[u]nreviewed businesses [were] growing as a proportion of sales and also show[ed] a concerning

17  downward trend in retention," and that "retention for [local twelve-month] advertisers ha[d] been

18  on the decline for cohorts starting in [the second quarter of 2015]."  Pls.' Ex. 45 at 815, 820.  By

19  the time they made the February 9 and 14 statements, Defendants knew that the churn rate reached

20  "above historical levels" in the fall of 2016.  Pls.' Exs. 23; 37; 56.  Defendants also knew that this

21  trend was continuing, albeit somewhat more muted, into January and February 2017.  Similarly,

22  there is no evidence that the churn rate was tied to the election in November.  By not disclosing

23  this reality, and instead pinning the problem on the "the election" and "vacation time," Defendants

24  "affirmatively create[d] an impression of a state of affairs that differ[ed] in a material way from

25  the one that actually exist[ed]."  *Brody*, 280 F.3d at 1006.  In other words, Defendants painted the

26  churn rate problem as a one-off aberration even though they knew it rose well before the holidays

27  and the election and did not abate after the holidays.  *See* Defs.' Ex. 17 at 4937–39.

28        Third, and relatedly, on September 21, 2016. Defendants told the board of directors that

United States District Court
Northern District of California

the increased churn rate was one of the "things keeping [them] up at night."  Pls.' Ex. 49 at 273114.  Instead of admitting this to investors, Defendants told them in February 2017 that "the fundamentals are in place and really strong," they had "a strong, embedded client base . . . that has very nice trends behind it," they were not "concerned" or "alarmed in any way about" revenue churn, and "there [is] nothing fundamentally wrong with Yelp's business."  This is despite the fact that the churn rate continued to climb in October, November, and December 2016, and only slightly leveled off in January 2017.  Defs.' Ex. 17 at 4937–39.  In fact, just weeks after Defendants made these rosy statements, Defendant Stoppelman emailed Mr. Halprin on March 15, 2017, imploring him "to make sure [LCP is] not the smoking gun driving up churn," which was a "[h]uge lever on the business that's *been going in the wrong direction for [the] last few months.*"  Pls.' Ex. 81 (emphasis added).  While defendants touted to investors in February 2017 the use of a local sales team to sign up local advertisers as "a fairly proven model" that Yelp is "pretty good at operating" and tends to produce favorable returns that are "predictable over time," the reality was that Defendants knew "the churn spike [among local advertisers] over the last 4–5 months"—from November 2016 to March 2017—was "*a huge problem.*"  Pls.' Ex. 82 (emphasis added).  The churn rate among local advertisers had been so serious over this time period, in fact, that Defendant Stoppelman stated internally in that March 15 email that "all [he] care[d] about is getting to the root of this problem and fixing it immediately . . . through any means available."  *Id.* And yet on February 14—just a month earlier—he was pronouncing to investors that Yelp "execute[d] even better" with respect to local advertising and that doing so "paid off," giving the erroneous impression that the "strong growth" in the program was sustainable in spite of the high churn rate among local advertisers.

These statements ran afoul of § 10(b) because they characterize the high churn rate "as-yet unrealized risks and contingencies" that were not a cause for concern when there is plenty evidence that "some of the risks [had] already [] come to fruition."  *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982 (9th Cir. 2008).  In *Berson*, the defendant company reported backlogged work projects it had been contracted to perform but had not yet completed as a way of demonstrating to investors it had sources of future income, even though the company knew that

the projects had already been stopped and would likely be cancelled. *Id.* at 985. The Ninth

Circuit held that "[h]ad defendants released no backlog reports, their failure to mention the stop-

work orders might not have misled anyone." *Id.* at 987. "But once defendants chose to tout the

company' backlog, they were bound to do so in a manner that wouldn't mislead investors as to

what that backlog consisted of." *Id.* Likewise, when Defendants here chose to tout their local

advertising model as "fairly proven," they conveniently omitted any mention that the churn rate

among these advertisers had spiked in 2016 and continued into 2017, leading investors to believe

Yelp did not have a systemic problem retaining local advertisers, when Defendants knew

otherwise.

Accordingly, there is a genuine issue of material fact as to whether Defendants' February 9

and 14, 2017 statements "affirmatively create[d] an impression of a state of affairs that differe[d]

in a material way from the one that actually exist[ed]." *Brody*, 280 F.3d at 1006.

    2.   <u>The March 2017 Statement</u>

On March 1, 2017, Defendants attended a second Goldman Sachs conference. FAC ¶ 97.

When asked "about [Yelp's] main areas of investment spending," Defendant Baker responded:

> So it's really about making product and marketing investments at a
> heartier clip than we made them in the second half of last year.
> Second half of last year, in which 50% of the revenue growth
> dropped down to the bottom line, gives an indication of the margin
> and leverage that's inherent in the business. *But the revenue
> opportunity that sits out there with 3 million claimed businesses and
> only 140,000 paid advertisers really merits the investment activity
> that would – we think merits the investment activity on the product
> and marketing side that we're making this year.* Little things kind
> of seesaw back and forth. *Last year, there was an acceleration in
> revenue growth in 2016*, an acceleration in investment activity in
> 2017. And I think that's all part of the long-term plan.

Defs.' Ex. 37 at 7–9 (emphases added).

A trier of fact could reasonably conclude that this statement was misleading because

Defendants' extolled the "revenue opportunity" that Yelp could expect from increased local

advertising based on the touted "acceleration in revenue growth in 2016," even though there is

ample evidence Defendants knew that acceleration was a short-lived precursor to an all-time-high

churn rate among local advertisers later that year and into 2017. Indeed, as discussed above,

22

1    Defendants knew, and failed to disclose, that Yelp had a systemic problem with retaining local

2    advertisers.  This statement therefore misled investors into thinking that investing in Yelp's local

3    advertising program would lead to revenue growth based on past results, when in fact the results

4    for the past six months suggested the high churn among Yelp's local advertisers would continue to

5    be a serious issue in 2017.

6            Accordingly, there is a genuine issue of material fact as to whether Defendants' March 1,

7    2017 statements "affirmatively create[d] an impression of a state of affairs that differ[ed] in a

8    material way from the one that actually exist[ed]."  *Brody*, 280 F.3d at 1006.

9    B.    Scienter

10           In securities fraud cases, scienter is a mental state "embracing intent to deceive,

11   manipulate, or defraud."  *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n. 12 (1976).  "Plaintiffs

12   can 'establish scienter by proving either actual knowledge or recklessness.'"  *Provenz v. Miller*,

13   102 F.3d 1478, 1489 (9th Cir. 1996) (quoting *In re Software Toolworks*, 38 F.3d 1078, 1088 (9th

14   Cir. 1994)).  A party is reckless if "[they] had reasonable grounds to believe material facts existed

15   that were misstated or omitted, but nonetheless failed to obtain and disclose such facts although

16   [they] could have done so without extraordinary effort."  *Howard v. Everex Systems, Inc.*, 228

17   F.3d 1057, 1063 (9th Cir. 2000).  Importantly, "[s]cienter can be established by direct or

18   circumstantial evidence."  *Provenz*, 102 F.3d at 1490 (quoting *In re World of Wonder Secs. Litig.*

19   ("*WOW*"), 35 F.3d 1407, 1424 (9th Cir. 1994)).[6]

20           "Because the PSLRA did not alter the substantive requirements for scienter under § 10(b),

21   however, the standard on summary judgment or JMOL remains unaltered."  *Howard*, 228 F.3d at

22   1064.  "Generally, scienter should not be resolved by summary judgment . . . unless all reasonable

23   inferences that could be drawn from the evidence defeat the plaintiff's claims."  *Provenz*, 102 F.3d

24   at 1489 (quoting *Vaughn v. Teledyne, Inc.*, 628 F.2d 1214, 1220 (9th Cir. 1980)); *Howard*, 228

25

26   _____

27   [6] Plaintiffs must prove scienter as to the individual Defendants before imputing it to Yelp.  *In re
     Apple Computer, Inc.*, 127 F. App'x 296, 303 (9th Cir. 2005) ("[A] corporation is deemed to have
     the requisite scienter for fraud only if the individual corporate officer making the statement has the
28   requisite level of scienter at the time he or she makes the statement." (citing *Nordstrom, Inc. v.
     Chubb & Son, Inc.*, 54 F.3d 1424, 1435–36 (9th Cir. 1995)).

*United States District Court*
*Northern District of California*

1    F.3d at 1060 ("[M]ateriality and scienter are both fact-specific issues which should ordinarily be

2    left to the trier of fact . . . .   Summary judgment may be defeated in a securities fraud derivative

3    suit only by showing a genuine issue of fact with regard to a particular statement by the company

4    or its insiders.").   "Thus, summary judgment on the scienter issue is appropriate *only* 'where there

5    is *no rational basis in the record* for concluding that any of the challenged statements was made

6    with the requisite scienter.'"   *Provenz*, 102 F.3d at 1489 (emphasis added) (quoting *In re Software*

7    *Toolworks*, 38 F.3d at, 1088).   Conflicting inferences result in a case for the trier of fact.   *Howard*,

8    228 F.3d at 1060.

9         1.    <u>Defendants' Stock Transactions</u>

10        Defendants first argue that summary judgment on the scienter issue is appropriate because

11    Defendants Baker and Nachman made no stock trades during the relevant period and Defendant

12    Stoppelman initiated the process of amending his trading plan to sell more of his stock on

13    November 29, 2016, a couple of months *before* the first statement at issue was made.   Defs.' Ex.

14    32.   But just because Defendant Stoppelman decided to sell his stock before making the statements

15    does not mean he did not make that decision knowing Yelp's stock could suffer when the high

16    churn rate among local advertisers was revealed to investors.   *Applestein v. Medivation, Inc.*, No.

17    C-10-0998 EMC, 2011 WL 3651149, at \*7 (N.D. Cal. Aug. 18, 2011) ("[A] Rule 10b5–1 plan

18    prearranges stock transactions and provides an affirmative defense to an allegation of insider

19    trading, provided the plan is adopted in writing *prior to becoming aware of material non-public*

20    *information*." (emphasis added) (quoting *In re NutriSystem, Inc. Secs. Litig.*, 653 F. Supp. 2d 563,

21    576 (E.D. Pa. 2009)).   By November 2016 Defendant Stoppelman was well aware of Yelp's

22    systemic problem with retaining local businesses.   On his own volition, Defendant Stoppelman

23    arranged to sell his stock.   This provides some (though perhaps not as compelling as a sale of

24    shares after misleading statements are made) basis for inferring scienter; it minimized anticipated

25    personal losses.

26        In any event, "scienter can be established even if the officers who made the misleading

27    statements did not sell stock during the class period."   *No. 84 Employer-Teamster Joint Council*

28    *Pension Tr. Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 944 (9th Cir. 2003) (citing *Hanon v.*

*Dataprods. Corp.*, 976 F.2d 497, 507 (9th Cir. 1992)); *see also Matrixx*, 563 U.S. at 48 ("The absence of a motive allegation, though relevant, is not dispositive.").  Accordingly, the Court cannot conclude that Defendants acted without scienter simply because they did not sell their stock during the relevant period.

>    2.    Actual Knowledge[7]

As discussed above, there is ample evidence here that Defendants had "actual knowledge" by February 9, 2017, that Yelp had a systemic problem with retaining local advertisers.  *Provenz*, 102 F.3d at 1490.  Indeed, there are multiple internal communications that preceded the statements—including Defendants' July 2016 presentation to the board of directors, Mr. Halprin's September 7, 2016 email to Defendants, Defendant Stoppelman's December 12, 2016 email to Defendant Nachman, the January 31, 2017 email from Ms. Sullivan to Defendants, the February 1, 2017 email from Mr. Hoekstra to Defendant Nachman, the February 6, 2017 email from Ms. Dalglish, and the February 8, 2017 presentation to the board of directors—showing Defendants knew about the all-time-high churn rate among local business in the fall of 2016 that continued into January 2017.  Those internal communications also establish that Defendants knew February 2017 would likely see a positive churn rate, even higher than January's.

Moreover, Defendant Stoppelman's March 15, 2017 email to Mr. Halprin, although it came a couple of weeks after the statements, confirms Defendants were aware that revenue churn had "been going in the wrong direction *for [the] last few months*."  Pls.' Ex. 81 (emphasis added).  In another email dated March 28, 2015, Defendant Stoppelman expressed his frustration to Defendant Nachman regarding the "churn spike *over the last 4-5 months*," and reminded him that "this is a huge problem, one which the Board *double underlined for us*."  Pls.' Ex. 82. at 3619 (emphases added).  This is substantial evidence that Defendants knew there was a systemic and ongoing problem with retaining local advertisers when they made the optimistic February and March 2017 statements.

Defendants respond that they each "testified that their communications with investors were

---

[7] The Court need not address whether Defendants acted recklessly because there is more than enough evidence they had actual knowledge of Yelp's churn problem.

United States District Court
Northern District of California

1  based on their good faith and complete understanding of Yelp's business at that time."  Summ. J.

2  Mot. at 16 (citing Defs.' Ex. 11 ("Stoppelman Dep.") at 88:13–19; 89:10–24; 90:16–91:15; Defs.'

3  Ex. 10 ("Nachman Dep.") at 235:16–22; 236:25–237:15; Defs.' Ex. 25 ("Baker Dep.") at 29:17–

4  30:5).  At best, this self-serving testimony creates a genuine factual issue appropriate for a trier of

5  fact.  *Howard*, 228F.3d at 1060 ("If conflicting inferences may be drawn from the facts, the case

6  must go to the jury." (quoting *Pierce v. Multnomah Cnty.*, 76 F.3d 1032, 1037 (9th Cir. 1996));

7  *Baker v. SeaWorld Ent., Inc.*, 423 F. Supp. 3d 878, 944–45 (S.D. Cal. 2019) (denying summary

8  judgment where defendants contended they "had no knowledge of an actual material *Blackfish*

9  impact, and . . . discharged their duties in good faith reliance on the Company's disclosure

10  processes," but plaintiffs "present[ed] evidence that Defendants knew or should have known that

11  their statements were false or misleading").

12      Accordingly, there is a genuine issue of material fact as to whether Defendants had actual

13  knowledge that their February and March 2017 statements were misleading.

14  C.    Section 20(a) Claim as to Individual Defendants

15      In addition to their claims under § 10 (b), Plaintiffs allege Defendants Stoppelman,

16  Nachman, and Baker violated § 20(a) of the Securities Exchange Act in their individual capacities.

17  Section 20(a) "provides for derivative liability; that is, it 'makes certain "controlling" individuals

18  also liable for violations of section 10(b) and its underlying regulations.'"  *Westley v. Oclaro, Inc.*,

19  897 F. Supp. 2d 902, 912 (N.D. Cal. 2012) (quoting *Zucco Partners, LLC v. Digimarc Corp.*, 552

20  F.3d 981, 990 (9th Cir. 2009)).  Because summary judgment is inappropriate as to Plaintiffs' §

21  10(b) claims, it is also inappropriate as to their § 20(a) claims.

22                    **VI.    CONCLUSION**

23      For the foregoing reasons, considering all the evidence and drawing every inference in

24  Plaintiffs' favor, the Court **DENIES** Defendants' motion for summary judgment because there is a

25  genuine issue of material fact as to whether Defendants made false or misleading statements, with

26  scienter, about Yelp's local advertising business.

27  ///

28  ///

United States District Court
Northern District of California

26

The Court files this order under seal and instructs the parties to notify the Court within seven (7) days which parts of this order must remain under seal and why.  Otherwise, the Court will unseal the entire order at that time.

This order disposes of Docket No. 132.

**IT IS SO ORDERED**.

Dated: September 9, 2021

EDWARD M. CHEN
United States District Judge